1  Jeffrey B. Isaacs (SBN 117104)
   Jerome H. Friedberg (SBN 125663)
2  Adam Kargman (SBN 212109)
   **ISAACS | FRIEDBERG LLP**
3  555 South Flower Street, Suite 4250
   Los Angeles, California 90071
4  Phone:     (213) 929-5550
   Facsimile:   (213) 955-5794
5  Email:     *jisaacs@ifcounsel.com*
              *jfriedberg@ifcounsel.com*
6              *akargman@ifcounsel.com*

7  *Attorneys for Plaintiff Antwon Jones*

8

9              **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11  **ANTWON JONES,**                  Case No. 2:20-CV-11502
        an individual and California
12      taxpayer,                      **COMPLAINT FOR DAMAGES**
                                       **AND OTHER RELIEF FOR:**
13              Plaintiff,
                                       1)  **VIOLATION OF CIVIL**
14         vs.                             **RIGHTS (42 U.S.C. §1983); and**

15  **CITY OF LOS ANGELES,**           2)  **TAXPAYER ACTION IN**
        a municipal entity;                **VIOLATION OF CALIFORNIA**
16  **MICHAEL N. FEUER,**                   **CODE OF CIVIL PROCEDURE**
        in his individual and official      **SECTION 526a.**
17      capacities;
    **JAMES P. CLARK,**
18      in his individual and former official
        capacities; and               **DEMAND FOR JURY TRIAL**
19  **THOMAS H. PETERS,**
        in his individual and former official
20      capacities,

21              Defendants.

22

23

24

25

26

27

28

                            1
                       **COMPLAINT**

428224.23

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT. ............................................................8

JURISDICTION AND VENUE. ..........................................................11

THE PARTIES AND OTHER PARTICIPANTS IN THE CITY'S CONSPIRACY. ..................................................................................11

    A.    Plaintiff. .................................................................................11

    B.    Defendants. ............................................................................11

    C.    Other Participants in the Misconduct at Issue. ......................13

RELEVANT LEGAL STANDARDS GOVERNING THE CONDUCT OF CALIFORNIA LAWYERS. ..........................................................14

    A.    A Lawyer's Fiduciary Duties to His or Her Client. ...............14

    B.    A Lawyer's Legal and Ethical Duties Under the California State Bar Act. ........................................................................14

    C.    A Lawyer's Legal and Ethical Duties Under the California Rules of Professional Conduct. ..............................................15

           *1.*    *The Duty of Loyalty*.................................................15

           *2.*    *The Duty of Confidentiality.* ...................................18

           *3.*    *The Duty to Communicate.* ......................................18

           *4.*    *Rules Regarding Fee-Sharing Agreements*...............18

    D.    Rules Governing the Ability of Lawyers Licensed in Other States to Practice Law in California.........................................19

    E.    Special Rules for the Settlement of Class Action Lawsuits...............19

    F.    Rules Governing the LACAO's Retention and Supervision of Special Counsel. ....................................................................20

    G.    Statute of Limitations for Claims Against Attorneys. .........20

STATEMENT OF FACTS ...................................................................21

    A.    Background. ...........................................................................21

           *1.*    *The CISCON Contract and the Monstrous Failure of LADWP's CC&B System.* .........................................21

           *2.*    *The Filing of the Early Class Actions*......................21

428224.23

3. *Mr. Jones is Grossly Overbilled by LADWP and Complains Online.* ...................................................22

B. Events Leading Up to the Filing of the *Jones v. City* Case (December 2014 – April 2015). ...........................................23

1. *Paradis Responds to Mr. Jones and Sends Him a Retainer Agreement for PLG.* ...................................................23

2. *Paradis and Kiesel Enter into Discussions with the LACAO.* ...................................................24

3. *Paradis and Kiesel are Retained by the LACAO on Behalf of the CITY.* ...................................................26

4. *The CITY and Paradis's Two-Prong Plan to Shift Blame to PwC.* ...................................................26

5. *Paradis Sends Mr. Jones a Draft of the* Jones v. PwC *Complaint.* ...................................................28

6. *Paradis Sends the Draft* Jones v. PwC *Complaint to the LACAO.* ...................................................29

7. *The Draft Special Counsel Agreement.* ...................................................30

8. *The LACAO and LADWP Prepare for the Simultaneous Filing of the* City v. PwC *and* Jones v. PwC *Complaints.* ...........30

9. *The CITY Abandons Its Plan to File a Ratepayer Class Action Against PwC After Liner Raises Legal and Ethical Concerns.* ...................................................31

10. *Mr. Jones is Repurposed by Paradis, CLARK and PETERS to be the Plaintiff in a Class Action Against the CITY.* ...................................................32

11. *Paradis and Kiesel Bring Landskroner and Libman Aboard.* ...................................................33

12. *The LACAO, Paradis and Kiesel File the* City v. PwC *Complaint.* ...................................................34

13. *Paradis Prepares Mr. Jones's Government Claim as a Precursor to the Filing of the* Jones v. City *Case.* ...................34

14. *Paradis Introduces Mr. Jones to Landskroner and Sends Mr. Jones the* Jones v. City *Complaint for His Authorization to File.* ...................................................35

15. *Paradis and Kiesel Arrange for the Filing and Service of the* Jones v. City *Complaint.* ...................................................36

16. *Paradis and PLG Abandon Mr. Jones.* ...................................................37

3

**COMPLAINT**

C.   Events Leading Up to the Settlement of the *Jones v. City* Case (April 2015 - July 2017)......................................................38

    1.   *Landskroner's April 2, 2015 Settlement Letter to the LACAO.*......................................................................38

    2.   *Paradis and Kiesel Enter into a Formal Special Counsel Agreement with the LACAO.*................................38

    3.   *The May 22, 2015 Hearing Attended by Paradis, Landskroner, Libman and Kiesel*.................................40

    4.   *Blood's June 26, 2015 Letter to FEUER.*......................41

    5.   *The Initial Mediation Sessions*..................................41

    6.   *The First Amended* Jones v. City *Complaint.*................43

    7.   *Landskroner Sends Mr. Jones a Retainer Agreement Falsely Backdated to December 11, 2014.*................44

    8.   *LADWP Awards PLG a $1.3 Million Contract.*................44

    9.   *Judge Berle Grants Preliminary Approval of the* Jones v. City *Settlement.*........................................46

    10.   *LADWP Extends the Paradis Contract and Increases Its Total Value to Over $6 Million.*........................46

    11.   *Blood and Himmelfarb Seek Limited Discovery into the Fairness of the* Jones v. City *Settlement.*................46

    12.   *Paradis Forms Aventador*..........................................47

    13.   *Landskroner and Libman Make Materially False and Misleading Statements to Judge Berle in Support of Their Attorney's Fees Application.*..............................47

    14.   *Paradis and the LACAO Cause the Mediator to Submit a False and Misleading Declaration.*........................49

    15.   *Landskroner Causes Mr. Jones to Sign a False and Misleading Declaration.*........................................49

    16.   *LADWP Awards Aventador a $30 Million Contract.*................50

    17.   *Judge Berle Grants Final Approval of the* Jones v. City *Settlement.*........................................51

    18.   *The CITY's Payment of Over $11.7 Million in Attorney's Fees to Landskroner and Libman.*........................52

D.   The Cover Up (March 2017 - Present)................................52

    1.   *The CITY's September 2017 Revised Privilege Log*................52

**COMPLAINT**

428224.23

2.   *Paradis's False and Misleading November 15, 2017 Declaration.* ................................................53

3.   *Paradis's False and Misleading Responses to Judge Berle at the December 4, 2017 Hearing.* ....................54

4.   *PETERS's False and Misleading April 26, 2018 Declaration.* ................................................55

5.   *Tufaro's False and Misleading June 8, 2018 Declaration* ......56

6.   *PETERS's False and Misleading Testimony at His Abbreviated September 13, 2018 PMQ Deposition.* .................57

7.   *Tufaro's False and Misleading November 1, 2018 Declaration.* ................................................60

8.   *Judge Berle Orders the Depositions of Mr. Jones and Landskroner.* ......................................61

9.   *Tufaro's False and Misleading Responses to Judge Berle at the December 12, 2018 Hearing.* ...........................61

10.  *Landskroner Deliberately Absents Himself from the January 30, 2019 Status Conference.* .......................63

11.  *Mr. Jones' February 13, 2019 Deposition.* .............................63

12.  *CLARK's February 26, 2019 Deposition as the CITY's New PMQ.* ........................................64

13.  *The CITY's False and Misleading Representations in Its March 1, 2019 Brief.* ....................................67

14.  *Landskroner Asserts His Privilege Against Self-Incrimination at the March 4, 2019 Status Conference.* ..........68

15.  *Landskroner Asserts His Privilege Against Self-Incrimination at His March 5, 2019 Court-Ordered Deposition.* ................................................68

16.  *Paradis and Kiesel Resign as Special Counsel for the CITY.* ................................................70

17.  *FEUER Announces the LACAO's Retention of Ellen Pansky to Conduct an Independent Ethics Inquiry.* .................70

18.  *Landskroner Seeks to Withdraw as Class Counsel Due to a Conflict of Interest.* ....................................71

19.  *CLARK's After-the-Fact Material Changes to His February 26, 2019 Deposition Testimony.* ..........................71

20.  *Paradis Surreptitiously Transfers Ownership of Aventador to Ryan Clarke.* ....................................75

5

**COMPLAINT**

21. *Judge Berle Finds that Paradis Simultaneously Represented Adverse Parties.* .................................................. 76

22. *PETERS Resigns From the LACAO.* .......................................... 76

23. *Aventador Changes Its Name to Ardent and is Awarded a New Contract by LADWP.* .......................................... 76

24. *Paradis Asserts His Privilege Against Self-Incrimination at His April 3, 2019 Court-Ordered Deposition* ..................... 77

25. *Judge Berle Appoints Brian Kabateck and Kabateck LLP as New Class Counsel.* ............................................ 79

26. *The CITY's Withholding and Then Selective Public Disclosure of Damning Emails Received from Kiesel.* ............. 80

27. *Kiesel's May 28, 29 and 30, 2019 Deposition Sessions and Paradis's April 29, 2019 Text Message* .................... 80

28. *Judge Berle Appoints Edward Robbins, Jr. as Special Master.* ................................................................. 82

29. *Tufaro Asserts Her Privilege Against Self-Incrimination at Her July 8, 2019 Court-Ordered Deposition.* .................. 83

30. *The FBI Executes Search Warrants for the Offices of LADWP, the LACAO and Kiesel Law.* ........................... 85

31. *Mr. Jones Presents a Government Claim for Damages to the CITY.* ................................................................. 86

32. *Wright Asserts His Privilege Against Self-Incrimination at His July 23, 2019 Court-Ordered Deposition and Resigns Effective Immediately.* ...................................... 86

33. *Libman's Admissions at the July 25, 2019 Hearing.* ............... 87

34. *Judge Berle Finds that the Mediation was a "Charade."* ....... 87

35. *Judge Berle Grants PwC's Motion to Compel the CITY to Produce Relevant Documents.* ...................................... 88

36. *The CITY Denies Mr. Jones's Government Claim as Untimely.* ................................................................. 90

37. *Judge Berle Denies PLG and Paradis's Application for a Protective Order.* ............................................................ 91

38. *The CITY Dismisses Its Case Against PwC, Reciting Specious Reasons.* .......................................................... 93

39. *Judge Berle Denies PLG and Paradis's Motion for a Protective Order Regarding Communications with Landskroner.* ................................................................. 93

6

**COMPLAINT**

E.   Pansky Issues a False, Misleading and Biased Ethics Report in an Attempt to Exonerate FEUER and the LACAO. ...........................95

F.   Levine and CLARK Resign. ...........................................100

G.   Judge Berle Finds that the CITY and Its Counsel Committed a "Serious Abuse of Discovery" and Awards PwC $2.5 Million in Monetary Sanctions............................................................101

**FIRST CAUSE OF ACTION**
**(For Deprivation of Plaintiff's Constitutional Right and Privilege to Access the Courts, in Violation of Title 42, United States Code, Section 1983)**
**(Against the CITY)** ...........................................................104

A.   The Constitutional Right and Privilege to Access the Courts. .........104

B.   Mr. Jones Possessed Valuable Claims Against Paradis....................105

C.   Mr. Jones Possessed Valuable Claims Against the CITY. ...............113

D.   The Government Cover Up....................................................114

E.   Mr. Jones Has Lost His Ability to Pursue His State Causes of Action Against Paradis as a Result of the Cover Up. .......................115

F.   Mr. Jones Has Lost His Ability to Pursue His Claims Against the CITY as a Result of the Cover Up. .............................................116

G.   Mr. Jones Would Have Been Entitled to Substantial Relief Against Paradis and the CITY. ..........................................................117

H.   The CITY Deprived Mr. Jones of his Constitutional Right and Privilege to Access the Courts. ........................................................117

**SECOND CAUSE OF ACTION**
**(For Violation of California Code of Civil Procedure section 526a)**
**(Against All DEFENDANTS)** ...............................................118

**PRAYER FOR RELIEF** .........................................................120

**DEMAND FOR JURY TRIAL**...................................................122

**COMPLAINT**

428224.23

1    Plaintiff Antwon Jones alleges as follows against Defendants City of

2  Los Angeles, Michael N. Feuer, James. P. Clark and Thomas H. Peters (collectively,

3  "DEFENDANTS").

4                              **PRELIMINARY STATEMENT.**

5       1.      Antwon Jones ("Mr. Jones") was one of more than one-million utility

6  customers who were overcharged, in many instances by astounding amounts, by the

7  Los Angeles Department of Water and Power ("LADWP"), a public utility owned

8  and operated by the City of Los Angeles (the "City"), in 2014.  The erroneous

9  billing was the result of LADWP's premature and disastrous rollout of a new billing

10 system.  The City had contracted with the global consulting firm

11 PricewaterhouseCoopers LLP ("PwC") in 2013 to implement the system.

12      2.      At the time, Mr. Jones was in his early twenties and living in a small,

13 one-bedroom apartment in Van Nuys, California, without a washer, a dryer, a

14 dishwasher, or central air conditioning.  His average LADWP bill was $25 to $30

15 for a month.  In August 2014, however, he received an LADWP bill for $1,374 for

16 four months (which averaged out to more than $340 per month).

17      3.      After complaining about LADWP online, in late 2014, Mr. Jones was

18 contacted by New York attorney Paul Paradis ("Paradis") about becoming a plaintiff

19 in a class action lawsuit to be brought against the City and LADWP.  In

20 December 2014, Mr. Jones signed a retainer agreement with Paradis and his law

21 firm, Paradis Law Group PLLC ("PLG"), becoming their client.

22      4.      In March 2015, Paradis introduced Mr. Jones to Ohio attorney

23 Jack Landskroner ("Landskroner").  Paradis advised Mr. Jones that Landskroner

24 would be assisting Paradis in preparing and filing the class action.  The lawsuit,

25 *Jones v. City of Los Angeles et al.*, Los Angeles Superior Court, Case

26 No. BC577267 (the "*Jones v. City* case"), was filed in April 2015 in Los Angeles

27 Superior Court, with Mr. Jones as the plaintiff and putative class representative, and

28 Landskroner and Los Angeles lawyer Michael Libman ("Libman") as counsel of

**COMPLAINT**

1    record.

2         5.    The Court approved the settlement in the *Jones v. City* case in 2017,

3    with Landskroner and Libman receiving approximately $11.9 million in attorney's

4    fees ($10.3 million to Landskroner and $1.6 million to Libman), even though they

5    filed no motions, conducted no discovery and engaged in no litigation, and although

6    the settlement was highly advantageous to the City and not particularly favorable to

7    many members of the settling class.  Landskroner and Libman's fees were paid by

8    the City.

9         6.    As is now well established, the settlement was the product of collusion

10   and a fraud on the court involving, among others, Paradis, Landskroner, Libman and

11   a number of high-level City officials, including Los Angeles City Attorney

12   Michael Feuer ("Feuer"); his Chief Deputy, James Clark ("Clark"); the Chief of the

13   Civil Litigation Branch of the Los Angeles City Attorney's Office ("LACAO"),

14   Thomas Peters ("Peters"); and the General Manager of the LADWP, David Wright

15   ("Wright").  But because of a cover up by these individuals, the collusion and fraud

16   underlying the settlement did not come to light until 2019, when it was exposed by

17   PwC in the course of defending against a lawsuit brought by the City, *City of*

18   *Los Angeles v. Pricewaterhouse Coopers, LLP et al.*, Los Angeles Superior Court,

19   Case No. BC574690 (the "*City v. PwC*" case), relating to the implementation of the

20   new LADWP billing system.

21        7.    As part of this revelation, it also came to light that, unbeknownst to

22   Mr. Jones, at the same time he retained Paradis as his counsel to sue the City in

23   December 2014, Paradis and his co-counsel, Los Angeles attorney Paul Kiesel

24   ("Kiesel"), were hired by the City to represent it as Special Counsel in the

25   *City v. PwC* case.  Thus, during the entirety of his purported representation of

26   Mr. Jones, Paradis had a massive conflict of interest, representing a party – the City

27   – that Mr. Jones was suing and whose interests were directly adverse to his.

28   Moreover, Paradis, Kiesel, Landskroner and Libman affirmatively concealed this

9

**COMPLAINT**

1    conflict from Mr. Jones in blatant violation of their legal and ethical duties to him.

2         8.    In fact, as was later revealed, Paradis and the City had used Mr. Jones

3    as an unwitting pawn in procuring the fraudulent and collusive settlement in the

4    *Jones v. City* case, and in a related scheme by which Paradis enriched himself by

5    tens of millions of dollars in City funds.

6         9.    The City's cover up of this wrongdoing included: perjury by Clark and

7    Peters in declarations and deposition testimony; misrepresentations to the Court; the

8    suppression and destruction of evidence; violations of court orders; invalid

9    invocations of the attorney-client privilege and work-product doctrine; numerous

10   instances of discovery abuses; and using $175,000 in taxpayer funds to commission

11   the preparation of a bogus ethics report in an attempt to falsely exonerate Feuer,

12   Clark, Peters and the LACAO of their misconduct.

13        10.   As a result of the cover up, the City has deprived Mr. Jones of his

14   constitutional right to access to the courts.  In particular, because of the cover up,

15   Mr. Jones was unaware of Paradis and the City's malfeasance until after his claims

16   were barred by the statute of limitations and the Government Claims Act.  Thus,

17   because of the cover up, by the time Mr. Jones discovered that he had been used to

18   procure a collusive settlement and commit a fraud on the Court, it was too late for

19   him to exercise his right to access the courts and bring legal actions against them to

20   recover the damages and obtain the other relief to which he would otherwise have

21   been entitled.

22        11.   Mr. Jones now brings this action in his individual capacity against the

23   City to recoup the damages and other monetary relief to which he was entitled and

24   would have received but for the City's violation of his civil rights.

25        12.   Mr. Jones also brings this action as a California taxpayer, to enjoin the

26   City and Feuer from illegally expending and wasting more taxpayer funds to conceal

27   and cover up their misconduct, and to require Feuer, Clark and Peters to reimburse

28   the City for having caused it to illegally expend and waste taxpayer funds in

**COMPLAINT**

concealing and covering up their wrongdoing to protect themselves, with no benefit to the City, in violation of their legal and ethical duties as City officials and employees.

### JURISDICTION AND VENUE.

13.     This Court has subject matter jurisdiction over this matter pursuant to Title 28, United States Code, section 1331, because the matter in controversy arises under Title 42, United States Code, section 1983, thus raising federal questions. The Court also has subject matter jurisdiction under Title 28, United States Code, section 1343, because this action is brought to redress the deprivation, under color of state law, of rights secured to Plaintiff by the Constitution of the United States.

14.     This Court has subject matter jurisdiction over Plaintiff's claims arising under state law pursuant to Title 28, United States Code, section 1367, in that these claims are so related to the claims arising under federal law that they form part of the same case or controversy under Article III of the United States Constitution.

15.     Pursuant to Title 28, United States Code, section 1391(b)(1)(b)(2), venue for this matter properly lies within the Central District of California, as a substantial part of the events, acts and/or omissions giving rise to Plaintiff's claims occurred in this judicial district.

### THE PARTIES AND OTHER PARTICIPANTS
### IN THE CITY'S CONSPIRACY.

**A.     Plaintiff.**

16.     Plaintiff Antwon Jones is a resident of Los Angeles County, California. At all relevant times, Mr. Jones lived and worked in the City of Los Angeles and paid income and sales taxes.  Mr. Jones is bringing this action as an individual and in his capacity as a California taxpayer.

**B.     Defendants.**

17.     The City of Los Angeles (the "CITY") is a public entity organized and existing under the laws of the State of California.  The CITY is a "local agency"

**COMPLAINT**

428224.23

1   within the meaning of California Code of Civil Procedure section 526a(d)(1).

2        18.    Defendant Michael N. Feuer ("FEUER") is the CITY's elected City

3   Attorney, and the head attorney and policymaker in the LACAO.  At all relevant

4   times, FEUER had legal and ethical duties to act in the best interests of the CITY

5   and to avoid conflicts of interest by putting his personal interests ahead of those of

6   the CITY.  FEUER is a resident of Los Angeles County, California.  He is being

7   sued in his individual and official capacities.

8        19.    Defendant James P. Clark ("CLARK") was, until recently, the Chief

9   Deputy City Attorney of the LACAO.  At all relevant times prior to his resignation

10   from the LACAO in August 2020, he reported directly to FEUER, and the General

11   Counsel of the LADWP reported directly to CLARK.  Additionally, he had overall

12   supervisory authority for the CITY's defense in *Jones v. City* and litigation of its

13   claims in *City v. PwC*, from 2015 through at least 2019.  At all relevant times prior

14   to his resignation, CLARK had legal and ethical duties to act in the best interests of

15   the CITY and to avoid conflicts of interest by putting his personal interests ahead of

16   those of the CITY.  He is a resident of Los Angeles County, California.  CLARK is

17   being sued in his individual and official capacities.

18        20.    At all times prior to his resignation from the LACAO in March 2019,

19   Defendant Thomas H. Peters ("PETERS") was the Chief of the Civil Litigation

20   Branch of the LACAO, reporting directly to CLARK, and was responsible for

21   supervising Paradis, Kiesel and the LACAO attorneys involved in bringing and

22   litigating the *City v. PwC* case and defending and settling the *Jones v. City* case.

23   Before joining the CITY, PETERS was a partner at Kiesel Boucher & Larson, a law

24   firm that eventually became Kiesel Law LLP ("Kiesel Law").  At all times prior to

25   his resignation, PETERS had legal and ethical duties to act in the best interests of

26   the CITY and avoid conflicts of interests by putting his personal interests ahead of

27   those of the CITY.  He is a resident of Los Angeles County, California.  PETERS is

28   being sued in his individual and official capacities.

**COMPLAINT**

428224.23

**C.      Other Participants in the Misconduct at Issue.**

21.      Other participants in the misconduct at issue included:

(a)      ***The Los Angeles Department of Water and Power (the "LADWP")*** is a municipal agency of local jurisdiction of the CITY that provides water, power and sanitation services to over four million residents and businesses in Los Angeles and surrounding communities.

(b)      ***Paul O. Paradis ("Paradis")*** is a lawyer licensed to practice law in the State of New York.

(c)      ***Paradis Law Group, PLLC ("PLG")*** is Paradis's New York law firm.

(d)      ***Gina M. Tufaro ("Tufaro")*** is a lawyer licensed to practice law in the State of New York and Paradis's partner in PLG.

(e)      ***Paul Kiesel ("Kiesel")*** is a lawyer licensed to practice law in the State of California.

(f)      ***Kiesel Law LLP ("Kiesel Law")*** is Kiesel's law firm.

(g)      ***Michael J. Libman ("Libman")*** is a lawyer licensed to practice law in the State of California.

(h)      ***Richard Brown ("Brown")*** was an LACAO attorney and the General Counsel for LADWP until his retirement in 2016.

(i)      ***Richard Tom ("Tom")*** is an LACAO attorney assigned to the LADWP and the Assistant General Counsel for LADWP.

(j)      ***Eskel Solomon ("Solomon")*** is an LACAO attorney assigned to the LADWP and the head of the Civil Litigation Group within LADWP.

(k)      ***Deborah Dorny ("Dorny")*** is an LACAO attorney assigned to the LADWP.

(l)      ***Jack Landskroner ("Landskroner")*** is a lawyer licensed to practice law in the State of Ohio.

(m)      ***Landskroner Grieco Merriman, LLC ("LGM")*** was an Ohio

13

**COMPLAINT**

1  law firm of which Landskroner was the managing member.

2          (n)    ***The Law Offices of Michael J. Libman APC (the "Libman***

3  ***Firm")*** is Libman's law firm.

4          (o)    ***Aventador Utility Solutions, LLC ("Aventador")*** is a California

5  limited liability company formed in 2017 by Paradis.  ***Ardent Cyber Solutions, LLC***

6  ***("Ardent")*** was the new name given to Aventador in 2019.

7          (p)    ***Ryan D. Clarke ("Clarke")*** was the President and sole manager

8  of Aventador from March until November 2019.

9          (q)    ***David Wright ("Wright")*** was an employee of LADWP, who

10  served as the Contract Administrator and Chief Administrative Officer, the Chief

11  Operating Officer and, ultimately, the General Manager of LADWP.

12          (r)    ***Mel Levine ("Levine")*** was the President of the Board of Water

13  and Power Commissioners.

## RELEVANT LEGAL STANDARDS GOVERNING
## THE CONDUCT OF CALIFORNIA LAWYERS.

16  **A.     A Lawyer's Fiduciary Duties to His or Her Client.**

17          22.    "The relation between attorney and client is a fiduciary relation of the

18  very highest character."  *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*,

19  6 Cal. 3d 176, 189 (1971).  Attorneys owe various fiduciary and legal duties to their

20  clients, which include the duty of undivided loyalty; the duty of confidentiality; the

21  duty of full disclosure of material information; and the duty to keep clients

22  reasonably informed of significant developments in their cases.

23  **B.     A Lawyer's Legal and Ethical Duties Under the California State Bar Act.**

24          23.    The legal and ethical duties of California attorneys are further

25  delineated by the California State Bar Act, California Business and Professions

26  Code sections 6000 *et seq*., and applicable case law.

27          24.    California Business and Professions Code section 6068 states, in

28  pertinent part:

It is the duty of an attorney to do all of the following:

\* \* \*

(e)(1)  To maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client.

\* \* \*

(g)     Not to encourage either the commencement or the continuance of an action or proceeding from any corrupt motive of passion or interest.

\* \* \*

(m)    To . . . keep clients reasonably informed of significant developments in matters with regard to which the attorney has agreed to provide legal services.

Cal. Bus. & Prof. Code § 6068.

25.    The State Bar Act provides criminal penalties for any attorney who is "guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party."  Cal. Bus. & Prof. Code § 6128.

**C.     A Lawyer's Legal and Ethical Duties Under the California Rules of Professional Conduct.**

26.    In addition, the California Supreme Court has approved Rules of Professional Conduct ("Rules") that have been adopted by the State Bar of California and are binding on all members of the State Bar.  These rules impose duties that include, but are not limited to, the following:

**1.     *The Duty of Loyalty.***

27.    Former Rule 3-310, which was in effect from 1992 to November 1, 2018, provided, in pertinent part:

(B)    A member shall not accept or continue representation of a client without providing written disclosure to the client where:

(1)    The member has a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; or

(2)    The member knows or reasonably should know

15

**COMPLAINT**

428224.23

that:

       (a)    the member previously had a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; and

       (b)    the previous relationship would substantially affect the member's representation; or

       ***

       (4)    The member has or had a legal, business, financial, or professional interest in the subject matter of the representation.

(C)    A member shall not, without the informed written consent of each client:

       (1)    Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or

       (2)    Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or

       (3)    Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter.

*See also Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co.*, 6 Cal. 5th 59, 84 (2018) ("Because rule 3-310(C)(3) embodies a core aspect of the duty of loyalty, the disclosure required for informed consent to dual representation must also be measured by a standard of loyalty.  To be informed, the client's consent to dual representation must be based on disclosure of all material facts the attorney knows and can reveal.").

    28.    Effective November 1, 2018, Rule 3-310 was replaced by Rule 1.7, which states:

(a)    A lawyer shall not, without informed written consent from each client and compliance with [this rule], represent a client if the representation is directly adverse to another client in the same or a separate matter.

**COMPLAINT**

(b)   A lawyer shall not, without informed written consent from each affected client and compliance with [this rule], represent a client if there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client, a former client or a third person, or by the lawyer's own interests.

* * *

(d)   Representation is permitted under this rule only if the lawyer complies with paragraphs (a), (b), . . ., and:

   (1)   the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

   (2)   the representation is not prohibited by law; and

   (3)   the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.

29.   The official commentary to Rule 1.7 makes clear that "[t]here are some matters in which the conflicts are such that even informed written consent may not suffice to permit representation." *Id.*, 1.7, cmt. [8] (citing *Woods v. Superior Court*, 149 Cal. App. 3d 931 (1983); *Klemm v. Superior Court*, 75 Cal. App. 3d 893 (1977); *Ishmael v. Millington*, 241 Cal. App. 2d 520 (1966)).

30.   When an attorney purports to represent clients whose interests are directly adverse in the same litigation, a rule of automatic disqualification applies. *See People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1147 (1999) ("The most egregious conflict of interest is representation of clients whose interests are directly adverse in the same litigation.  Such patently improper dual representation suggests to the clients – and to the public at large – that the attorney is completely indifferent to the duty of loyalty and the duty to preserve confidences.  However, the attorney's actual intention and motives are immaterial, and the rule of automatic disqualification applies . . . .  The loyalty the attorney owes one client cannot be allowed to compromise the duty owed another.") (citations omitted).

428224.23

1    **2.      *The Duty of Confidentiality.***

2        31.     Rule 1.8.2. provides: "A lawyer shall not use a client's information

3    protected by Business and Professions Code section 6068, subdivision (e)(1) to the

4    disadvantage of the client unless the client gives informed consent . . . ."  The

5    official commentary to this Rule further explains that "[a] lawyer violates the duty

6    of loyalty by using information protected by Business and Professions Code

7    section 6068, subdivision (e)(1) to the disadvantage of a current client."  Rule 1.8.2.,

8    cmt.  (There is no corresponding rule under the former Rules.)

9        **3.      *The Duty to Communicate.***

10       32.     Former Rule 3-500, in effect from 1992 to November 1, 2018,

11   provided: "A member shall keep a client reasonably informed about significant

12   developments relating to the employment or representation . . . ."

13       33.     Current Rule 1.4 similarly provides: "(a) A lawyer shall: [¶] . . .

14   (3) keep the client reasonably informed about significant developments relating to

15   the representation . . . ."

16       **4.      *Rules Regarding Fee-Sharing Agreements.***

17       34.     Former Rule 2-200, in effect from 1992 to November 1, 2018,

18   provided: "A member shall not divide a fee for legal services with a lawyer who is

19   not a partner of, associate of, or shareholder with the member unless: [¶] (1) The

20   client has consented in writing thereto after a full disclosure has been made in

21   writing that a division of fees will be made and the terms of such division . . . ."

22   Former Rule 2-200(A)(1).  Additionally, except as otherwise permitted, "a member

23   shall not compensate, give, or promise anything of value to any lawyer for the

24   purpose of recommending or securing employment of the member or the member's

25   law firm by a client, or as a reward for having made a recommendation resulting in

26   employment of the member or the member's law firm by a client."  *Id*. 2-200(B).

27       35.     Current Rule 1.5.1. provides that "[l]awyers who are not in the same

28   law firm shall not divide a fee for legal services unless: . . . the client has consented

18

**COMPLAINT**

1  in writing, either at the time the lawyers enter into the agreement to divide the fee or

2  as soon thereafter as reasonably practicable, after a full written disclosure to the

3  client of: (i) the fact that a division of fees will be made; (ii) the identity of the

4  lawyers or law firms that are parties to the division; and (iii) the terms of the

5  division . . . ."  Additionally, a lawyer generally "shall not compensate, promise or

6  give anything of value to a person for the purpose of recommending or securing the

7  services of the lawyer or the lawyer's law firm."  Rule 7.2(b).

8  **D.     Rules Governing the Ability of Lawyers Licensed in Other States to**

9  **         Practice Law in California.**

10     36.     A lawyer who is licensed in another state, but not in California, who

11 has been retained to appear in a case pending in California state court, must apply to

12 appear *pro hac vice*.  *See* Cal. Rule of Court 9.40.

13     37.     "A person permitted to appear as counsel *pro hac vice* . . . is subject to

14 the jurisdiction of the courts of [California] with respect to the law of [California]

15 governing the conduct of attorneys to the same extent as a licensee of the State Bar

16 of California.  The counsel *pro hac vice* must familiarize himself or herself and

17 comply with the standards of professional conduct required of licensees of the State

18 Bar of California and will be subject to the disciplinary jurisdiction of the State Bar

19 with respect to any of his or her acts occurring in the course of such appearance."

20 *Id.*, 9.40(f).

21 **E.     Special Rules for the Settlement of Class Action Lawsuits.**

22     38.     Both former Rule 3-510 and current Rule 1.4.1 provide that a lawyer

23 "shall promptly" communicate to the lawyer's client "[a]ll amounts, terms, and

24 conditions of any written offer of settlement made to the client."

25     39.     Settlement of a class action must be fair, adequate and reasonable, and

26 requires court approval.  *See Dunk v. Ford Motor Co.*, 48 Cal. App. 4th 1794, 1800-

27 01 (1996); Cal. Rule of Court 3.769(a).

28 / / /

1   **F.   Rules Governing the LACAO's Retention and Supervision of**
2   **Special Counsel.**

3       40.   When public entities engage private counsel under contingency fee
4   arrangements, "all critical discretionary decisions ultimately must be made by the
5   public entities' government attorneys rather than by private counsel – in other
6   words, neutral government attorneys must retain and exercise . . . requisite control
7   and supervision over both the conduct of private attorneys and the overall
8   prosecution of the case." *County of Santa Clara v. Super. Ct. (Atlantic Richfield*
9   *Company et al.)*, 50 Cal. 4th 35, 61-62 (2010).

10      41.   The California Supreme Court has set forth a non-exhaustive list of
11  provisions that "comprise the minimum requirements for a retention agreement
12  between a public entity and private counsel adequate to ensure that critical
13  governmental authority is not improperly delegated to an attorney possessing a
14  personal pecuniary interest in the case," and include: (a) "decisions regarding
15  settlement of the case [must be] reserved exclusively to the discretion of the public
16  entity's own attorneys"; (b) "the public-entity attorney [must] retain complete
17  control over the course and conduct of the case"; (c) "the government attorneys
18  [must] retain a veto power over any decisions made by outside counsel"; and (d) "a
19  government attorney with supervisory authority must be personally involved in
20  overseeing the litigation." *Id*. at 63-64.

21  **G.   Statute of Limitations for Claims Against Attorneys.**

22      42.   Under California Code of Civil Procedure section 340.6, "[a]n action
23  against an attorney for a wrongful act or omission, other than for actual fraud,
24  arising in the performance of professional services shall be commenced within one
25  year after the plaintiff discovers, or through the use of reasonable diligence should
26  have discovered, the facts constituting the wrongful act or omission, or four years
27  from the date of the wrongful act or omission, whichever occurs first."

28      43.   The one-year statute of limitations applies to any claim whose merits

necessarily depend on proof that an attorney violated a professional obligation in the course of providing professional services.  *See Lee v. Hanley*, 61 Cal. 4th 1225, 1236-39 (2015).

## STATEMENT OF FACTS.

A.     **Background.**

      *1.    The CISCON Contract and the Monstrous Failure of LADWP's CC&B System.*

      44.     In or about July 2010, in an effort to modernize its customer information and billing system, LADWP entered into a professional services agreement (the "CISCON Contract") with PwC for implementation of the CC&B System.

      45.     On or about September 3, 2013, LADWP decided to "go live" with the CC&B System before it was operationally ready.  As a result, millions of LADWP ratepayers were overbilled and assessed inaccurate late-payment charges, had refunds withheld and were not credited with solar-energy surpluses.  Adding to ratepayers' frustrations, LADWP demanded full payment from customers with threats of disconnection if they failed to pay, though LADWP knew full well of the billing errors.

      *2.    The Filing of the Early Class Actions.*

      46.     Due to LADWP's failure to resolve ratepayer complaints and ongoing issues with the CC&B System implementation, four class actions were filed against the CITY in 2014 and early 2015:

- *Kimhi v. The City of Los Angeles*, Los Angeles Superior Court Case No. BC536272, filed February 13, 2014 (the "*Kimhi* Class Action");

- *Bransford v. City of Los Angeles*, Los Angeles Superior Court Case No. BC565618, filed December 4, 2014 (the "*Bransford* Class Action");

- *Morski v. City of Los Angeles*, Los Angeles Superior Court Case No. BC568722, filed January 7, 2015 (the "*Morski* Class Action"); and

21

**COMPLAINT**

- *Fontaine v. City of Los Angeles*, Los Angeles Superior Court Case No. BC571664, filed February 5, 2015 (the "*Fontaine* Class Action").

The *Kimhi*, *Bransford*, *Morski* and *Fontaine* Class Actions are collectively referred to herein as the "Early Class Actions."

47.     With the CITY facing tremendous political pressure and horrendous publicity, the LACAO was tasked with working with LADWP to find a solution to the hundred-million-dollar debacle and forestall additional lawsuits, which it knew could result in enormous liability to the CITY.

48.     To defend LADWP against the Early Class Actions, the LACAO retained the law firm of Liner LLP ("Liner") as outside counsel for LADWP. Angela Agrusa ("Agrusa"), a senior Liner partner and experienced class-action litigator, served as lead counsel.  She was assisted by Maribeth Annaguey ("Annaguey"), a junior Liner partner.

49.     CLARK had overall supervisory authority and strategic responsibility for the CITY's defense of the Early Class Actions.  As head of the Civil Litigation Group within LADWP, Solomon was also heavily involved in planning and executing LADWP's defense.

### 3.    *Mr. Jones is Grossly Overbilled by LADWP and Complains Online.*

50.     Mr. Jones was one of more than one million ratepayers who was grossly overcharged for LADWP services as a result of the CC&B System failure. In August 2014, he received an LADWP bill in the amount of $1,374 for four months service, although he was living in a small apartment in Van Nuys, paying $25 to $30 per month for electricity.  Thus, the bill he received was an astounding 46 to 55 times more than average.

51.     Mr. Jones complained about the overcharges on several websites, one of which he believed was affiliated with a governmental agency.  In registering his online complaint, he checked a box indicating that he wanted to be contacted by an attorney about filing a lawsuit against LADWP.

**B.     Events Leading Up to the Filing of the *Jones v. City* Case (December 2014 – April 2015).**

*1.     Paradis Responds to Mr. Jones and Sends Him a Retainer Agreement for PLG.*

52.     In early December 2014, Paradis contacted Mr. Jones online in response to his online complaint.  On December 9, 2014, Paradis sent Mr. Jones an email with the subject line "LADWP Litigation," which attached a boilerplate PLG retainer agreement.  The agreement included the following provisions:

(a)     "*This letter will serve to confirm that, on December 9, 2014, you retained [PLG] to represent you as a named plaintiff and putative class representative in a class action lawsuit against PriceWaterHouse Coopers, LLP ('PwC') and other defendants, if necessary, to recover damage you incurred as a result of having been billed, and paid for, electricity in excess of the amount of electricity that you actually utilized as a customer of the Los Angeles Department of Water and Power.*"

(b)     "*Mr. Jones has authorized the Firm to associate counsel of its choice in the prosecution of this action, and has further authorized and empowered the Firm's attorneys to act on behalf of Mr. Jones and the Class in connection with the prosecution of this action to settlement or final judgment, and to take all actions reasonably necessary to prosecute this action.*"

(c)     "*Mr. Jones will be informed of all important developments in the case.*"

53.     Mr. Jones told Paradis that he wanted to bring an action against LADWP, and that was always his intention.  Although the retainer agreement referred to a class action against PwC and "*other defendants*," Mr. Jones's understanding was that PLG would be representing him in connection with an action against LADWP.

54.     The next day, December 10, 2014, Paradis emailed Mr. Jones "*to

23

**COMPLAINT**

*confirm that you received the Retainer Letter that I sent you*," and wanting to know "*when I can expect to receive the signed retainer letter from you because I need it in order to move forward as we discussed.*"  Paradis also stated that "*we estimate that there will be somewhere between 75,000 to 100,000 other people with you in the class.*"

55.    Mr. Jones executed the retainer agreement and returned it to Paradis on or about December 11, 2014.

> ### 2.    *Paradis and Kiesel Enter into Discussions with the LACAO.*

56.    Around the same time Paradis was soliciting Mr. Jones as a client, Kiesel introduced PETERS – who was Kiesel's former law partner – to Paradis.

57.    On or about December 11, 2014, Paradis emailed PETERS, copying Kiesel and Tufaro, confirming a meeting for the next week.  Paradis stated: *"Thank you for taking the time to meet with us next Tuesday morning, we look forward to seeing you.  As I am sure [Kiesel] mentioned, we are investigating issues arising from the selection and installation of a new Customer Care & Billing ('CC&B') software package for the LADWP and look forward to discussing our finding with you."*

58.    That same day, PETERS emailed CLARK to inform him that he would be meeting with Kiesel and "*a lawyer from New York,*" to discuss "*whether [LADWP] has a case concerning some technology they purchased which doesn't do what it is supposed to do.*"

59.    On or about December 16, 2014, Paradis traveled from New York to Los Angeles to meet with PETERS and Kiesel at the LACAO about a plan for the CITY to shift the blame for the CC&B fiasco from LADWP to PwC.  PETERS provided Paradis and Kiesel with non-public LADWP documents labeled as "Privileged and Confidential" so that Paradis could begin drafting a complaint against PwC on behalf of the CITY.

60.    The next day, December 17, 2014, Paradis emailed PETERS, "*Thank*

**COMPLAINT**

*you for taking the time to meet with us yesterday.  As promised, we are already hard at work on preparing the Draft Complaint you requested,*" and asking for documents to aid in the drafting of the complaint.

61.    That same day, December 17, 2014, PETERS emailed Brown, regarding a *"[p]ossible plaintiff's case for DWP,"* stating, "*I met with some lawyers who believe DWP may have a case against Price Waterhouse Coopers [sic] related to the Customer Care & Billing software that has been problematic.  I'd like your take on their ideas."*

62.    Also that same day, PETERS emailed Tom, copying Brown and Dirk Broersma, another Deputy City Attorney assigned to LADWP, stating: "*It was great talking with you guys. . . .  As I mentioned, the potential plaintiff's attorney sent the following request, and I'd like to accommodate him as much as possible.*"  PETERS forwarded Paradis's email from earlier that day.

63.    On December 18, 2014, Paradis emailed Mr. Jones that PLG had "*completed a significant portion of our pre-filing investigation and obtained a number of non-public documents that provide strong evidence in support of the claims we are alleging,*" concealing that he had received those documents from PETERS for purposes of drafting the CITY's complaint.  He added: "*We are also almost finished drafting the Complaint that will be filed . . . .  I think you will be impressed with the evidence we have uncovered when you read a draft of the Complaint.*"  Paradis concealed from Mr. Jones that the "*non-public documents*" had been provided by the CITY, as well as his discussions with the LACAO and LADWP.

64.    On December 24, 2014, Paradis emailed PETERS that:

> *The good news is that the Appendices that you provided are a treasure trove of useful information and are providing great factual specificity that we are incorporating in the draft Complaint.  The bad news is that because of the length (one Appendix alone is over 4,000 pages) and complexity of the Appendices, we are slightly behind where I*

1    *anticipated being at this point . . . .*

2

3    65.     PETERS responded the same day, stating that "*there is no need to*

4    *continue to work at the pace you suggest*" because "*Mike Feuer, who will obviously*

5    *need to approve this suit, is out until January 5.*"

6    **3.     Paradis and Kiesel are Retained by the LACAO on**

7    **Behalf of the CITY.**

8    66.     On or before January 1, 2015, the LACAO retained PLG and

9    Kiesel Law to serve as Special Counsel for the CITY on a contingency fee basis.

10   Thus, as of that date, Paradis and PLG were representing Mr. Jones in his billing

11   grievance against the CITY, while, **at the same time**, serving as Special Counsel for

12   the CITY.  Plaintiff is informed and believes, and on that basis alleges, that CLARK

13   and PETERS knew that Paradis, Kiesel and their respective firms also represented a

14   ratepayer, Mr. Jones.

15   67.     Paradis never disclosed to Mr. Jones that he had been retained by the

16   CITY or that he was representing the CITY at the same time that he was

17   representing Mr. Jones.  In fact, Mr. Jones remained unaware of Paradis's

18   simultaneous representation of him and the CITY until 2019.

19   **4.     The CITY and Paradis's Two-Prong Plan to Shift Blame to PwC.**

20   68.     On or about January 5, 2015, Paradis emailed PETERS a draft

21   complaint styled *City of Los Angeles v. Pricewaterhouse Coopers, et al.* ("*City v.*

22   *PwC*").  Paradis wrote PETERS that he looked "*forward to discussing this matter in*

23   *detail in the near future*" and that "*there are a number of contractual provisions that*

24   *could impact strategy that will need to be discussed in detail before any action is*

25   *taken.*"

26   69.     Between on or about January 5 and January 13, 2015, the LACAO,

27   LADWP, Paradis and Kiesel met and concocted the following two-prong plan to

28   shift blame for the disastrous CC&B rollout from LADWP to PwC:  First, the CITY

**COMPLAINT**

would file the *City v. PwC* action.  Second, after it did that, Paradis and Kiesel would use Mr. Jones to file a consumer class action against PwC ("*Jones v. PwC*"), while enlisting plaintiffs' counsel in the *Bransford* and *Morski* Class Actions to dismiss those suits and instead become co-counsel with Paradis and Kiesel in the *Jones v. PwC* lawsuit.

70.     Between on or about January 5 and January 13, 2015, the LACAO again met with Paradis and Kiesel to further strategize on how to shift the blame for the failed CC&B System from LADWP to PwC.  This meeting was attended by CLARK, PETERS, Paradis, Kiesel and other high-ranking officials from the LACAO.  Notably, Liner was not invited to this meeting, although they were counsel of record for the CITY in the pending class actions.  Plaintiff is informed and believes, and on that basis alleges, that FEUER, Tom, Brown and Solomon also participated in discussions involving the two-prong plan.

71.     In mid- to late-January 2015, Paradis, with the help of Kiesel, convinced Timothy Blood ("Blood"), plaintiffs' counsel in the *Bransford* Class Action, and Alan Himmelfarb ("Himmelfarb"), plaintiffs' counsel in the *Morski* Class Action, to dismiss those lawsuits without prejudice, in exchange for a tolling agreement and the opportunity to become co-counsel in *Jones v. PwC*.

72.     On or about January 13, 2015, Paradis sent Blood and his partner, Leslie Hurst ("Hurst"), a draft Confidential Tolling Agreement.  The next day, Paradis sent the draft Tolling Agreement to PETERS, noting that it had been *"approved by Plaintiff's Counsel."*  Paradis extolled that, *"[w]hen executed, this Tolling Agreement will accomplish the immediate dismissal of the [Bransford] Action at absolutely no cost to the City."*

73.     On or about January 24, 2015, Kiesel emailed CLARK, asking "*if we have a greenlight to reach out to Blood and let him know that the 'tolling' agreement is going to be forwarded for his execution.*"  CLARK responded on or about January 26, 2015, that he had been "*working on this all weekend,*" and that he

1   hadn't "*been able to connect with Mel [Levine]*."  CLARK went on to say, "*I am*

2   *100% sure that he'll be fine with it – and Mike [FEUER] is completely on board –*

3   *but I just want Mel's sign off*."

4       74.   Later that same day, Paradis emailed Blood and Hurst, "*I am happy to*

5   *report that the City just informed us that they are signing off on the draft of the*

6   *Confidential Tolling Agreement that we provided*," and attached it for their

7   signature.  Hurst returned it the same day.

8       75.   All of these machinations were concealed from Mr. Jones.

9       **5.   *Paradis Sends Mr. Jones a Draft of the* Jones v. PwC *Complaint.***

10      76.   Shortly after retaining Paradis, Paradis proposed to Mr. Jones that he

11  first sue PwC before bringing an action against the CITY.

12      77.   On or about January 9, 2015, Paradis sent Mr. Jones a draft class action

13  complaint styled, *Antwon Jones v. PricewaterhouseCoopers, LLP* ("*Jones v. PwC*"),

14  which Paradis had prepared using the confidential and proprietary information the

15  CITY had provided to him.  In his email transmitting the complaint, which copied

16  Tufaro, Paradis asked Mr. Jones to *"[p]lease review it and confirm that we are*

17  *authorized to file it on your behalf . . . .  Once we have filed it, I will send you a file*

18  *stamped copied for your records*."

19      78.   The draft *Jones v. PwC* complaint asserted a single cause of action

20  against PwC for tortious interference with contract, and listed Paradis, Tufaro and

21  Kiesel, and their respective law firms, PLG and Kiesel Law, as counsel for

22  Mr. Jones.  Plaintiff is informed and believes, and on that basis alleges, that Paradis

23  actually drafted the *Jones v. PwC* complaint on behalf of the CITY, and not for the

24  benefit of Mr. Jones.

25      79.   Mr. Jones never specifically authorized Paradis to associate Kiesel or

26  Kiesel Law to be his counsel; nor did Paradis advise Mr. Jones that he had

27  associated Kiesel as Mr. Jones's counsel.

28      80.   On or about January 11, 2015, Mr. Jones authorized Paradis to file

*Jones v. PwC*.  But because the CITY's plan changed (as described further below), the *Jones v. PwC* complaint was never filed.  Mr. Jones, however, was not aware at the time that the complaint had not been filed.

> **6.**      ***Paradis Sends the Draft* Jones v. PwC *Complaint to the LACAO.***

81.      On or about January 23, 2015, Paradis, without Mr. Jones's authorization or knowledge, emailed another version of the draft *Jones v. PwC* complaint to LACAO attorneys Tom, Solomon and Dorny.  Like the version Paradis had sent to Mr. Jones, this draft listed Paradis, Tufaro and Kiesel, and their respective law firms, as Mr. Jones's counsel.  It also contained spaces for other counsel to be listed.  The 82 substantive paragraphs of that complaint were identical to the version sent to Mr. Jones.

82.      In his cover email to the LACAO attorneys, Paradis stated: "*Thank you for the opportunity to discuss this matter earlier this afternoon.  Attached please find the current confidential draft of the Consumer Class Action Complaint that we talked about.  I look forward to meeting with LADWP people you mentioned in order to further hone our allegations as we continue our investigation.*"

83.      Solomon promptly forwarded the draft *Jones v. PwC* complaint to other LACAO attorneys and LADWP staff members, including LADWP's General Counsel, Brown.  In his email, Solomon stated: "*In anticipation of the meeting we need to hold next week attached please find a second draft lawsuit which I ask you review for accuracy and comment.  This draft lawsuit and the earlier one sent to your attention will be discussed during the meeting.*"

84.      Earlier that day, Solomon had sent the draft *City v. PwC* complaint to the same individuals, stating: "*There has been a significant positive development in the class action billing case(s) which requires your attendance next week at a meeting . . . .  Attached you will find a draft lawsuit you are not to discuss with anyone and that will be the subject of the meeting.  The attorney who drafted the lawsuit will attend the meeting and want your advice and input regarding the*

29
**COMPLAINT**

1   *accuracy of the complaint."*

2       85.    LADWP staff met with Paradis multiple times, including on or about

3   January 27, 2015.  Plaintiff is informed and believes, and on that basis alleges, that

4   the purpose of these meetings was for the LADWP to provide confidential and

5   proprietary information to Paradis for use in one or both draft complaints.

6       86.    In fact, Tom stated in a January 26, 2017 email to CLARK, PETERS,

7   Solomon, Brown and others that the January 27, 2015 meeting was *"intended to*

8   *make LADWP internal staff available to Paul Paradis and Paul Kiesel for purposes*

9   *of vetting the draft* [City v. PwC and Jones v. PwC] *complaints."*

10      87.    At all times, Paradis, Tufaro and PLG concealed the sending of the

11  draft *Jones v. PwC* complaint to the LACAO, and their meetings with the LACAO

12  attorneys about it, from Mr. Jones.

13          **7.    The Draft Special Counsel Agreement.**

14      88.    On or about February 2, 2015, Kiesel emailed PETERS a draft

15  Engagement and Contingency Fee Agreement (the "Special Counsel Agreement")

16  for PLG and Kiesel Law, which designated Paradis and Kiesel as the principal

17  attorneys that would be assisting the CITY.  The draft, which stated it was "made on

18  February __, 2015," recited, in part, that:

19          *[T]he City . . . is aware that special counsel has been retained*
            *to represent a putative class in an action that will be captioned*
20          *Jones v. PricewaterhouseCoopers LLP (the Jones action) and hereby*
            *provides special counsel with approval to proceed with the filing and*
21          *litigation of the Jones action.*

22      89.    Subsequently, on or about March 12, 2015, Tom revised the draft

23  Special Counsel Agreement and deleted this language in its entirety.

24          **8.    The LACAO and LADWP Prepare for the Simultaneous**

25              **Filing of the City v. PwC and Jones v. PwC Complaints.**

26      90.    On or about February 2, 2015, Kiesel emailed PETERS a proposed

27  timeline that contemplated filing both the *City v. PwC* and *Jones v. City* complaints

28  on February 11, 2015, followed by press conferences.  The email provided:

428224.23

*February 2, 2015 City to receive draft pleading City of Los Angeles v. PWC;*

*February 6, 2015 Meeting **with Mike**, Jim, Thomas and the Pauls.*

*February 10, 2015 make sure the complaint is finalized and ready for filing on the 11th.*

*February 11, 2015 File City complaint and hold press conference announcing the filing of this action.*

*February 11, 2915 [sic] Consumer case v. PWC can be filed on the same day, though after City action filed, and a "joint" press conference is conducted at City Hall.*

(Emphasis added.)

91.     Plaintiff is informed and believes, and on that basis alleges, that the plan was to file the *City v. PwC* and *Jones v. PwC* actions on the heels of the anticipated dismissal of the *Bransford* and *Morski* Class Actions, and *"train all guns on PwC at the same time."*

### 9. The CITY Abandons Its Plan to File a Ratepayer Class Action Against PwC After Liner Raises Legal and Ethical Concerns.

92.     On or about February 17, 2015, Liner attorneys Agrusa and Annaguay sent a memorandum to the LACAO raising concerns about the fact that Paradis and Kiesel were intending to file a consumer class action against PwC while also representing LADWP.  Plaintiff is informed and believes, and on that basis alleges, that Liner had first learned of these plans at a meeting with LADWP representatives only a week before.

93.     Liner's memorandum noted, among other things, that: (a) there were *"potential conflict issues,"* which could result in PLG, Kiesel Law and Blood's firm *"being disqualified"* and *"any settlement or other dispositive result being distributed or overturned"*; (b) *"[t]he plaintiffs in the PWC [Class] Suit, represented by [PLG and Kiesel Law], will likely by necessity take contrary positions regarding class certification"*; (c) allegations of *"tortious interference with contracts between the DWP and its customers . . . may directly contradict or limit the DWP's defenses to*

**COMPLAINT**

428224.23

*the contract claims in the state court class actions*"; and (d) "*PWC will undoubtedly seek to join (and cross-claim against) [LADWP] in the PWC Class Suit*," which will result in LADWP "*defending itself in yet another consumer class action, this time with another party (PWC) and their counsel involved*."

94.     On or about February 19, 2015, Annaguay emailed Solomon, warning of additional issues that could arise should PLG and Kiesel Law be required to defend LADWP, if LADWP were joined as a cross-defendant in a consumer class action against PwC, including, among other things, that "*the lawyers' defense of [LADWP] in the consumer class action against PwC would likely pose a significant conflict of interest with . . . the consumer class*"; the lawyers would be "*unlikely to be able to get a 'conflict waiver' from the consumer class*"; there were "*practical complications*" of LADWP being "*represented by the same lawyers who are contending that a consumer class exists and is ascertainable*"; and "*any potential settlement or resolution of the consumer case against PwC may be challenged because of a perceived conflict . . . .*"

95.     Around this same time, Himmelfarb was becoming distrustful of Paradis, who was refusing to disclose the identity of the proposed ratepayer plaintiff (Mr. Jones) in the planned class action against PwC.  Ultimately, these concerns led Himmelfarb to back out of the agreement to dismiss the *Morski* Class Action.

96.     As a result of these developments, the CITY decided against having Paradis and Kiesel file the *Jones v. PwC* complaint.

**10.     *Mr. Jones is Repurposed by Paradis, CLARK and PETERS to be the Plaintiff in a Class Action Against the CITY.***

97.     After the decision to file *Jones v. PwC* was abandoned, Plaintiff is informed and believes, and on that basis alleges, that the CITY and Paradis's focus changed to using Mr. Jones to file a ratepayer class action ***against the CITY***, to then settle that suit with a CITY-friendly counsel representing Mr. Jones and the putative class, and use that settlement to obtain a full and complete release of all pending

32

**COMPLAINT**

class action claims against the CITY, insulating the CITY against all other such claims.  Plaintiff is further informed and believes, and on that basis alleges, that after *Jones v. City* was settled, the CITY planned to seek to recoup the costs of the settlement from PwC as damages.

98.    In a meeting with CLARK in or about February 2015, PETERS, Kiesel and Paradis discussed repurposing Mr. Jones by revising the draft *Jones v. PwC* complaint into what would become the *Jones v. City* complaint.

99.    At the time, the CITY approved the plan.  It provided Paradis with copies of the complaints in the Early Class Actions so that he could draft a single comprehensive lawsuit that included the causes of action alleged in the Early Class Actions.

100.   At all times, Paradis, Tufaro and PLG concealed these discussions with the LACAO attorneys, and the plan to repurpose Mr. Jones, from Mr. Jones.

### 11.    *Paradis and Kiesel Bring Landskroner and Libman Aboard.*

101.   Because Paradis and Kiesel were to serve as counsel of record for the CITY in the *City v. PwC* case, they could not appear as counsel of record for Mr. Jones in the *Jones v. City* case.  To address this problem, Paradis recruited Landskroner to file *Jones v. City* and represent Mr. Jones and the putative class in that case, and Kiesel recruited Libman to serve as local counsel.  Plaintiff is informed and believes, and on that basis alleges, that Landskroner and Libman were brought in with the CITY's knowledge and at its direction.

102.   During March 2015, Paradis revised the *Jones v. PwC* complaint, converting it into the *Jones v. City* complaint.  Plaintiff is informed and believes, and on that basis alleges, that Paradis lifted language from the former to include in the latter.

103.   On or about March 3, 2015, Kiesel emailed Libman, copying Paradis, about the *Jones v. City* complaint as follows:

> *We are preparing the complaint for your review.*  **Can you send me**

*your State Bar number for inclusion in the draft complaint?  [¶]  I am including **Paul Paradis, my cocounsel, who is drafting this complaint.***

(Emphasis added.)  In response, Libman emailed Kiesel, copying Paradis, with his state bar number.  Paradis responded: *"Thank you."*

104.   Plaintiff is informed and believes, and on that basis alleges, that Paradis drafted the *Jones v. City* complaint on behalf of the CITY, and not for the benefit of Mr. Jones.

### 12.   The LACAO, Paradis and Kiesel File the City v. PwC Complaint.

105.   On or about March 6, 2015, the CITY filed the *City v. PwC* complaint, alleging causes of action for fraudulent inducement and breach of contract.  The complaint listed Kiesel and Kiesel Law, along with FEUER, CLARK, PETERS, Tom and Solomon of the LACAO, as counsel for the CITY, acting by and through LADWP.  Paradis was not listed.

### 13.   Paradis Prepares Mr. Jones's Government Claim as a Precursor to the Filing of the Jones v. City Case.

106.   Under the California Government Claims Act, prior to filing suit against a public entity, a plaintiff must first present a timely written claim to the public entity.

107.   On or about March 24, 2015, Paradis emailed Kiesel a Notice of Claim ("Notice") letter to the CITY on behalf of Mr. Jones, which Paradis had drafted. The Notice set forth the grounds for Mr. Jones's claims against the CITY and LADWP.  In his email to Kiesel, Paradis wrote:

> *The letter we discussed is attached.  If you do not have any edits, please send it to Michael [Libman], have him put it on his letterhead and sign it and then send it back to me so that I can send it to Jack Landskroner for his signature.  Once it has been signed by both Michael and Jack Landskroner, I will have Jack serve it tomorrow.*

/ / /

108.   On or about March 25, 2015, Kiesel forwarded Paradis's email to Libman, attaching the Notice.  The opening paragraph of the letter drafted by Paradis stated, "*I write on behalf of my client, Mr. Antwon Jones . . . .*"

109.   That same day, in an email with the subject line "New Matter," Paradis told Landskroner to "*[p]lease expect an email of a PDF letter from your co-counsel, Michael Libman, tonight.  Please let me know when you get it so I can give you instructions on next steps.*"

110.   In a follow-up email sent a short time later, Paradis commented to Landskroner: "*Just FYI – between us – this guy Libman takes 3 days to do anything – **so I want to run this show through your shop to move things along**.*" (Emphasis added.)

### 14.   *Paradis Introduces Mr. Jones to Landskroner and Sends Mr. Jones the* **Jones v. City** *Complaint for His Authorization to File.*

111.   On or about March 26, 2015, Paradis introduced Mr. Jones via email to Landskroner and LGM as "*one of the other attorneys who will be working on the case.*"  Paradis told Mr. Jones that Landskroner had been involved in a similar dispute against PwC in Ohio, which Plaintiffs are informed and believe, and on that basis allege, was false.

112.   On or about March 29, 2015, Paradis emailed the *Jones v. City* class action complaint to Mr. Jones, copying Landskroner.  It alleged 13 causes of action, including fraud and deceit, negligent misrepresentation, breach of contract and unfair competition.  It had been drafted by Paradis to encompass all of the claims in the Early Class Actions so it could be used to settle those claims on terms favorable to the CITY.

113.   In his cover email to Mr. Jones, Paradis stated: "*[A]ttached is another complaint for you to review and approve for filing.  You will notice that this one has many more claims than the initial complaint that you approved - the reason for this is that this complaint details the numerous problems that we have uncovered to date*

*as a result of our ongoing investigation.  This most recent complaint will be used to provide the framework for the settlement structure that will be proposed to the LADWP just as soon as the Complaint is filed."*

114.   Paradis further falsely represented to Mr. Jones that he ***and*** Landskroner would work together to move the case forward:  *"I have asked Jack to help out on this matter because of his expertise involving other settlements in complex matters such as this one and you will be hearing directly from both him and me as we move forward."*

115.   Mr. Jones approved of the filing of the *Jones v. City* complaint, believing, based on Paradis's false representations, that Paradis would be filing it ***with*** Landskroner.

**15.   *Paradis and Kiesel Arrange for the Filing and Service of the Jones v. City Complaint.***

116.   On or about March 31, 2015, Libman emailed Kiesel: "*I got the draft complaint from Jack Landskroner.  He is asking me to file it.  costs?*"  Kiesel responded: "*Let's discuss the complaint.  Would like to get it on file today.  Happy to reimburse your cost.*"

117.   No one informed Mr. Jones that he was also being represented by Libman, whom, to date, he has never met, spoken with, entered into a retainer agreement with, or authorized Landskroner to share fees with.

118.   On or about April 1, 2015, Libman filed the *Jones v. City* complaint.  The caption page listed Landskroner, Libman and their respective law offices – LGM and the Libman Firm – as counsel for Mr. Jones.

119.   After the filing, the case was assigned to Judge Elihu M. Berle in the Complex Litigation section of the Los Angeles Superior Court.

120.   In an email to Paradis forwarding a conformed copy of the summons and complaint, Kiesel asked: "*What shall we do about service of this complaint?*"  Paradis replied: "*Please have [Libman] serve it – but Landskroner already emailed*

**COMPLAINT**

*a courtesy copy to Richard Tom tonight (**per Richard's request to me**).*"  (Emphasis added.)

121.   Plaintiff is informed and believes, and on that basis alleges, that the LACAO, including PETERS, were aware that the *Jones v. City* case was about to be filed.  Nonetheless, on or about April 3, 2015, PETERS emailed CLARK, Tom, Solomon, Dorny, Kiesel, Paradis and Tufaro, feigning surprise at the new lawsuit:

> *Hello.  FYI, an attorney named Michael Libman has filed the case listed below, which is described in CNS as "class action for overbilling."  When we get served, I ask the lawyers at DWP to please share the complaint with the group.  Thanks.*

122.   Kiesel responded to PETERS's email with a "smiley face" emoji: "😊."  Plaintiff is informed and believes, and on that basis alleges, that the emoji symbolized that the LACAO was, in fact, well aware of the plan to file the *Jones v. City* complaint.

### 16.   *Paradis and PLG Abandon Mr. Jones.*

123.   Paradis's was not listed as one of the attorneys on the caption page of the *Jones v. City* complaint.

124.   On or about April 9, 2015, eight days after the *Jones v. City* complaint was filed, and without prior notice or cause, LADWP turned off Mr. Jones' power.  Concerned that this was an act of retaliation by LADWP for his having filed the complaint, Mr. Jones emailed Landskroner, copying Paradis, seeking their assistance in having his power restored.  Only Landskroner responded, however, and without copying Paradis.

125.   Paradis later took the position that he had transitioned representation of Mr. Jones to Landskroner at the end of March 2015.  However, Mr. Jones never received any written or oral advisement that Paradis was no longer his counsel, that Paradis was transitioning the case to Landskroner, or that Landskroner would be handling the case exclusive of Paradis going forward.

/ / /

37

**COMPLAINT**

**C.    Events Leading Up to the Settlement of the *Jones v. City* Case (April 2015 - July 2017).**

    *1.    Landskroner's April 2, 2015 Settlement Letter to the LACAO.*

    126.   On or about April 2, 2015, the day after the *Jones v. City* complaint was filed, a demand letter under Landskroner's signature was sent to attorneys for LADWP to initiate settlement discussions.  Plaintiff is informed and believes, and on that basis alleges, that Paradis drafted the demand letter.

    127.   The demand letter stated, in part:

> *The Jones complaint alleges claims on behalf of Plaintiff Jones and also encompasses all of the allegations made in all of the other "billing error" class actions filed against the City and/or LADWP that preceded the Jones action . . . .  I note this fact because I am aware that Judge Berle inquired of the parties on March 30th as to whether there should be a consolidated complaint filed that encompasses all of the allegations from all of the other "billing error" complaints.  Simply stated, the Jones complaint addresses Judge Berle's concerns and accomplishes precisely this task.*

    128.   On or about April 8, 2015, a week after the filing of the *Jones v. City* complaint, and in what is highly unusual, if not unheard of, in class action litigation, substantive settlement discussions began between Agrusa, Annaguey, Solomon, Tom and Dorny, on behalf of the CITY, and Landskroner and Libman, on behalf of Mr. Jones, including discussions about what a class settlement would look like and a plan to have a well-respected, retired judge acting as a mediator bless the terms of the settlement.

    129.   In fact, as early as on or about April 13 and 15, 2015, Agrusa had telephone conferences with Landskroner and Libman to discuss settlement, from which plaintiffs' counsel in the Early Class Actions were excluded.

    *2.    Paradis and Kiesel Enter into a Formal Special Counsel Agreement with the LACAO.*

    130.   On or about April 21, 2015, the CITY, PLG and Kiesel Law entered into the Special Counsel Agreement with the LACAO.  The agreement provided that:

- *"City Attorney, as the chief legal officer of the City, is charged with representing the City in legal proceedings with respect to which the City has an interest."*

- The LACAO was retaining PLG and Kiesel Law *"to provide legal services to the City for the purpose of conducting the 'Dispute Resolution' process [in the CISCON contract] and, if necessary, to initiate and conduct litigation against [PwC] and possibly other entities . . . ."*

- The LACAO *"shall supervise and retain final authority over all aspects of the Dispute Resolution Process and, if litigation is commenced, all aspects of the Litigation."*

- *"To facilitate [the LACAO]'s retention of such supervisory control and final authority, [the LACAO] will monitor, review, and participate as the lead counsel in the Dispute Resolution Process and the Litigation.  In addition, if litigation is commenced Special Counsel will present the following matters to [the LACAO] for decision with adequate time for City Attorney to review and decide, without limitation, such matters as: (a) the content of all court pleadings; (b) the content of all dispositive motions and oppositions to such motions; (c) the decision of whether to settle or try the case; (d) the decision of whether to waive a jury trial; (e) selection of witnesses and evidence to be presented at trial; (f) trial strategy questions; (g) the conduct of trial; and (h) all other matters of significance."*

- The LACAO *"retains all discretion to conduct the Dispute Resolution Process and the Litigation.  [The LACAO] retains veto power over any action or proposed action by Special Counsel in connection with the Dispute Resolution Process or the Litigation.  [The LACAO] and the Board of the [LADWP] retain sole authority to settle or otherwise*

**COMPLAINT**

*compromise the matter at any time and in exchange for any consideration."*

- PLG and Kiesel Law *"shall ensure that [the LACAO] is kept fully informed of all material case development at all times . . . ."*

- PLG and Kiesel Law would *"receive attorneys' fees in the amount of 19.99% (split evenly between the two firms) of any net monetary and non-monetary recovery in the City v. PwC case, after deduction of Costs."*

- PLG and Kiesel Law *"promise[s], covenant[ ], and warrant[ ] that the performance of [their] services and representation to the City under this Agreement shall not result in a conflict of interest as that term is used in the Rules of Professional Conduct of the State Bar of California."*

131. The effective date of the Special Counsel Agreement was backdated to January 1, 2015. All prior mention of Paradis and Kiesel also representing Mr. Jones was omitted from the final agreement.

132. Around this same time, Kiesel assisted Landskroner and his associate, Drew Legando, with the filing of *pro hac vice* applications, although Kiesel was Special Counsel to the CITY and Landskroner was purporting to sue the CITY on behalf of Mr. Jones and the putative class.

### 3. The May 22, 2015 Hearing Attended by Paradis, Landskroner, Libman and Kiesel.

133. At a hearing on or about May 22, 2015, Landskroner and Libman appeared on behalf of Mr. Jones in the *Jones v. City* case, while Paradis and Kiesel appeared on behalf of the CITY in *City v. PwC*. Solomon was also in attendance as counsel for LADWP. Judge Berle ordered the Early Class Actions, *Jones v. City* and *City v. PwC* related.

/ / /

428224.23

### 4.    *Blood's June 26, 2015 Letter to FEUER.*

134.    On or about June 26, 2015, Blood sent a letter to FEUER, copying CLARK, complaining that: (a) the lawyers in the Early Class Actions were being excluded from the settlement negotiations; (b) the CITY was "*negotiat[ing] with the lawyers who copied the work of the other lawyers, have the least amount of relevant experience in class action litigation, have done the least amount of work in this case and filed their copy-cat complaint a full five months after the first lawsuit was filed*"; and (c) the CITY's "*[k]eeping the details of a secret settlement from the lawyers who are actually litigating the case is a telltale [sic] of a reverse auction.*"

135.    Plaintiff is informed and believes, and on that basis alleges, that FEUER and CLARK disregarded the letter and never sought to investigate Blood's allegations, notwithstanding their seriousness.

### 5.    *The Initial Mediation Sessions.*

136.    In June 2015, just six weeks after the filing of *Jones v. City*, and without the filing of a responsive pleading by the CITY or service of any discovery by either party, the parties entered into mediation before retired U.S. District Judge Dickran Tevrizian ("Judge Tevrizian").

137.    Plaintiff is informed and believes, and on that basis alleges, that the mediation was a sham and that, in reality, the purpose of the mediation was *not* to negotiate an arms-length settlement, but to cloak a collusive settlement in confidentiality under the mediation privilege, and convince Judge Berle that the settlement was the product of arm's length bargaining, when it was not.

138.    The first two mediation sessions occurred on July 11 and 12, 2015. Although the mediation did not involve the *City v. PwC* case, Paradis and Kiesel, along with CLARK, were present at the mediation sessions and negotiated on behalf of the CITY.  Agrusa, the Liner attorney ostensibly defending the CITY in the *Jones v. City* and Early Class Actions, was only present on the first day of the mediation, July 11, 2015, and even then, was relegated to the sidelines.  Only Paradis, Kiesel

1  and CLARK participated in the "break-out sessions" with Judge Tevrizian, at which

2  settlement terms were discussed with Landskroner.  Plaintiff is informed and

3  believes, and on that basis alleges, that Libman did not participate in the mediation

4  despite being counsel of record for Mr. Jones.

5      139.   At the conclusion of the July 12, 2015 mediation session, the parties

6  reached an agreement in principle on the material terms of a proposed class action

7  settlement, which encompassed claims from the Early Class Actions and was

8  memorialized in a Memorandum of Understanding.  The parties ironed out the terms

9  of the settlement at subsequent mediation sessions on July 24 and 31, 2015.

10  Attorneys' fees and reimbursement of expenses were discussed at the July 31, 2015

11  session.

12      140.   Thus, the mediation consisted of "negotiations" between counsel –

13  CLARK, Paradis, and Landskroner – who all represented the same interests – those

14  of the CITY – a fact concealed from Judge Tevrizian, the mediator, and that no one

15  was present to represent the interests of Mr. Jones and the putative class.

16      141.   Following the mediation sessions, on or about August 1, 2015, an email

17  exchange with the subject line, "follow up re mediation," occurred between

18  CLARK, Agrusa, Annaguey, Brown, Tom, Solomon, Dorny, Paradis and Kiesel,

19  indicating that the CITY was attempting to resolve the issue of attorney's fees for all

20  of the lawyers.  The emails discussed the substantial attorney's fees being claimed

21  by Landskroner.

22      142.   In the exchange, Annaguey identified numerous reasons why an

23  attorney's fee "*figure in the 7 figures may be difficult to support*," including, among

24  other reasons, the fact that "*these cases, particularly the Jones lawsuit, are in their*

25  *infancy by litigation standards*"; "*LADWP committed to fully refund/credit its*

26  *customers before any litigation had been filed*"; "*LADWP had already determined*

27  *it was going to settle these cases before Landskroner filed the Jones lawsuit*";

28  "*[t]he lawsuit against PWC contained LADWP admissions virtually admitting*

**COMPLAINT**

*liability on the billing class actions"*; Landskroner would *"be receiving the lions [sic] share of fees despite little demonstrable work"*; *"[w]e do not have back up for plaintiff's counsel's alleged lodestar numbers to support the fees requests"*; *"[d]efense fees are nowhere near the alleged lodestar for Landskroner"*; and *"Kiesel and Libman apparently just tried a PI case together."*

143.   In addition, she remarked that "*Paradis said yesterday that he thinks [the back-billing claims] are in the $80M-$120M range*," and that the fee application was expected to be nearly $15 million.

144.   Annaguey's email ended with the following warning, which would go unheeded:

> *We understand that the client is seriously considering the fee proposed because of Plaintiffs' threats to leverage the back-billed accounts issue.  This feels like nothing short of blackmail.  Dave Wright pointed out that this was an issue the Department identified to Landskroner and offered a solution.  In his words, "we [the Department] brought it to him" and now we're being penalized for it. Our position at the prior mediation sessions was that these claims are not even ripe.*

(Alteration in original.)

145.   On or about August 7, 2015 – without the CITY having responded to the *Jones v. City* complaint or either party having served discovery – the parties entered into a Class Action Settlement Agreement and Limited Release.  Plaintiff is informed and believes, and on that basis alleges, that the settlement excluded refunds to customers for back billing before September 11, 2015, in exchange for an agreement to pay higher fees to Landskroner and Libman, with the exact fee amounts still being discussed.

## 6.    *The First Amended* Jones v. City *Complaint.*

146.   On or about August 17, 2015, Landskroner and Libman filed a First Amended Complaint in *Jones v. City* (the "FAC").  The FAC excluded all allegations regarding back billing, including references to "*delayed billing*," "*lump*

*sum billing*," "*overestimated billing*," and "*delay [in] the issuance of customer bills . . . for multiple billing cycles*."  At the same time, the FAC included extraneous allegations about PwC's software implementation.

**7.    *Landskroner Sends Mr. Jones a Retainer Agreement Falsely Backdated to December 11, 2014.***

147.    Although Landskroner had begun representing Mr. Jones in late March 2015, it was not until August 21, 2015 that he sent Mr. Jones a written retainer agreement.

148.    The agreement that Landskroner sent was a duplicate of the retainer agreement Paradis had sent Mr. Jones in December 2014, except that it identified Landskroner as Mr. Jones's attorney and the CITY as the defendant.  Landskroner falsely backdated the agreement to December 11, 2014, the date that appeared on Mr. Jones's agreement with Paradis, to make it appear as if he had been representing Mr. Jones longer than he had.

**8.    *LADWP Awards PLG a $1.3 Million Contract.***

149.    Unbeknownst to Mr. Jones, on or about October 20, 2015, after the CITY and Landskroner had agreed upon the terms for settling *Jones v. City*, but before Judge Berle had granted preliminary approval of that settlement, LADWP and PLG entered into a single source Project Management Services Agreement, Contract No. 47361-6 (the "Paradis Contract").  LADWP awarded the Paradis Contract without first issuing a request for proposal, supposedly to "ensure LADWP's full compliance with the mandated Revised Settlement Agreement."

150.    The terms of the Paradis Contract applied retroactively from July 13, 2015, and continued through March 12, 2016 (an eight month period).  The Paradis Contract also included an option to extend the duration of the Paradis Contract for an additional four months, from March 13, 2016 through July 12, 2016. The total amount of the contract was $1,304,090 (or $108,674 per month).

151.    The Description of Services PLG was to provide under the Paradis

Contract included oversight, project management and implementation services for: (a) overseeing the CC&B System and software contracts to remediate the current billing system and recommend system improvements; (b) identifying and calculating customer-billing overcharges incurred since September 3, 2013; (c) compensating class members that were overcharged by June 30, 2016; (d) creating, adopting and monitoring of procedures that meet or exceed 13 court-mandated customer service performance metrics; (e) developing internal guidelines and procedures to identify, escalate and manage future complex customer billing issues; and (f) coordinating with a court-appointed, independent CC&B System monitoring expert.

152.   The Paradis Contract further provided that PLG would "*also assist in the development of requirements for a Chief Project Manager to direct the Project Management Organization (PMO), support the selection resulting from a nationwide recruiting campaign, an [sic] arrange the transition of project management duties to the new Chief Project Manager*," i.e., assist in finding a replacement project manager.

153.   Exhibit F of the Paradis Contract identified Paradis as "Project Manager" and Tufaro as "Deputy Project Manager," with hourly billing rates of $450 and $425, respectively.

154.   The Paradis Contract was executed by Wright as LADWP Contract Administrator and Chief Administrative Officer, on behalf of Marcie Edwards ("Edwards"), the LADWP's General Manager.  The LACAO reviewed and approved the Contract, and the LADWP Board of Commissioners (the "Board") voted to approve it on or about October 20, 2015.

155.   All of these facts were concealed from Mr. Jones.  Plaintiff is informed and believes, and on that basis alleges, that LADWP and the LACAO caused the Paradis Contract to be awarded to PLG not because it needed Paradis's services (it did not), but to compensate and reward Paradis for assisting FEUER, CLARK and

1    PETERS to settle the Early Class Actions on terms highly favorable to the CITY.

2    **9.**    ***Judge Berle Grants Preliminary Approval of the***

3         ***Jones v. City*** ***Settlement.***

4    156.    On or about December 21, 2015, Judge Berle preliminarily and

5 conditionally approved the settlement in *Jones v. City*, appointed Mr. Jones as the

6 class representative, appointed Landskroner and LGM as class counsel, and

7 appointed Libman as local class liaison counsel (even though he had never been

8 retained by, or was even known to, Mr. Jones).

9    **10.**    ***LADWP Extends the Paradis Contract and Increases***

10         ***Its Total Value to Over $6 Million.***

11    157.    On or about June 20, 2016, the Paradis Contract was extended by one

12 year, to July 13, 2017, with a one-year option.  Additionally, the amount of the

13 Contract was increased an additional $4,725,675, to a total of $6,029,765 (or

14 $196,903 per month).  The extension was signed by Wright, who by that time had

15 been promoted to Chief Operating Officer of LADWP, on behalf of

16 Marcie Edwards.  The LACAO reviewed and approved the extension.

17    158.    On or about June 27, 2017, the Paradis Contract was again extended by

18 one year, to July 12, 2018.

19    159.    Between on or about December 30, 2015 and October 3, 2017,

20 LADWP paid $6,028,482 to PLG under the Paradis Contract.

21    160.    Mr. Jones was unaware of these facts.

22    **11.**    ***Blood and Himmelfarb Seek Limited Discovery into the Fairness of***

23         ***the*** ***Jones v. City*** ***Settlement.***

24    161.    On or about February 3, 2017, plaintiffs' counsel in the *Bransford* and

25 *Fontaine* Class Actions filed an *ex parte* application before Judge Berle for an order

26 lifting a discovery stay in the Early Class Actions to allow limited discovery into the

27 procedural fairness of the *Jones v. City* settlement.

28    162.    In their *ex parte* papers, the *Bransford* and *Fontaine* plaintiffs noted

that "*the circumstances surrounding the settlement*" had been "*called into question*," and raised concerns "*regarding collusion amongst the settling parties*."

163.  On or about February 7, 2017, Landskroner, on behalf of Mr. Jones, and the CITY, filed a joint opposition to the *ex parte* application.  Landskroner submitted a declaration in support of the opposition, in which he declared that, prior to *Jones v. City*, he had "*never worked on any matter with [Liner] or the [LACAO] either as co--counsel or opposing counsel*," and "*the suggestion that the attorneys from LGM have an inappropriate relationship with any of the attorneys from [Liner] or the [LACAO] is false*."

164.  Plaintiff is informed and believes, and on that basis alleged, that Landskroner intentionally omitted mention of his relationships with Paradis, PLG, Kiesel and Kiesel Law, as that would expose the collusive nature of the settlement.

### 12.  *Paradis Forms Aventador.*

165.  On or about March 28, 2017, Paradis filed Articles of Organization for "Aventador" (named after a Lamborghini that sells for $400,000).  Paradis listed Aventador's business address as 801 Ocean Avenue, Suite 603, Santa Monica, California 90403, which was a $3.9 million oceanfront residential condominium in which Paradis was living.

166.  The next day, Paradis filed a Statement of Information listing himself as the manager of Aventador and describing the business as a "*consulting firm that provides consulting anf [sic] project management services to utilities company*."

167.  Mr. Jones was unaware of these facts.

### 13.  *Landskroner and Libman Make Materially False and Misleading Statements to Judge Berle in Support of Their Attorney's Fees Application.*

168.  On or about May 5, 2017, Landskroner and Libman submitted declarations in support of a Motion for Final Approval and Award for Attorney's Fees (the "Motion for Final Approval") in *Jones v. City*, falsely claiming that they

had spent thousands of hours investigating and litigating the case to justify the award of millions of dollars in unearned attorney's fees.

169.   Landskroner claimed that he and his firm had spent 8,117.50 hours on the litigation, justifying fees totaling $5,306,059.  Of this amount, however, over a thousand hours was purportedly for work performed *prior even to his introduction to Mr. Jones on March 26, 2015*, as the following chart shows:

| Landskroner's Declaration regarding Hours LGM Worked | | | | |
|---|---|---|---|---|
| Month | Nov. 2014 | Dec. 2014 | Jan. 2015 | Feb. 2015 | Mar. 2015 |
| Total hours | 201.50 | 145.75 | 282.75 | 320.00 | 244.75 |

170.   Libman submitted a declaration in which he claimed to have spent a total of 1,444 hours on *Jones v. City*, justifying fees totaling $799,100.  Yet, the information he submitted included time spent in 2013 and 2014, prior to Libman's involvement in any litigation or proposed litigation involving Mr. Jones, as the following chart illustrates:

| Libman's Declaration re Hours | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Month | Nov. 2013 | Dec. 2013 | Jan. 2014 | Feb 2014 | Mar. 2014 | Apr. 2014 | May 2014 | Jun. 2014 | Jul. 2014 |
| Hours | 34.35 | 27.0 | 43.50 | 25.75 | 14.0 | 24.5 | 22.25 | 11.75 | 10.0 |
| Month | Aug. 2014 | Sep. 2014 | Oct. 2014 | Nov. 2014 | Dec. 2014 | Jan. 2015 | Feb. 2015 | Mar. 2015 | |
| Hours | 17.0 | 22.75 | 26.25 | 24.50 | 24.50 | 16.0 | 19.75 | 16.75 | |

171.   Plaintiff is informed and believes, and on that basis alleges, that the CITY was aware that the declarations submitted by Landskroner and Libman were false, but nonetheless agreed to pay $19 million in attorney's fees, of which Landskroner and Libman ultimately received **$11,755,000**.  Plaintiff is further informed and believes, and on that basis alleges, that Landskroner and Libman were paid these exorbitant fees to compensate and reward them for settling the Early Class Actions on terms highly favorable to the CITY.

/ / /

/ / /

48

**COMPLAINT**

428224.23

**14.     *Paradis and the LACAO Cause the Mediator to Submit a False and Misleading Declaration.***

172.   On or about May 5, 2017, Judge Tevrizian submitted a declaration in support of the Motion for Final Approval, in which the LACAO caused him to *unknowingly* make the following false and misleading statements:

(a)     Landskroner and LGM had conducted an "*extensive and lengthy investigation*" into "*the widespread nature of the defect affecting customers of LADWP*";

(b)     "*Class Counsel' [sic] in-depth investigation . . . played an integral role in advancing the settlement discussions*";

(c)     "*[T]he proposed request for an award of attorneys' fees and expense reimbursement[ ] is reasonable*"; and

(d)     "*[T]he outstanding results obtained in this action warrants [sic] a reasonable enhancement by way of a lodestar multiplier . . . .*"

**15.     *Landskroner Causes Mr. Jones to Sign a False and Misleading Declaration.***

173.   On or about April 30, 2017, Landskroner emailed Mr. Jones a draft declaration for him to sign in support of the Motion for Final Approval.  Mr. Jones was not involved in the drafting of the declaration.  Plaintiff is informed and believes, and on that basis alleges, that the declaration was drafted entirely by Landskroner and/or Paradis.

174.   The declaration described Mr. Jones's communications with "counsel" or "class counsel," never mentioning either Paradis or Landskroner by name.  Based on what had been represented to him, Mr. Jones believed that those terms accurately referred to Paradis for the time period from December 2014 to April 2015, and to both Paradis and Landskroner for the period March 2015 to April 2017.  In fact, however, the declaration had been deliberately drafted to avoid Mr. Jones identifying Paradis as one of his attorneys by name.

175.   The declaration also included the following false and misleading statements that Landskroner and/or Paradis caused Mr. Jones to attest to under penalty of perjury, believing them to be true:

(a)   "*In response to my instruction, my counsel retained experts to assist in counsel's investigation . . . .*"

(b)   "*Soon after my initial complaint was filed, I directed my counsel to pursue the most efficient, effective and expeditious means of recovering LADWP customers' losses in this action.  This included working with the consulting team to develop a highly detailed settlement proposal by which I proposed to resolve the claims asserted in the class action that I had filed, as well as the class claims asserted in [the Bransford Action], [the Fontaine Action] and [the Kimhi Action].*"

(c)   "*My counsel regularly consulted with me while preparing the settlement proposal to discuss various aspects of the proposal and to obtain my: (i) agreement concerning specific terms and conditions that I was demanding; and (ii) approval to proceed with the further development of the proposal.*"

(d)   "*Class Counsel steadfastly represented my interests and the interests of my fellow Class members and has remained a tenacious advocate throughout all stages of the litigation.*"

176.   After Mr. Jones executed the declaration, Landskroner filed it with the Superior Court on May 5, 2017.

### 16.   *LADWP Awards Aventador a $30 Million Contract.*

177.   On or about June 2, 2017, before the termination of the Paradis Contract, and without receiving any other bids or proposals, LADWP awarded a $30-million contract to Aventador for a term of three years (Contract No. 47442-7) (the "Aventador Contract").  The Aventador Contract required Paradis to perform the same services as under the Paradis Contract, as well as additional services related to the CC&B remediation efforts.  Essentially, that is, Paradis had replaced himself *with himself* under an even more lucrative contract.

178.   The Aventador Contract was signed by Wright as the General Manager of LADWP, and reviewed and approved by the LACAO.

179.   In a memorandum dated June 5, 2017, the head of the Contracting Division at LADWP reported that the consultants' rates under the Aventador Contract – $400 per hour on average (with Paradis charging $475) – were significantly higher than those of other companies, and it could not be determined whether the type of work being performed justified the higher rates.  Moreover, Aventador's employees planned to work nearly full time at the hourly rate, whereas other consulting firms typically charged on an as-needed basis.

180.   Nonetheless, the Board adopted and approved the Aventador Contract on or about June 6, 2017.

181.   Between February 2018 and December 2018, LADWP paid approximately $17,544,475 to Aventador under the Aventador Contract.

182.   Neither Mr. Jones nor Judge Berle were advised of the Paradis or Aventador Contracts at any time prior to Judge Berle granting final approval of the *Jones v. City* settlement, and only learned of them in 2019.

**17.   *Judge Berle Grants Final Approval of the* Jones v. City *Settlement.***

183.   On or about July 7, 2017, Judge Berle granted final approval of the *Jones v. City* settlement.  The settlement obligated the CITY to, among other things:

(a)   Repay all overcharged LADWP bills from September 3, 2013 forward (which LADWP had previously committed to doing);

(b)   Commit to spending at least $20 million in remediating LADWP's billing system (even though remediation was not something the class had requested);

(c)   Meet certain performance metrics by the conclusion of the remediation period; and

(d)   Pay $19 million in attorneys' fees to plaintiffs' counsel in *Jones v. City* and the Early Class Actions, with Landskroner receiving

51

**COMPLAINT**

1    approximately $10.1 million and Libman approximately $1.6 million.

2          184.   The Final Settlement Agreement also included a broad release of

3    claims by class members for both economic and non-economic damages that

4    included direct, incidental, or consequential damages proximately caused by

5    LADWP's actions.  Other than certain limited carve-outs of claims and causes of

6    action asserted in the pending *Morski* and *Fontaine* Class Actions, the order

7    approving the settlement and release effectively barred any future actions, suits,

8    proceedings, or claims by any class members against the CITY relating to the failed

9    CC&B System roll-out.

10         185.   In approximately November 2017, Mr. Jones received a $5,000 service

11   award for the time he had devoted to serving as class representative in *Jones v. City*.

12         **18.    The CITY's Payment of Over $11.7 Million in Attorney's Fees to**

13                 **Landskroner and Libman.**

14         186.   On or about July 28, 2017, pursuant to the *Jones v. City* settlement, the

15   CITY issued a check in excess of $19.2 million.  Out of that amount, approximately

16   $10.1 went to LGM (including Landskroner) and approximately $1.6 million went

17   to Libman based on their fraudulent inflated hours worked.

18   **D.    The Cover Up (March 2017 - Present).**

19         *1.    The CITY's September 2017 Revised Privilege Log.*

20         187.   During the events described above, the *City v. PwC* case, in which PLG

21   and Kiesel Law were representing the CITY, continued to progress.  On or about

22   December 21, 2015, PwC served discovery on the CITY in that case, seeking,

23   among other things, documents related to the nature and costs of the alleged

24   remediation.

25         188.   On or about January 20, 2017, the CITY submitted a privilege log,

26   reflecting that it was withholding more than 19,000 documents from its production

27   on the basis of the attorney-client privilege and/or work product doctrine.  It claimed

28   that the withheld documents were privileged and/or work product because the

**COMPLAINT**

1  remediation was being performed under the supervision of Paradis, serving as

2  Special Counsel to the CITY.

3      189.    On or about March 8, 2017, Judge Berle overruled the CITY's privilege

4  claims and ordered the CITY to produce most of the remediation documents along

5  with a revised privilege log.

6      190.    On or about September 29, 2017, the CITY served its Revised Privilege

7  Log.  Document number 70 on the Revised Privilege Log was a January 24, 2015

8  email with the subject line: "FW: Jones v. Pricewaterhouse Coopers, LLP

9  (Consumer Class Action)" ("Document No. 70").  The log indicated that the email

10  had been circulated to various LADWP legal personnel and staff members,

11  including Brown, Tom, Solomon and Dorny, *but not PETERS*.

12      191.    Document No. 71 on the Revised Privilege Log was a document titled

13  "*Jones v. PwC* – Initial Complaint – FINAL.DOC," dated January 24, 2015

14  ("Document No. 71").  As described further below, over the ensuing 18 months,

15  PwC would seek disclosure of these documents, which the CITY vigorously

16  resisted.

17      ***2.    Paradis's False and Misleading November 15, 2017 Declaration.***

18      192.    On or about November 3, 2017, PwC moved to compel the production

19  of documents listed on the Revised Privilege Log, including Document No. 71,

20  which the CITY opposed.

21      193.    In response to PwC's motion to compel, the CITY, through Paradis,

22  Tufaro and PETERS, repeatedly represented, under oath and in court hearings, that

23  Paradis had prepared the draft *Jones v. PwC* complaint at the behest and on behalf of

24  the CITY, concealing from Judge Berle that Paradis had been counsel for Mr. Jones

25  at the time the *Jones v. City* complaint was filed, and that the draft *Jones v. PwC*

26  complaint had first been sent to Mr. Jones.

27      194.    On November 15, 2017, in support of its opposition to PwC's motion to

28  compel, the CITY filed a declaration signed under penalty of perjury by Paradis,

**COMPLAINT**

which contained the following false and misleading statements:

        (a)    *"To aid LADWP officials in understanding one possible avenue of recovery against PwC, LADWP officials requested that outside counsel prepare a draft complaint alleging claims that could be brought by an LADWP rate payer against PwC."*

        (b)    *"As requested by LADWP officials, outside counsel then researched and drafted Document No. 71 in Plaintiff's Revised Privilege Log,* i.e.*, the* Jones v. PwC *Complaint."*

        (c)    *"After the draft complaint had been circulated, the LADWP officials met with these City Attorneys and outside counsel to discuss whether the City/LADWP should pursue claims against PwC directly – or indirectly – as reflected in the draft* Jones v. PwC *Complaint."*

        (d)    *"Following these discussions, the City/LADWP ultimately determined to pursue claims against PwC directly by filing this action, rather than indirectly, as discussed in Document No. 71 and no further action was ever taken based on the legal theory proposed in Document No. 71 after the use of this legal theory was rejected by the LADWP."*

195.   In fact, Paradis had drafted the *Jones v. PwC* complaint as part of the CITY's two-prong plan to shift blame for the disastrous CC&B rollout to PwC, and the CITY only abandoned that plan as a result of the concerns raised by Liner, as well as Himmelfarb's decision to back out of dismissing the *Morski* Class Action.

### 3.   *Paradis's False and Misleading Responses to Judge Berle at the December 4, 2017 Hearing.*

196.   At the December 4, 2017 hearing on PwC's Motion to Compel, Paradis falsely and misleadingly represented as follows in response to Judge Berle's questioning:

        *THE COURT: . . . Who was the attorney in this case drafting the pleading?*

**COMPLAINT**

428224.23

*PARADIS: I drafted the pleading, your honor, on behalf of the City, at the request of the City.*

\* \* \*

*THE COURT: . . . You're telling me that you, as the attorney for the City, are drafting a complaint for a plaintiff that's not the City.*

*PARADIS: Correct.*

\* \* \*

*THE COURT: Who are you representing in that case?*

*PARADIS: We represented the City, your honor. We were actually contemplating different legal strategies, different legal theories. And the City requested that we prepare two different draft complaints: one which was a direct complaint by the City against PwC; the other on behalf of Mr. Jones against PwC . . . .*

*THE COURT: I hear you, but I don't understand it. [¶] What are you doing as a city attorney drafting a complaint on behalf of Mr. Jones?*

*PARADIS: . . . There was a concern on the City's part that people who were customers be entitled to recover. So the idea was, what are the types of legal theories that might be out there that could be used by the class members if they wanted to recover? What are the theories? They wanted to explore and understand that . . . . [¶] [The draft complaint] was never provided to anyone other than the City . . . .*

197. Throughout this colloquy, Paradis concealed from Judge Berle that he had been counsel for Mr. Jones, and that the draft *Jones v. PwC* complaint was prepared for, and first sent to, Mr. Jones, and not the CITY.

198. Judge Berle deferred ruling on whether there was a basis for the CITY to withhold Document No. 71 and, instead ordered the CITY to produce a person most qualified ("PMQ") witness to be deposed on a number of topics related to the *Jones v. PwC* complaint, including "*how the document was prepared and the circumstances surrounding the document*."

**4.      PETERS's False and Misleading April 26, 2018 Declaration.**

199. On or about April 13, 2018, PwC served the CITY with a PMQ deposition notice.

55

**COMPLAINT**

200.   On or about April 26, 2018, the CITY moved to quash the notice.  In support of its motion, the CITY submitted a declaration by PETERS, which substantially repeated Paradis's November 15, 2017 declaration.  In it, PETERS falsely and misleadingly stated:

(a)   Despite not being listed on the CITY's privilege log as having received Document Nos. 70 or 71, "*I requested that outside counsel prepare a draft complaint alleging claims that could be brought by an LADWP rate payer against PwC,*" purportedly "*[t]o aid the City in understanding one possible avenue of recovery against PwC,*" and "*for the purpose of advancing then ongoing discussions of legal advice and potential legal strategy.*"

(b)   "*Outside counsel . . . researched and drafted Document No. 71 in Plaintiff's Revised Privilege Log, i.e., the* Jones v. PwC *draft Complaint.*"

(c)   "*Following these discussions, the City/LADWP chose to pursue claims against PwC by filing this action.  Since that choice was made, no further action has been taken based on the legal theories set forth in Document No. 71.*"

201.   These statements were false and misleading: the *Jones v. PwC* complaint was drafted by Paradis as part of the CITY's two-prong plan to shift blame for the disastrous CC&B rollout to PwC; and it was only abandoned as a result of (a) the concerns raised by Liner, and (b) Himmelfarb backing out of dismissing the *Morski* Class Action.

202.   As a delaying tactic, the CITY selected a hearing date for its motion to quash that was nearly three months away.

**5.   *Tufaro's False and Misleading June 8, 2018 Declaration.***

203.   On or about May 25, 2018, PwC filed a motion to compel compliance with the Judge Berle's January 17, 2018 order and to strike the CITY's motion to quash, which the CITY opposed.  On or about June 8, 2018, the CITY submitted a declaration from Tufaro, in which she made the following false and misleading statements:

**COMPLAINT**

428224.23

(a)    "*One document sought by PwC was Document No. 71 (also referred to as the '*Jones v. PwC *Complaint'), an un-filed, internally circulated complaint drafted by Plaintiff's counsel, at the request of Plaintiff.*"

(b)    "*In connection with Plaintiff's Opposition to PwC's Privilege Log Motion to Compel, Plaintiff provided PwC with the Declaration of Paul O. Paradis (the 'Paradis Declaration') which explained that Plaintiff had requested that its counsel draft Document No. 71 in order to facilitate discussions about legal advice and legal strategy and Document No. 71 was, therefore, protected by both the attorney client privilege and the attorney work product doctrine.*"

204.   These statements were false and misleading: a nearly identical version of the *Jones v. PwC* complaint had been sent to Mr. Jones that had only two minor and immaterial differences; the *Jones v. PwC* complaint was drafted by Paradis as part of the CITY's two-prong plan to shift blame for the disastrous CC&B rollout to PwC; the draft *Jones v. PwC* complaint had not been prepared to give legal advice to the CITY; and therefore it was *not* protected by the attorney-client privilege or work product doctrine.

### 6.    *PETERS's False and Misleading Testimony at His Abbreviated September 13, 2018 PMQ Deposition.*

205.   On or about June 21, 2018, the CITY withdrew is motion to quash.

206.   On or about September 13, 2018, PETERS appeared for his deposition as the CITY's PMQ.  Paradis and Tufaro attended the deposition as counsel for PETERS and the CITY.  At the start of the deposition, PETERS was placed under oath.

207.   PETERS testified that he had not conducted any investigation, reviewed any documents, searched for any documents, or brought any requested documents to the deposition; in short, he "*did nothing to prepare*" himself.  He then proceeded to make the following false and misleading statements under oath:

(a)    The draft *Jones v. PwC* complaint had been his idea, he had

**COMPLAINT**

instructed Paradis to draft it as "*a thought experiment*" to help him "*think about and provide legal advice*," and it "*was never intended to be filed*";

(b)     He was not aware of anyone affiliated with the CITY, including Special Counsel, providing a copy of the draft complaint *Jones v. PwC* complaint to Mr. Jones or his counsel, falsely testifying:

> Q.     *Has anyone affiliated with the City, including special counsel in this litigation, ever provided a copy of the draft Jones versus PwC Complaint to Mr. Jones' counsel or Mr. Jones?*
>
> A.     *Not to my knowledge. I would never consent to that.*
>
> Q.     *Did you do any inquiry to determine whether or not anyone other than you has done that?*
>
> A.     *No.*
>
> Q.     *Have you ever asked special counsel whether they provided a copy of the Jones v. PwC Complaint to Jones – Jones' counsel?*
>
> A.     *I have made that inquiry and been assured that has not happened;*

(c)     He did not believe that any lawyer representing Mr. Jones provided the CITY with a draft *Jones v. PwC* complaint;

(d)     He claimed that there was "no impropriety" in preparing the draft *Jones v. PwC* complaint without checking with Mr. Jones or his attorney;

(e)     He "*never*" communicated with Mr. Jones's attorney about the fact that the CITY was preparing a draft complaint in Mr. Jones's name;

(f)     He had "*no idea*" how Mr. Jones came to retain counsel in Cleveland, Ohio, or whether anyone affiliated with the CITY, including Special Counsel, had recommended Mr. Jones to retain or put him in touch with Landskroner;

(g)     He claimed to be unaware of any communications by or among

LADWP, the LACAO, Kiesel Law, Liner, or Paradis, on the one hand, and
Mr. Jones or his attorneys, agents, or representatives, on the other, prior to
April 1, 2015; and

(h)     He did not have any advance notice of the filling of the *Jones v. City* case, nor, to his knowledge, did anyone else in his office.

208.   These statements were false or misleading:

(a)     The draft *Jones v. PwC* complaint had been drafted as a part of a two-prong plan by Special Counsel and the CITY to shift blame for the disastrous CC&B rollout from LADWP to PwC;

(b)     Paradis provided a copy of the draft *Jones v. PwC* complaint to Mr. Jones;

(c)     Paradis and Kiesel were representing Mr. Jones at the time Paradis provided the CITY with the draft *Jones v. PwC* complaint;

(d)     In providing the draft *Jones v. PwC* complaint to the CITY, Paradis breached his fiduciary duties and professional responsibilities to Mr. Jones;

(e)     PETERS met with Paradis, including on January 27, 2015, about the draft *Jones v. PwC* complaint, at the same time that Paradis was counsel for Mr. Jones;

(f)     Plaintiff is informed and believes, and on that basis alleges, that the LACAO knew Paradis had recruited Landskroner to represent Mr. Jones;

(g)     Plaintiff is informed and believes, and on that basis alleges, that the LACAO, including PETERS, not only had advance notice that the *Jones v. City* complaint was going to be filed, but also directed the filing, and that PETERS had been present at a meeting in February 2015, at which the plan to file and quickly settle the *Jones v. City* complaint had been hatched; and

(h)     Paradis and Kiesel were counsel for Mr. Jones prior to April 1, 2015, while they were concurrently serving as Special Counsel to the CITY, and communicating with the LACAO (including with PETERS) and LADWP staff.

209.   During the deposition, Paradis instructed PETERS not to answer whether he had known Mr. Jones was represented by counsel in January 2015, and who had made the decision to identify Mr. Jones as the plaintiff in the draft *Jones v. PwC* complaint, on the ground that such information was protected by the attorney-client privilege, although it was clearly not.

210.   Finally, when PwC's counsel began questioning PETERS about the CITY's knowledge of the professional relationship between Paradis and Landskroner, Paradis abruptly and without legal cause ended the deposition and claimed that the CITY would be seeking a protective order.

### 7.   *Tufaro's False and Misleading November 1, 2018 Declaration.*

211.   The CITY waited seven weeks, until November 1, 2018, to file its motion for a protective order.  The motion was accompanied by a declaration by Tufaro, who falsely and misleadingly declared as follows:

(a)   The draft *Jones v. PWC* complaint was only "*internally circulated*";

(b)   "*. . . Plaintiff had requested that its counsel draft Document No. 71 in order to facilitate discussions about legal advice and legal strategy and Document No. 71 was, therefore, protected by both the attorney client privilege and the attorney work product doctrine.*"

(c)   "*PwC repeatedly sought to depose Attorney Peters on matters that well-exceeded the scope of the Court's January 11th Order*" and engaged in "*inappropriate questioning of the PMQ Witness.*"

(d)   "*. . . Attorney Peters . . . provided PwC with the testimony concerning the matters ordered by the Court on January 11, 2018.*"

212.   These statements were false and misleading:

(a)   A version of the draft *Jones v. PwC* complaint had been sent to Mr. Jones;

(b)   The draft *Jones v. PwC* complaint had been prepared as part of

the CITY's two-prong plan to shift blame to PwC, and was not protected by the attorney-client privilege or work product doctrine;

       (c)    PwC had not engaged in inappropriate questioning of PETERS; and

       (d)    In derogation of his duties as the CITY's designated PMQ, PETERS did not prepare for his deposition, he declined to answer proper questions based on instruction by Paradis, and the CITY had unilaterally ended the deposition without legal cause.

213. Additionally, Tufaro attached to her declaration the prior false and misleading declarations of Paradis and PETERS.

### 8. *Judge Berle Orders the Depositions of Mr. Jones and Landskroner.*

214. PwC's motion to compel the production of documents the CITY was withholding originally came on for hearing on December 5, 2018. At that time, Judge Berle expressed his *"concern[ ] that [the CITY] ended the [PETERS PMQ] deposition and it was right after counsel for [PwC] referred the witness to topic seven of the Notice, which was [the CITY's] knowledge as of February 7 of a professional relationship between [PLG] and [Landskroner]."* To address his concerns, Judge Berle authorized and ordered PwC's counsel to promptly conduct the depositions of Mr. Jones and Landskroner.

215. Plaintiff is informed and believes, and on that basis alleges, that at that point in time, Judge Berle and PwC viewed Mr. Jones as a potential co-conspirator with Landskroner and others in engineering a collusive settlement.

### 9. *Tufaro's False and Misleading Responses to Judge Berle at the December 12, 2018 Hearing.*

216. On or about December 12, 2018, at the continued hearing on PwC's motion to compel, Judge Berle also heard the CITY's motion for a protective order prohibiting PwC from deposing or continuing to depose the CITY's PMQ about the *Jones v. PwC* complaint. At the hearing, Judge Berle asked Tufaro whether she was

**COMPLAINT**

involved in the class action litigation.  Despite the fact that Mr. Jones had been represented by PLG, Paradis and Tufaro in his class action lawsuit against the CITY, Tufaro falsely denied any involvement in the litigation, stating as follows:

> THE COURT:  It appears to me . . . , there may not be an adversary relationship [between Jones and the CITY].  There are serious issues – were you involved in the class action litigation?
>
> TUFARO:  No.
>
> *   *   *
>
> THE COURT:  Does the City take the position that Mr. Jones was at some time represented by the City Attorney's Office?  Or counsel for the City?
>
> TUFARO:  No, your honor.
>
> THE COURT:  At no time was Mr. Jones represented by counsel for the City; is that right?
>
> TUFARO:  No, your honor.  No.

217.   Tufaro's responses to Judge Berle's questions were false and misleading: Tufaro (along with PLG and Paradis) had represented Mr. Jones in the *Jones v. City* case, while at the same Paradis and PLG was serving as Special Counsel for the CITY.

218.   Later in the hearing, Kiesel stated that he "*wanted to clarify*" that, while the LACAO "*never had any relationship to Mr. Jones*," "*Special Counsel did have a relationship with Mr. Jones that was not adverse to the City . . . until Mr. Jones wanted to pursue an action against the City and that was the end of that relationship.*"  This representation was misleading; in fact, Mr. Jones had wanted to pursue an action against the CITY from the very beginning and Special Counsel's relationship with the CITY was always adverse to Mr. Jones.

219.   At the conclusion of the hearing, Judge Berle denied the CITY's motion for a protective order and granted PwC's motion to compel.  Judge Berle also ordered that if PETERS was not qualified to be the CITY's designated PMQ, the CITY must designate someone else who was.

### 10.    *Landskroner Deliberately Absents Himself from the January 30, 2019 Status Conference.*

220.    On or about January 30, 2019, Judge Berle held a status conference in *Jones v. City*.  Despite being the court-appointed class counsel, Landskroner did not attend.  Libman, who appeared for him, could not explain Landskroner's absence:

> THE COURT:  Where is Mr. Landskroner?
>
> MR. LIBMAN:  I have – I don't know, Your Honor.  All I know is I got a call yesterday that I needed to cover this, and I'm not –
>
> \*   \*   \*
>
> THE COURT:  Wasn't Mr. Landskroner supposed to be in court today?
>
> MR. LIBMAN:  Here?  Correct.
>
> THE COURT:  So where is he?
>
> MR. LIBMAN:  I don't know, Your Honor.
>
> THE COURT:  Did he tell you in your conversation yesterday why he was not planning to come today?
>
> MR. LIBMAN:  I have no information in that regard.  All I know is I received a call late yesterday that I needed to cover this hearing for the class . . . .

221.    Plaintiff is informed and believes, and on that basis alleges, that Landskroner deliberately absented himself from the hearing to avoid being questioned by Judge Berle about his relationship with Paradis and because he feared that he would be ordered to appear for his deposition while in town for the hearing.

### 11.    *Mr. Jones' February 13, 2019 Deposition.*

222.    On or about January 16, 2019, PwC's counsel served Mr. Jones with a deposition subpoena to testify and produce documents in the *City v. PwC* case.  Shortly thereafter, Mr. Jones retained his current counsel to represent him in connection with his deposition and the production of documents.

223.    On or about February 12, 2019, one day before Mr. Jones's deposition, Paradis and Kiesel, as Mr. Jones's former counsel, insisted that Mr. Jones assert the

**COMPLAINT**

work product doctrine on their behalves and withhold certain documents that had

been requested in PwC's deposition subpoena, including the version of the draft

*Jones v. PwC* complaint that was in Mr. Jones's possession, as well as to refuse to

answer questions that may be put to Mr. Jones about those documents at his

deposition.

224. Mr. Jones's deposition went forward the next day, February 13, 2019.

As directed by Paradis and Kiesel, Mr. Jones asserted that the draft *Jones v. PwC*

complaint was protected under the work product doctrine, and therefor he was

limited in what he could say about it.

225. During the deposition, in an impromptu telephonic hearing, Judge Berle

learned for the first time of Paradis's dual representation of Mr. Jones and the CITY.

### *12.    CLARK's February 26, 2019 Deposition as the CITY's New PMQ.*

226. Following Judge Berle's December 12, 2018 ruling, the CITY

designated CLARK as its PMQ (replacing PETERS). PwC took CLARK's

deposition on or about February 26, 2019. PETERS was present as counsel for

CLARK and the CITY. Neither Paradis nor Tufaro, who had represented PETERS

at his PMQ deposition, were present.

227. At the start of the deposition, CLARK was placed under oath. During

his deposition, CLARK made many damaging admissions, including the following:

(a)    He believed that Tom, Dorny and Solomon all received a copy of

the *Jones v. PwC* complaint, and that they knew that Paradis was counsel to

Mr. Jones:

> *A   . . . Mr. Wright confirmed, if you will, that he was aware that Mr. Paradis was representing Mr. Jones in connection with a possible case by Mr. Jones against PwC, and that sometime after Mr. Paradis was retained by Mr. Jones he informed Mr. Wright, at least, that -- of that representation.*
>
> *Q    Do you know when Mr. Paradis informed Mr. Wright of that representation?*
>
> *A    It was in December of 2012, Counsel.  I don't have an exact -- not 2012.· I'm sorry.· Of 2014 . . . .*

\*   \*   \*

*Q     Did Mr. Tom tell you that he was aware that Mr. Paradis had an attorney/client relationship with Mr. Jones?*

*A·    I -- I think so.*

*Q     So he knew about the Jones v PwC Complaint and you believe he knew that Mr. Paradis was the actual counsel to Mr. Jones?*

*A·    Well, Mr. Paradis' name was on the Complaint, so I assume he knew it either orally or through that.*

*Q     To your knowledge, at any time prior to April 1, 2015, which is the date that the Jones case·was actually filed in court, at any time prior to that do you know whether Ms. Dorny was aware that Mr. Paradis had an attorney/client relationship with Mr. Jones?*

*A     I believe so, for the same reasons I believe Mr. Tom was aware.*

\*   \*   \*

*Q     . . . [I]s it your understanding that Ms. Dorny had seen the Jones v PwC draft Complaint?*

*A ·   I believe she had.*

*Q·    To your knowledge, was Mr. Eskel Solomon aware of the attorney/client relationship between Mr. Paradis and Mr. Jones prior to April 1, 2015?*

*A·    I believe that was the case.· I don't know whether he was informed orally, but he received a·copy of the Complaint with Mr. Paradis' name as counsel for Mr. Jones.*

\*   \*   \*

*A     . . . I believe [Tom, Dorny and Solomon] were orally told through counsel [of Paradis's representation of Mr. Jones] . . .*

(b)     *"I understood from the draft [*Jones v. PwC*] Complaint [Kiesel and Mr. Jones] had an attorney/client relationship, but Mr. Kiesel informed me he had never met Mr. Jones until the deposition in this case which was, I think, within the last couple of weeks."*

(c)     PETERS *"directed Mr. Paradis to prepare [the draft* Jones v. PwC *complaint] for evaluation," and "for the possibility of Mr. Jones . . . suing PwC directly," "probably [in] December of 2014."*

428224.23

(d)      He understood *"that Mr. Landskroner was retained six days before the filing of the [*Jones v. City*] complaint and that he had received copies from Mr. Paradis of the other complaints already filed,"* so as *"to both make it easier for him to draft a complaint and try to draft one that would cover the claims in all actions."*

(e)      When asked about FEUER's role in the decision-making process, CLARK testified:

> Q·    *Mr. Clark, you testified about the reasons that the decision was made not to file the Jones v PwC draft Complaint.· Was Mr. Feuer part of that·decisionmaking process?*
>
> *           *       *       *
>
> THE WITNESS:·*I don't remember Mike taking part in that -- those discussions.·* **I'm sure I reported it to him**, *but I don't think he was·involved in the decision.*  (Emphasis added.)

(f)      In reaching the settlement in *Jones v. City*, the CITY *"agreed not to oppose a fee application"* for up to a certain amount of money.

(g)      In response to the question of whether *"anyone within the City Attorney's office or LADWP voice any concern about ·the propriety of Mr. Paradis serving as counsel for Mr. Jones and special counsel for the City of Los Angeles at the same time,"* CLARK testified: *"Not that I recall."*

(h)      CLARK understood that Paradis did not recommend for Mr. Jones to retain Blood or Himmelfarb because those attorneys were not acceptable to the LADWP:

> Q     *So the question was:·  Why did Mr. Paradis not recommend that Mr. Jones retain Mr. Blood, ·Mr. Himmelfarb or some other plaintiff's counsel who had already filed an action against the City?·. . . .*
>
> A     *Okay. My understanding, and this is mostly from outside counsel, the Liner people, who have been trying to deal with Mr. Blood, Mr. Himmelfarb, and I think there was another plaintiff's lawyer involved, too, that they were just intransigent, couldn't – they wouldn't – didn't want to negotiate or propose things that were not – were not acceptable.  And I don't know if they were willing to do what DWP wanted, which was basically – there would have been overcharge repaid and have the – and have oversight of the system to*

**COMPLAINT**

*correct it.*

(i)     CLARK knew well before the *Jones v. City* complaint was filed on April 1, 2015, "*[s]ometime during the latter half of – the end of March,*" that a settlement demand would be forthcoming.

228.   CLARK also admitted to destroying evidence.  He testified that as part of his preparation for his PMQ deposition he had spoken with PETERS, Tom, Solomon, Dorny, Wright, Paradis, Tufaro, Kiesel and Annaguey, and had taken notes of these discussions.  When asked where those notes were, he claimed that he had discarded them several days earlier because he "*didn't need them,*" even though, during his deposition, he often could not recall who had told him what.

### 13.    The CITY's False and Misleading Representations in Its March 1, 2019 Brief.

229.   On or about February 21, 2019, Judge Berle ordered counsel in *Jones v. City*, *City v. PwC* and the Early Class Actions to submit briefs addressing, among other issues, "*whether representation of two adverse parties, without knowing consent of parties, constitutes fraud within the fraud exception*" to the attorney-client privilege, and "*whether failure to disclose to the Court . . . any alleged conflicts in representation of adverse parties before the court, constitutes fraud on the Court.*"

230.   On or about March 1, 2019, the CITY filed its response to Judge Berle's February 21 Order, which was signed by Tufaro for the CITY and on behalf of Kiesel.  In it, the CITY continued to falsely represent the nature and scope of PLG's representation of Mr. Jones, stating:

> *On December 9, 2014, [PLG] was retained by [Mr. Jones] to represent Mr. Jones in connection with the commencement of a putative consumer class action **against PwC** to recover damages that Mr. Jones incurred as a result of improper billing.  Shortly thereafter, [PLG] then reached out to [Kiesel], who also began working for Mr. Jones as counsel.  Mr. Jones had retained counsel for the purpose of bringing suit against PwC.*
>
> *[PLG] and Kiesel Law continued to represent Mr. Jones in a*

*matter involving putative class claims **against PwC** until late March 2015, and had no further communications of any type with Mr. Jones relating to any litigation matters.  (Emphasis in original.)*

231.   All of these statements were false: (a) Mr. Jones had retained PLG to represent him in action he wanted to bring against LADWP; (b) PLG and Kiesel Law represented Mr. Jones in connection with his putative class claims against the CITY – in fact, Paradis drafted the *Jones v. City* complaint, communicated with Mr. Jones about the complaint and was, by his own admission, "*run[ning] th[e] show*"; and (c) Paradis continued to have communications with Mr. Jones after the filing of the *Jones v. City* complaint.

### 14.   *Landskroner Asserts His Privilege Against Self-Incrimination at the March 4, 2019 Status Conference.*

232.   On or about March 4, 2019, Landskroner appeared at a status conference in *Jones v. City*.  When asked by Judge Berle about his financial relationship with Paradis, Landskroner invoked his privilege against self-incrimination through his counsel, specifically refusing to answer: (a) whether he had paid a referral fee to Paradis; and (b) how much of the $19 million in attorney's fees the CITY had paid in the *Jones v. City* settlement, if any, went to Paradis.

### 15.   *Landskroner Asserts His Privilege Against Self-Incrimination at His March 5, 2019 Court-Ordered Deposition.*

233.   On or about March 5, 2019, Landskroner was deposed in the *City v. PwC* case pursuant to a court order by Judge Berle.  At the start of the deposition, Landskroner was placed under oath.  During his deposition, Landskroner invoked his privilege against self-incrimination and refused to answer questions put to him concerning virtually all substantive subject matter areas.  By way of example:

> *Q    When did you become counsel to Mr. Antwon Jones?*
>
> *A    On the advice of counsel I'm exercising my Fifth Amendment protection and respectfully decline to answer at this time.*

\*    \*    \*

68

**COMPLAINT**

428224.23

1   *Q   Have you entered into any oral agreement or
understanding with anyone from LADWP, the city attorney's office,*
2   *Kiesel Law, Liner LLP or Paradis Law Group with respect to
Mr. Jones or the Jones class action?*

3   *A   On the advice of counsel I'm asserting my Fifth
Amendment protection and respectfully decline to answer the*
4   *question at this time.*

5   * * * *

6   *Q   What was your role in the drafting of [the Jones v. City*
7   *complaint]?*

8   *A   On the advice of counsel I'm exercising my Fifth
Amendment protection and respectfully decline to answer this*
9   *question at this time.*

10   * * * *

11   *Q   Prior to April 1, 2015, did you have any communications
with anyone at LADWP, the city attorney's office, Kiesel Law or*
12   *Liner LLP . . . with regard to the complaint that was ultimately filed
on April 1, 2015?*

13
*A   On the advice of counsel, I'm exercising my Fifth*
14   *Amendment protection and respectfully decline to answer the
question at this time.*

15   * * * *

16   *Q   Did you ever make your prior association through serving*
17   *as a co-counsel with Mr. Paradis and/or Ms. Tufaro did you ever
make that information available to anyone at the city attorney's*
18   *office for the City of Los Angeles?*

19   *A   I'm exercising my Fifth Amendment protection on the
advice of counsel and respectfully decline to answer this question at*
20   *this time.*

21   * * * *

22   *Q   Did you make any such disclosure of your prior
relationship as co-counsel with Mr. Paradis and Ms. Tufaro, did you*
23   *make that information known to Mr. Antwon Jones at any time?*

24   *A   On the advice of counsel I'm exercising my Fifth
Amendment protection and respectfully decline to answer the*
25   *question at this time.*

26   * * * *

27   *Q   To the best of your knowledge, was there anyone in the
City Attorney's office or at LADWP who anticipated receiving a*
28   *settlement demand from you or counsel on behalf of Mr. Jones prior*

69
**COMPLAINT**

*to April 1, 2015?*

     *A   On the advice of counsel, I'm exercising my Fifth Amendment protection and respectfully decline to answer the question at this time.*

          \*   \*   \*

     *Q   Did anyone representing the City of Los Angeles ask you to include a demand for $20 million of remediation expenditures in connection with the Jones case so that that term could be included in the settlement agreement?*

     *A   On the advice of counsel I am exercising my Fifth Amendment protections and respectfully decline to answer the question at this time.*

          \*   \*   \*

     *Q   Did you personally have any fee splitting agreement with any counsel in connection with attorneys' fees that were awarded to your firm in connection with representation of Mr. Jones and the class in the Jones versus LADWP case?*

     *A   On the advice of counsel I am exercising my Fifth Amendment protection and respectfully decline to answer the question at this time.*

          \*   \*   \*

     *Q   Did you at any time have any conversations with Mr. Paul Paradis or Mr. Paul Kiesel regarding strategies that might be employed by the City of Los Angeles to avoid producing the draft Jones v. PWC complaint in response to discovery requests in the City of Los Angeles versus PricewaterhouseCoopers case?*

     *A   On the advice of counsel I am exercising my Fifth Amendment protection and respectfully decline to answer the question at this time.*

**16.    Paradis and Kiesel Resign as Special Counsel for the CITY.**

234.   On or about March 6, 2019, one day after Landskroner's deposition, Paradis and Kiesel announced their resignations as Special Counsel for the CITY.

**17.    FEUER Announces the LACAO's Retention of Ellen Pansky to Conduct an Independent Ethics Inquiry.**

235.   On or about March 8, 2019, FEUER announced that the LACAO had hired an ethics attorney, Ellen Pansky ("Pansky"), to conduct an ethics review concerning the *City v. PwC* and *Jones v. City* cases.  FEUER promised to take

**COMPLAINT**

428224.23

1   "*decisive action if this review reveals any breach of ethics.*"

2   236.   Plaintiff is informed and believes, and on that basis alleges, that

3   FEUER caused the LACAO to hire Pansky to create the false impression that

4   Paradis and Kiesel were rogue actors and that neither FEUER nor the LACAO had

5   been aware of their unethical activities on behalf of the CITY.

6   237.   On or about that same day, the CITY issued a statement that Paradis

7   and Kiesel had never represented the CITY in *Jones v. City* and that the LACAO

8   "*was never apprised that outside counsel may concurrently have been representing*

9   *Mr. Jones on a possible matter against LADWP at the same time outside counsel*

10   *was representing LADWP [in City v. PwC] – if in fact that was true.*"

11   238.   This statement was false and misleading: at a minimum, (a) Paradis and

12   Kiesel had represented the CITY in *Jones v. City*, including by attending and

13   negotiating on behalf of the CITY during the initial mediation sessions; and

14   (b) CLARK and PETERS were aware that Paradis and Kiesel were representing

15   Mr. Jones on a matter against LADWP.

16   **18.   *Landskroner Seeks to Withdraw as Class Counsel Due to a***

17   **      *Conflict of Interest.***

18   239.   On or about March 12, 2019, Landskroner filed a Motion to be

19   Relieved as Counsel in *Jones v. City*.  In his supporting declaration, he stated that

20   neither he nor his firm could continue to represent Mr. Jones, individually or as the

21   class representative due to an "*ethical conflict.*"

22   240.   In fact, that ethical conflict had existed from the day Landskroner and

23   LGM undertook to represent Mr. Jones, back in March 2015.

24   **19.   *CLARK's After-the-Fact Material Changes to His***

25   **      *February 26, 2019 Deposition Testimony.***

26   241.   On or about March 14, 2019, in an attempt to walk back many of his

27   damaging admissions during his February 26, 2019 deposition, CLARK executed a

28   five-page errata sheet to his February 26, 2019 deposition transcript, making over

**COMPLAINT**

*50 changes* to his testimony, the vast majority of which were substantive.  By way of example:

| From | To |
|------|-----|
| *Q.  Do you know when Mr. Paradis informed Mr. Wright of that representation?*<br><br>***A.  It was in December of 2012, Counsel. I don't have an exact — not 2012. I'm sorry. Of 2014. I'm having trouble with dates, too.*** | *Q.  Do you know when Mr. Paradis informed Mr. Wright of that representation?*<br><br>***A.  It must have been in February or March of 2015. Mr. Wright didn't start at DWP until that February.*** |
| *Q.· To your knowledge, at any time prior to April 1, 2015, which is the date that the Jones case was actually filed in court, at any time prior to that do you know whether Ms. Dorny was aware that Mr. Paradis had an attorney/client relationship with Mr. Jones?*<br><br>***A.  I believe so, for the same reasons I believe Mr. Tom was aware.*** | *Q.· To your knowledge, at any time prior to April 1, 2015, which is the date that the Jones case was actually filed in court, at any time prior to that do you know whether Ms. Dorny was aware that Mr. Paradis had an attorney/client relationship with Mr. Jones?*<br><br>***A.  She tells me she did not.*** |
| *Q.· And what decision was made?*<br><br>***A.  Not to file [the Jones v. PwC complaint].*** | *Q.· And what decision was made?*<br><br>***A.  Not to consent to Special Counsel concurrently representing the City and a consumer class against PwC.*** |
| *Q.  Was Mr. Feuer part of that decision making process?*<br><br>***A.  I'm sure I reported it to him, but I don't think he was involved in the decision.*** | *Q.  Was Mr. Feuer part of that decision making process?*<br><br>***A.  I don't think he was involved in the recommendation.*** |
| *Q.· At any time did anyone within the City Attorney's office or LADWP voice any concern about the propriety of Mr. Paradis serving as counsel for·Mr. Jones and special counsel for the City* | *Q.· At any time did anyone within the City Attorney's office or LADWP voice any concern about the propriety of Mr. Paradis serving as counsel for·Mr. Jones and special counsel for the City of* |

428224.23

| From | To |
|------|-----|
| of Los Angeles at the same time?<br><br>A.  Not that I recall. | Los Angeles at the same time?<br><br>A.  Yes, I understand that Richard Tom passed on the advice of an outside counsel that Special Counsel should not represent a consumer in a class action against PwC and for the City of Los Angeles against PwC at the same time. |
| Q.  So the question was:· Why did Mr. Paradis not recommend that Mr. Jones retain Mr. Blood,·Mr. Himmelfarb or some other plaintiff's counsel who had already filed an action against the City?·. . . .<br><br>A.  Okay. My understanding, and this is mostly from outside counsel, the Liner people, who have been trying to deal with Mr. Blood, Mr. Himmelfarb, and I think there was another plaintiff's lawyer involved, too, that they were just intransigent, couldn't — they wouldn't —didn't want to negotiate or propose things that were not —were not acceptable. And I don't know if they were willing to do what DWP wanted, which was basically — there would have been overcharge repaid and have the — and have oversight of the system to correct it. | Q.  So the question was:· Why did Mr. Paradis not recommend that Mr. Jones retain Mr. Blood,·Mr. Himmelfarb or some other plaintiff's counsel who had already filed an action against the City?· And let's try that answer again.<br><br>A.  I don't know what Mr. Paradis recommended to Mr. Jones. |
| Q.· Was Mr. Landskroner viewed as someone who would be more, in your words, reasonable than Mr. Himmelfarb or Mr. Blood based simply on Mr. Paradis' prior association with him or based on some | Q.· Was Mr. Landskroner viewed as someone who would be more, in your words, reasonable than Mr. Himmelfarb or Mr. Blood based simply on Mr. Paradis' prior association with him or based on some understanding that had been received -- that had been made between Mr. Paradis |

| From | To |
|---|---|
| *understanding that had been received -- that had been made between Mr. Paradis and·Mr. Landskroner?*<br><br>**A.  I know of no such understanding, but that was Mr. Paradis' recommendation.** | *and·Mr. Landskroner?*<br><br>**A.  I know of no such understanding.** |
| *Q.· No one brought Mr. Landskroner into the case because he was viewed as someone who would be·the most zealous advocate available for Mr. Jones to·pursue claims; correct?*<br><br>**A.  That's — that's right.** | *Q.· No one brought Mr. Landskroner into the case because he was viewed as someone who would be·the most zealous advocate available for Mr. Jones to·pursue claims; correct?*<br><br>**A.  I don't know why Mr. Paradis recommended him to Mr. Jones.** |
| *Q.· If the City was using or was agreeing to not oppose a fee application based on hours, times rate, equals loadstar, times multiplier, if that formula was going to be used, would the City have concerns to make sure that the hours reflected hours spent -- actually spent working on the case?*<br><br>**A.  I don't think so, because I think this fee was negotiated, heavily negotiated, and I think we agreed to the number without having seen the hours.** | *Q.· If the City was using or was agreeing to not oppose a fee application based on hours, times rate, equals loadstar, times multiplier, if that formula was going to be used, would the City have ·concerns to make sure that the hours reflected hours spent -- actually spent working on the case?*<br><br>**A.  I don't think so, because I think this fee was negotiated, heavily negotiated and was a mediator's proposal by a highly respected former California State and Federal judge, and I think we agreed to the number without having seen the hours.** |
| *Q.· How much earlier than April 1 did you know that the settlement demand would be forthcoming at some point and that you would be settling with·Mr. Jones?*<br><br>**A.  Sometime during the latter half of — the end of March.** | *Q.· How much earlier than April 1 did you know that the settlement demand would be forthcoming at some point and that you would be settling with·Mr. Jones?*<br><br>**A.  I didn't.** |

**COMPLAINT**

| From | To |
|------|-----|
| Q. And [Paradis's] involvement in the remediation predated even the filing of the [Jones v. City] Complaint; correct?<br><br>**A.  I think that's right.** | Q. And his involvement in the remediation predated even the filing of the Complaint; correct?<br><br>**A.  No.** |

242.   When CLARK's PMQ deposition by PwC continued on April 9, 2019, he was asked about the errata sheet.  CLARK testified that, following his February 26, 2019 deposition session, he had reviewed the deposition transcript with PETERS, Solomon, Tom, Dorny and LADWP's new General Counsel, Joseph Brajevich, and the errata sheet had been "*informed*" by their comments.

243.   Plaintiff is informed and believes, and on that basis alleges, that after his February 26, 2019 deposition session, CLARK met with these individuals, and realizing just how damaging his PMQ testimony was to the CITY, the LACAO and FEUER, it was decided among them to change his truthful responses to untruthful or equivocal responses.

### 20. *Paradis Surreptitiously Transfers Ownership of Aventador to Ryan Clarke.*

244.   On or about March 4, 2019, Judge Berle issued an order "*restrain[ing] the City . . . from paying any further sums to Mr. Landskroner, to Mr. Paradis, or to any company in which Mr. Landskroner or Mr. Paradis have an interest.*"

245.   Ten days later, on or about March 14, 2019, Paradis transferred ownership of Aventador to a third party, Ryan Clarke.  Clarke paid little or no money to acquire Aventador.  Plaintiff is informed and believes, and on that basis alleges, that the transfer to Clarke was a fraudulent transfer that was intended to disguise that Aventador remained under Paradis's control after the entry of Judge Berle's March 4 Order.

246.   In fact, as described further below, the CITY continued to pay

**COMPLAINT**

428224.23

Aventador substantial sums after the transfer, resulting in the CITY violating Judge Berle's March 4 Order.

**21.    *Judge Berle Finds that Paradis Simultaneously Represented Adverse Parties.***

247.    On or about March 13, 2019, Judge Berle overruled Paradis's assertion of the attorney work product doctrine with respect to the draft *Jones v. PwC* complaint in Mr. Jones's possession, and ordered that the draft complaint be disclosed.  (Kiesel stated at the hearing that he was no longer claiming any privilege in the document.)

248.    In issuing this ruling, Judge Berle made the following findings:

(a)    "*Based upon the evidence that has been presented to the Court, the Court does conclude that the communications between [Paradis] on the one hand and Mr. Jones on the other hand were communications with an adverse party because [Paradis] was representing the City at the same time.*"

(b)    "*Additionally, based upon evidence that has been previously presented to the Court, the Court finds that [PwC] has presented sufficient evidence to establish a prima facie case of fraud by the CITY and its counsel, fraud on Mr. Jones, possible fraud on the public, and possible fraud on the Court.*"

**22.    *PETERS Resigns From the LACAO.***

249.    On or about March 22, 2019, PETERS resigned from the LACAO for undisclosed reasons, but just after it had been reported in the press that he had accepted referral fees from plaintiffs' lawyers while an employee of the LACAO.

**23.    *Aventador Changes Its Name to Ardent and is Awarded a New Contract by LADWP.***

250.    On or about March 29, 2019, shortly after the transfer of ownership of Aventador to Clarke, Aventador changed its name to Ardent Cyber Solutions, LLC ("Ardent").  On or about April 1, 2019, the CITY paid Ardent approximately $799,600 under the Aventador Contract for services invoiced on or about

**COMPLAINT**

428224.23

1   March 25, 2019.

2       251.   On or about April 13, 2019, the CITY ostensibly terminated the

3   Aventador Contract.  On or about April 19, 2019, the CITY issued its last payment

4   to Aventador (but made the check payable to Ardent).  In total, the CITY paid

5   Aventador $24,479,100 prior to the termination of the Aventador Contract.

6       252.   On or about April 23, 2019, the Board approved a Cooperative

7   Purchasing Agreement for Cyber Security Consulting Services with Ardent for a

8   six-month term, effective beginning May 8, 2019 (the "Ardent Contract").

9       253.   On or about June 13, 2019, the Ardent Contract was amended,

10  extending the term of the agreement by 60 days and increasing the cumulative

11  amount due under the agreement by an additional $3.6 million, for a new total

12  amount not to exceed $7.2 million.

13      254.   Plaintiff is informed and believes, and on that basis alleges, that

14  Aventador's name change, the CITY's ostensible termination of the Aventador

15  Contract, the CITY's April 19, 2019 payment to Aventador, and the CITY's

16  approval of the Ardent Contract and its amendment were attempts to circumvent

17  Judge Berle's March 4, 2019 order.

18      ***24.     Paradis Asserts His Privilege Against Self-Incrimination at***

19          ***His April 3, 2019 Court-Ordered Deposition.***

20      255.   On or about April 3, 2019, Paradis was deposed in the *City v. PwC* case

21  pursuant to court order.  At the beginning of his deposition, he was placed under

22  oath.  During his deposition, Paradis invoked his privilege against self-incrimination

23  and refused to answer every question put to him at the deposition, including

24  questions concerning the following subject matter areas, among others:

25          (a)    His address and primary residence, and about his practice of law;

26          (b)    When and how he was retained by Mr. Jones, the website

27  through which he first had contact with Mr. Jones, Mr. Jones' desire to bring a class

28  action against LADWP, his representation of Mr. Jones, the circumstances under

77

**COMPLAINT**

1    which his attorney-client relationship with Mr. Jones began and whether that

2    relationship remained ongoing;

3          (c)    Whether his representation of the CITY as Special Counsel

4    began on December 18, 2014, the period of time in which he concurrently

5    represented Mr. Jones and the CITY, and who within the LACAO and LADWP was

6    aware of his concurrent representation of Mr. Jones and the CITY;

7          (d)    All work that he performed on behalf of Mr. Jones and the CITY

8    during December 2014 and all of 2015;

9          (e)    The genesis of the draft *Jones v. PwC* complaint, and the

10   differences between the versions of that draft complaint he sent Mr. Jones and the

11   LACAO;

12         (f)    When he began drafting the *Jones v. City* complaint, his role in

13   drafting the complaint and his communications with others regarding his drafting of

14   the complaint;

15         (g)    His relationship with Landskroner, the circumstances under

16   which Landskroner came to represent Mr. Jones, his disclosures to Mr. Jones

17   concerning the reasons Landskroner was being brought into *the Jones v. City* case,

18   whether he provided Landskroner with previously filed class actions complaints

19   prior to the filing of the *Jones v. City* complaint, and whether he received a referral

20   fee or any other compensation from Landskroner in connection with the *Jones v.*

21   *City* case or his representation of Mr. Jones;

22         (h)    When he met and what he knew about Libman;

23         (i)    His interactions with plaintiff's counsel in the other ratepayer

24   class actions;

25         (j)    His involvement in the settlement of the *Jones v. City* case,

26   including his attendance at and participation in mediation sessions and his

27   involvement in obtaining court approval of the settlement;

28         (k)    The drafting of Mr. Jones's May 5, 2017 Declaration;

78
**COMPLAINT**

1    (l)    His initial contracts with the LACAO and LADWP, the timing

2  and circumstances of his retention by the CITY in any non-litigation capacity, when

3  and how he first met Wright, his communications with Wright, and any payments to

4  Wright;

5    (m)    Any compensation he received from the CITY for project

6  management, any compensation he received from the CITY for work relating to

7  cybersecurity, and any payments, gifts, or other items of value he gave to anyone at

8  LADWP or the LACAO;

9    (n)    His prior experience with utilities and/or billing system cases;

10    (o)    His first agreement with LADWP to provide project management

11  services in connection with the settlement in the *Jones v. City* case, his role in any

12  remediation as part of that settlement, LADWP's amendment of his original

13  agreement for project management services, his formation of and involvement in

14  Aventador, Aventador's business address, office, clients, website and employees,

15  and his disclosure of his affiliation with Aventador; and

16    (p)    The CITY's Privilege Log, including Documents Nos. 70 and 71

17  relating to the draft *Jones v. PwC* complaint.

18    ***25.    Judge Berle Appoints Brian Kabateck and Kabateck LLP as***

19    ***New Class Counsel.***

20    256.   On or about April 17, 2019, Judge Berle appointed Brian Kabateck and

21  his law firm, Kabateck LLP (collectively, "Kabateck"), as new class counsel,

22  replacing Landskroner and LGM.

23    257.   In appointing Kabateck as new class counsel, Judge Berle vested him

24  with authority to investigate "how the settlement was arrived," and "whether the

25  settlement of the class action was fair, reasonable, and adequate under all the

26  circumstances."

27    258.   Judge Berle further ordered the CITY to pay Kabateck's fees and

28  reimburse his costs upon future application.

1
2

***26.     The CITY's Withholding and Then Selective Public Disclosure of
Damning Emails Received from Kiesel.***

3   259.   On or about April 26, 2019, the CITY filed a Notice re Documents in

4   the *City v. PwC* case, explaining that, two days earlier, on April 24, 2019, it had

5   purportedly discovered the existence of emails between Paradis, Kiesel,

6   Landskroner and Libman on a forensically imaged hard drive, evidencing that they

7   had drafted the *Jones v. City* complaint and Mr. Jones's Government Claim (the

8   "Kiesel Emails").  In its Notice, the CITY stated: "*No City employee or officer sent*

9   *or received any of these emails*."  The CITY attached copies of the Kiesel Emails to

10   the Notice.

11   260.   Plaintiff is informed and believes, and on that basis alleges, that in

12   filing the Notice, the LACAO selected emails that did not implicate the CITY, while

13   concealing other damaging emails.

14   261.   Following the filing of the Notice, the CITY issued a statement that

15   "*[w]e are unaware of anything indicating any city officer or employee was aware*

16   *of, or directed, the conduct of prior outside counsel reflected in these emails.*"  This

17   statement was false and misleading: in fact, multiple city officials and employees,

18   including CLARK and PETERS, were aware of and had directed the conduct of

19   Paradis and Kiesel.

20   262.   Furthermore, the CITY concealed that Kiesel had sent the Kiesel

21   Emails to PETERS three months earlier, on or about January 30, 2019, such that

22   PETERS possessed them at the time of CLARK's PMQ deposition sessions, but

23   never disclosed them.

24
25

***27.     Kiesel's May 28, 29 and 30, 2019 Deposition Sessions and
Paradis's April 29, 2019 Text Message.***

26   263.   Kiesel was deposed on May 28, 29 and 30, 2019.  He testified under

27   oath as follows:

28   (a)     He had sent the Kiesel Emails and other emails to the CITY, in

particular to PETERS, in January 2019, in response to a PwC subpoena.  The emails included communications evidencing that the CITY knew about the plan to file the *Jones v. City* case and Paradis's representation of Mr. Jones in that matter in advance of its filing.

(b)     The CITY not only knew of the collusive *Jones v. City* filing and settlement, but directed it, and that CLARK and PETERS had been present at a meeting in February 2015, at which the plan to file and quickly settle the *Jones v. City* complaint had been devised.

264.    At his deposition, Kiesel also produced a text from Paradis, dated April 29, 2019, in which Paradis stated:

> *It is unbelievable how the [LACAO] is flat out lying and denying the fact that [the LACAO] both knew about and directed the preparation and filing of [Jones v. City]!*
>
> *Maybe they have forgotten that the [LACAO] emailed me the other consumer class action complaints that had been filed against the City and directed that the Jones complaint include those allegations?*
>
> *Maybe they have forgotten that the [LACAO] directed the preparation of the Jones class action complaint that Deb Dorny and Richard Tom repeatedly referred to as the 'White Knight Complaint?'*
>
> *Maybe they have forgotten that Jim Clark directed the entire strategy after clearing it with Mike Feuer, Mel Levine and Bill Funderbunk?  Maybe they have forgotten that we have numerous emails demonstrating that they are lying when they deny knowledge and participation in all of this?*

265.    After his deposition concluded, Kiesel submitted metadata to Judge Berle showing that the Kiesel Emails were in fact sent from Kiesel to PETERS and downloaded on at least two occasions, including just days before CLARK's February 26, 2019 PMQ deposition session, for which PETERS had prepared and at which he had represented CLARK.

266.    Following Kiesel's deposition, both CLARK and PETERS filed declarations denying that they were present at the alleged February 2015 meeting.

267.    On or about June 24, 2019, Rob Wilcox issued a statement on behalf of

the LACAO, dismissing Paradis's text as "*a self-serving text written four years after the events it purports to portray, by an individual who had previously invoked the Fifth Amendment, which is not worthy of comment.*"  In fact, as the LACAO was aware and Judge Berle would later find, Kiesel's deposition testimony, and thus Paradis's text, were well corroborated and credible.

### 28.    Judge Berle Appoints Edward Robbins, Jr. as Special Master.

268.   On or about June 17, 2019, Judge Berle appointed former federal prosecutor Edward M. Robbins, Jr. ("Robbins") as Special Master/Auditor with authority to investigate and determine the disposition of all settlement funds in *Jones v. City*, including the $19 million in attorney's fees; the relationships among Paradis, Kiesel, Landskroner and Libman; and whether any of those attorneys committed any ethical violations or criminal offenses requiring referral to the appropriate authorities.

269.   Specifically, Judge Berle directed Robbins to, among other things:

(a)    "*[I]nvestigate and audit all financial matters relating to payments by the [CITY] in connection with the settlement of* [Jones v. City], *the remediation of the DWP billing system . . ., all payments to [Kiesel], all payments to [Paradis], all payments to every entity in which [Paradis] or [Landskroner] have an interest, all other payments made in connection with the Related Cases, including all payments made to [Aventador] and/or [Ardent] and Bender Consultant*";

(b)    "*[C]onduct a complete financial audit about any financial arrangements, fee sharing agreements, referral fees. payments or disbursements regarding the* Related Cases *and any related litigation*";

(c)    "*[D]etermine the existence of relationships that preexisted the filing of the Related Cases as between and among counsel representing the [CITY] and counsel of record in Related Cases, including any individual relationships that pre-existed their work for the CITY], such as [PETERS] who was a partner of [Kiesel]'s before joining the [CITY]; and determine the extent and conditions under*

*which those preexisting relationships led to the naming of counsel in [Jones v. City]";*

(d)      *"[Investigate] the facts and circumstances surrounding the representation of Mr. Jones, the ethical duties owed to Mr. Jones and by whom, the knowledge or lack of knowledge by the [CITY] regarding Mr. Jones's representation by counsel," "how Mr. Landskroner and Mr. Libman became counsel for Mr. Jones in the class action cases," "the facts and circumstances surrounding the preparation of the [Jones v. PwC] draft complaint and any version or other drafts of such complaint"* and *"the facts and circumstances regarding the terms contained in the proposed settlement agreement in the [Jones v. City] case";* and

(e)      *"[D]etermine whether written submissions or oral presentations made by counsel in the Related Cases to support the settlement complied with ethical duties and responsibilities, specifically, whether there was any unethical conduct."*

270.   To conduct his investigation, Judge Berle granted Robbins authority to issue subpoenas, take depositions, inspect and copy files of any party or counsel for any party, and retain experts and consultants.

271.   Judge Berle further ordered the CITY to pay Robbins's fees and reimburse his costs upon future application.

**29.      *Tufaro Asserts Her Privilege Against Self-Incrimination at Her July 8, 2019 Court-Ordered Deposition.***

272.   On or about July 8, 2019, Tufaro was deposed in the *City v. PwC* case pursuant to court order.  At the outset of the deposition, she was placed under oath. During her deposition, Tufaro invoked her privilege against self-incrimination and refused to answer nearly every question put to her at the deposition, including questions concerning the following subject matter areas, among others:

(a)      How long she had been living at her then address in Santa Monica, California;

(b)     When and how PLG was retained by Mr. Jones, the website through which Paradis had his initial contact with Mr. Jones, Tufaro's representation of Mr. Jones, the circumstances under which her attorney-client relationship with Mr. Jones began, whether that relationship remained ongoing, whether she believed Mr. Jones had a claim against LADWP in December 2014, and whether she was directed by anyone at the CITY to terminate her attorney-client relationship with Mr. Jones;

(c)     Whether her representation of the CITY as Special Counsel began on December 18, 2014, the period of time in which she concurrently represented Mr. Jones and the CITY, and who within the LACAO and LADWP was aware of her concurrent representation of Mr. Jones and the CITY;

(d)     All work that she performed on behalf of Mr. Jones and the CITY during December 2014 and all of 2015;

(e)     The genesis of the draft *Jones v. PwC* complaint, whether she played any role in its preparation and her communications with others regarding the drafting of the complaint;

(f)     Her relationship with Landskroner, the circumstances under which Landskroner came to represent Mr. Jones, whether she provided Landskroner with previously filed class actions complaints prior to the filing of the *Jones v. City* complaint, whether Paradis provided the draft *Jones v. City* complaint to Landskroner and Libman, whether she was aware of any payments being directed on behalf of Paradis or PLG (directly or indirectly) to Landskroner (directly or indirectly), and whether she was aware that Landskroner intended to communicate a settlement demand to the CITY within a day of the filing the *Jones v. City* complaint;

(g)     Whether she was aware of any payments being directed by PLG to Libman;

(h)     Her involvement in, and her knowledge of Paradis's involvement

**COMPLAINT**

in, the settlement of the *Jones v. City* case, including her participation in mediation sessions and obtaining court approval of the settlement;

(i)     Whether she ever discussed the *Jones v. City* case with CLARK or PETERS;

(j)     Initial contracts with the LACAO and LADWP, the timing and circumstances of her retention by the CITY in any non-litigation capacity, when and how she first met Wright, her communications with Wright and any payments to Wright;

(k)     Any compensation that she received from the CITY for project management or work relating to cybersecurity, and any payments, gifts, or other items of value Paradis gave to anyone at LADWP or the LACAO;

(l)     Her prior experience with utilities and/or billing system cases;

(m)     PLG's first agreement with LADWP to provide project management services in connection with the settlement in the *Jones v. City* case, her role in any remediation as part of that settlement, LADWP's amendment of the original agreement for project management services, the formation of and her involvement in Aventador, Aventador's business address, office, clients, website and employees, her knowledge of what services Aventador was contracted to perform for the CITY, her role in Aventador and any compensation that she received as a result, and whether she communicated with anyone at the LACAO or LADWP regarding work done by Aventador;

(n)     Her knowledge of the details and circumstances of the sale of Aventador, and her relationship with Clarke; and

(o)     Her concurrent representation of the CITY while under contract with LADWP to provide services related to the CC&B system.

**30.**     ***The FBI Executes Search Warrants for the Offices of LADWP, the LACAO and Kiesel Law.***

273.     On or about July 22, 2019, as part of a federal criminal investigation by

1   the U.S. Attorney's Office, the FBI served search warrants for documents at

2   City Hall, the LACAO, Kiesel Law and LADWP, and on several individuals,

3   including Wright and five members of the LADWP's Board of Commissioners.

4       274.   The affidavits establishing probable cause for the search warrants were

5   (and remain) sealed.  The government's criminal investigation is ongoing.

6       **31.   *Mr. Jones Presents a Government Claim for Damages to the CITY.***

7       275.   On or about July 22, 2019, pursuant to California Government Code

8   section 810 *et seq*., Mr. Jones presented a Claim for Damages to the CITY, seeking

9   damages for unjust enrichment, breach of fiduciary duty, conversion of property

10  rights, misappropriation of his name in violation of California Civil Code

11  section 3344, emotional distress, tort of another and disgorgement of illicit gains.

12  The claim included a detailed 53-page statement of facts.

13      **32.   *Wright Asserts His Privilege Against Self-Incrimination at***

14          ***His July 23, 2019 Court-Ordered Deposition and Resigns Effective***

15          ***Immediately.***

16      276.   On or about July 23, 2019, Wright was deposed in the *City v. PwC* case

17  pursuant to court order by Judge Berle.  At the start of his deposition, he was placed

18  under oath.  Wright invoked his privilege against self-incrimination and refused to

19  answer nearly every question put to him at the deposition, including questions

20  concerning the following subject matter areas, among others:

21          (a)   His role in hiring Paradis, Tufaro and Kiesel as special counsel;

22          (b)   Whether he was familiar of the conflict of interest disclosure in

23  the draft Special Counsel Agreement;

24          (c)   Whether he had authorized Paradis to prepare a complaint on

25  behalf of Mr. Jones;

26          (d)   When he first became aware of the draft *Jones v. PwC*

27  complaint;

28          (e)   Paradis's role in representing the CITY in the *Jones v. City* case;

(f)     What role he had in the settlement negotiations with Landskroner and in involving Paradis in the negotiations;

(g)     His involvement in negotiating the amount of attorney's fees that the CITY would agree not to oppose in connection with the *Jones v. City* settlement;

(h)     His role in the awarding of Paradis Contract, the Aventador Contract and the Ardent Contract; and

(i)     Whether he had spoken to Paradis about a plan to change ownership of Aventador from Paradis to Clarke.

277.   The same day as his deposition, Wright resigned from LADWP effective immediately.

**33.     *Libman's Admissions at the July 25, 2019 Hearing.***

278.   On or about July 25, 2019, at a hearing in the *City v. PwC* and *Jones v. City* cases, Libman admitted in open court that (a) he "*never met Mr. Jones*"; (b) despite never meeting him, he had purportedly represented Mr. Jones in the mediation; (c) he did not have Mr. Jones's "*consent for retention*"; and (d) he did not have Mr. Jones's consent "*to any fee arrangement*."

**34.     *Judge Berle Finds that the Mediation was a "Charade."***

279.   On or about July 25, 2019, Judge Berle granted PwC's motion to overrule objections based on the mediation privilege pertaining to the mediation in *Jones v. City*.

280.   In issuing his ruling, Judge Berle made the following findings, among others:

(a)     "*[E]vidence has been presented that the attorneys involved, [Paradis] and his office and perhaps others, were representing both sides.  They were representing Mr. Jones, the plaintiff, while at the same time representing the [City], defendant.*"

(b)     "*Jones . . . understood that he was represented by [Paradis] and Mr. Landskroner who was designated as Mr. Jones's counsel through the*

1  *arrangements made by [Paradis].*"

2         (c)    "*[T]he evidence that has been presented in connection with the*

3  *purported mediation and purported settlement resulted from a mediation which was*

4  *ultimately presented to the Court for approval [that] was based on collusion and*

5  *misrepresentation.*"

6         (d)    "*Mediation participation and the charade has been presented in*

7  *evidence in this case is akin to a fraud on the court.*"

8        ***35.*    *Judge Berle Grants PwC's Motion to Compel the CITY to***

9               ***Produce Relevant Documents.***

10      281.   On or about August 12, 2019, Judge Berle granted PwC's motion to

11  compel the CITY to produce certain documents responsive to PwC's March 2019

12  request for production of documents, including communications between the CITY

13  and Paradis, Tufaro and Kiesel, and draft declarations by them or Landskroner.

14      282.   Judge Berle found that PwC had "*established in limine that the alleged*

15  *fraud [between the CITY, Paradis, Kiesel and others] has some foundation in fact,*"

16  and that PwC had "*set forth sufficient proof from which reasonable inferences can*

17  *be drawn to establish the prima facie case of fraud.*"

18      283.   In reaching these conclusions, Judge Berle made the following

19  findings, based on Kiesel's testimony:

20         (a)    "*Paradis drafted the Jones versus PwC Complaint then*

21  *circulated to the [LACAO].*"

22         (b)    "*In late February, 2015, [CLARK and PETERS] met with*

23  *[Kiesel] and Paradis.  Paradis suggested to them he could revise his draft of the*

24  *Jones versus PwC Complaint into what became the Jones versus City of Los Angeles*

25  *Complaint.*"

26         (c)    "*The City asked Paradis if they could use Mr. Jones as a class*

27  *representative to assert a claim against the City so that the City could resolve all of*

28  *LADWP's billing issues with the claim.*"

1        (d)     CLARK and PETERS "*not only approved the plan to use Jones*

2  *as a named plaintiff in a comprehensive action to be filed against the City, but that*

3  *[Paradis] was directed to do so by the City.*"

4        (e)     "*[T]he plan was to have Jones versus City brought and have the*

5  *attorney who would be bringing the suit immediately make a request to settle the*

6  *claim.  [¶]   The City would then settle the claim and obtain a full and complete*

7  *release of all pending class action claims insulating the City against all other such*

8  *claims.*"

9        (f)     "*With the City's knowledge and direction, Paradis brought in*

10  *[Landskroner] as counsel to actually file the case on behalf of Mr. Jones.*"

11      284.   In addition, Judge Berle found that Kiesel's testimony at his May 28,

12  29 and 30, 2019 depositions sessions was corroborated by documentary evidence

13  establishing the following facts:

14        (a)     "*[T]he Jones versus PwC Complaint was sent to at least nine*

15  *City employees and discussed at an internal meeting*";

16        (b)     "*The Complaint clearly indicated Mr. Jones as the plaintiff and*

17  *[Paradis] and . . . Kiesel as his counsel*";

18        (c)     "*The City received and reviewed a draft of the Special Counsel's*

19  *engagement agreement in which it states that the City is aware that Special Counsel*

20  *was simultaneously retained by Jones*"; and

21        (d)     "*[T]he draft Jones v. PwC Complaint [of] which nine*

22  *Los Angeles City employees had possession contains ten pages of allegations that*

23  *are used wholesale as word-for-word allegations in the Jones versus City of*

24  *Los Angeles Complaint.*"

25      285.   Judge Berle also rejected the CITY's argument that "*Special Counsel*

26  *went rogue trying to conceal their actions from the City,*" finding that "*[t]his*

27  *explanation is questionable given that the Paradis/Jones relationship had been*

28  *previously disclosed to so many individuals at LADWP and the [LACAO].*"

286.   In making these findings, Judge Berle cited the following evidence:

(a)   Solomon "*testified that Paradis told him in early March, 2015 that an Ohio attorney with whom Paradis had previously worked was going to file a class action against the City*";

(b)   "*Paradis's email of April 1, 2015, indicated [Tom] requested Paradis to email a copy or to advise Landskroner to email a copy to Tom of the Jones versus City Complaint*";

(c)   "*The immediate rush to settle between the City and [Landskroner], along with [Landskroner's] settlement letter sent the day after filing of suit without any discovery undertaken[,] which settlement letter contained detailed information regarding the City's complex billing system that Landskroner inexplicably knew [about], further suggests . . . a prima facie showing of collusion*"; and

(d)   Solomon further "*testified that shortly after the Jones versus City case was filed, he heard the term White Knight Complaint or White Knight approach [from Paradis or Kiesel] or both[,] which he understood to mean negotiating a settlement with Plaintiff to globally deal with everything*," which "*further corroborates [Kiesel's] testimony that the intended Jones [Complaint] was referred to as the White Knight Action,*" and "*directly contradicts the City's questionable claim that Special Counsel were rogue actors*."

### *36.   The CITY Denies Mr. Jones's Government Claim as Untimely.*

287.   On or about September 6, 2019, in a terse, two-page letter, the CITY denied Mr. Jones's Claim for Damages, contending, without further elaboration, that "*[a]fter reviewing the circumstances of the claim and the applicable law, it has been determined that the claim should be denied,*" asserting that the claim was "*being returned*" because it was not timely presented.

/ / /

/ / /

37.     ***Judge Berle Denies PLG and Paradis's Application for a Protective Order.***

288.    On or about June 20, 2019, PLG and Paradis filed an *ex parte* application for a protective order prohibiting Mr. Jones from producing certain documents which PLG and Paradis contended contained their work product.

289.    On or about September 19, 2019, Judge Berle denied PLG and Paradis's application, making the following findings, among others:

(a)     "*On December 11, 2014 – less than three days after being retained by Jones – Paradis communicated with the City regarding the alleged LADWP billing system failures.*"

(b)     "*Paradis and [PETERS] . . . met at the Los Angeles City Attorney's Office on December 16, 2014, at which time they shared documents labeled as 'Privileged & Confidential.'*"

(c)     "*Peters stated in Court that Paradis's attorney-client relationship with the City began 'on or about December 18, 2014.'*"

(d)     "*The [Special Counsel] Agreement entered into between Paradis and the City provides that its term commenced on January 1, 2015.  Thus, by that date, Paradis, as well as . . . Kiesel . . . , were already clearly serving as outside Special Counsel to the City.*"

(e)     "*On January 9, 2015, Paradis emailed Jones a draft class action complaint captioned Antwon Jones v. PricewaterhouseCoopers LLP.  The draft pleading listed Paradis, Kiesel, and [Tufaro] as the lawyers representing Jones.*"

(f)     "*On January 23, 2015, Paradis emailed three attorneys in the City Attorney's Office that same draft class action complaint . . . , which had been provided to Jones two weeks earlier, but with only two minor edits.*"

(g)     "*In March 2015, while serving as Special Counsel to the City, Paradis revised these complaints to be the* Jones v. City of Los Angeles *complaint. The* Jones v. City of Los Angeles *complaint identifies the same plaintiff (Jones) and*

*contains 10 pages that are word-for-word identical to the draft* Jones v. PwC *complaint.*"

(h)    "*Well before repurposing the [*Jones v. PwC*] complaint, Paradis had been aware of Jones' claim against the City . . . .  Jones stated that he intended to bring a lawsuit against LADWP since early December 2014 through the filing of the case.*"

(i)    "*At a hearing held on December 4, 2017, Paradis acknowledged that he drafted the* Jones v. PwC *complaint (as well as the* Jones v. City of Los Angeles *complaint) on behalf of the City.*"

(j)    "*The evidence presented to the Court establishes that 1) Paradis drafted the* Jones v. PwC *complaint for the City, as his client; 2) Paradis also repurposed the* Jones v. PwC *complaint as the* Jones v. City of Los Angeles *complaint for the City, as his client.  The very acts of creating the draft complaints on behalf of the City precludes the notion that the draft complaints were generated on behalf of Jones.*"

(k)    "*[S]ubstantial evidence has been presented that, for almost the entirety of the period during which Paradis was communicating with Jones, Paradis was also concurrently representing the City as Special Counsel.  The evidence leads to the conclusion that Paradis was fully cognizant that he was playing both sides of the City/Jones relationship.  That is, he was contemporaneously talking with and/or writing to both sides, sending draft pleadings to both sides, and even drafted a complaint on behalf of one against the other.*"

(l)    "*[W]hen Paradis communicated with Jones, he was in effect communicating with an adversary of his client, namely the City of Los Angeles; when Paradis communicated with the City, he was in effect communicating with an adversary of his client, Jones.  Paradis is but one lawyer; he cannot legally claim to have concurrent loyal, trustworthy, confidential relationships with two adverse clients.*"

290.   On or about September 27, 2019, PLG and Paradis filed a petition for writ of mandate.  On or about November 22, 2019, the Court of Appeal denied the writ petition on the ground that PLG and Paradis had failed to demonstrate entitlement to extraordinary relief.

### 38.   *The CITY Dismisses Its Case Against PwC, Reciting Specious Reasons.*

291.   On or about September 27, 2019, the CITY unexpectedly dismissed the *City v. PwC* action it had filed in March 2015, and had been litigating for more than four years.  In a statement, the LACAO claimed that LADWP's "*ability to prove damages has been severely undermined by the unavailability of key witnesses who have invoked their 5th Amendment right against self-incrimination,*" particularly Paradis and Wright.

292.   This justification was false and misleading.  The CITY was never planning to call Paradis or Wright as witnesses to establish the CITY's alleged damages.  Furthermore, Plaintiff is informed and believes, and on that basis alleges, that the real reason the CITY dismissed the suit was to prevent PwC from further using the discovery process to scrutinize the LACAO and LADWP's actions, and thus prevent further damning evidence from coming to light and prevent further political damage to FEUER.

### 39.   *Judge Berle Denies PLG and Paradis's Motion for a Protective Order Regarding Communications with Landskroner.*

293.   On or about December 20, 2019, PLG and Paradis filed an *ex parte* application for a protective order prohibiting Mr. Jones from producing his email exchanges with PLG and Landskroner, which PLG and Paradis argued were their work product.

294.   On or about January 16, 2020, Judge Berle denied PLG and Paradis's application, making the following findings, among others:

(a)   Mr. Jones "*originally retained [Paradis] and [PLG] as counsel*

**COMPLAINT**

1   *connected with a potential law suit against [LADWP].  [¶]  And after being*
2   *retained . . ., they started communicating with the City of Los Angeles regarding*
3   *representation of the City in connection with its billing system.*"

4   (b)   Paradis and PLG "*brought in . . . Landskroner as counsel to file*
5   *the lawsuit on behalf of Jones.  [¶]  After the [*Jones v. City*] complaint was filed,*
6   *Landskroner immediately sought to settle on behalf of Jones, and Paradis worked*
7   *on settling the matter for the City Attorney's Office.*"

8   (c)   On "*September 11, 2015, Paradis made a court appearance and*
9   *spoke on behalf of the City on a hearing for preliminary approval of the [*Jones v.
10   City*] settlement.*"

11   (d)   "*As discussed at length in prior proceedings, evidence led this*
12   *Court to preliminarily conclude that Paradis was playing both side of the Jones/City*
13   *of Los Angeles matter.  And there was need to reexamine the settlement based on*
14   *possible collusion between Landskroner, Paradis and the City and possibly others.*"

15   (e)   "*The Court previously concluded that the fact that [Paradis] was*
16   *playing both sides constituted a waiver of the attorney work product privilege, if one*
17   *existed.*"

18   (f)   "*Even assuming that the communications contained Paradis's*
19   *impressions, conclusions, opinions or legal research that would claim to be*
20   *protective on a work product doctrine, Paradis does not offer a legal basis to*
21   *establish that such protection was needed to direct an immediate communication of*
22   *those impressions, conclusions, opinions to his supposed client's adversary.*"

23   (g)   "*Even if the expectation of confidentiality were to be established,*
24   *[the] second problem faced by [Paradis] and [PLG] would be that Paradis has not*
25   *provided any evidentiary or legal basis to support a finding that two parties had a*
26   *common interest in securing legal advice related to the same matter and that the*
27   *communications be made to advance the shared interest in securing legal advice on*
28   *that common matter.*"

**COMPLAINT**

(h)    "*The relationship between the entities at issue here are direct adversaries.  The parties appear on each respective side of the 'versus' in the case caption; it's Jones versus the City of Los Angeles.  They're not on the same side. [¶]  The communications at issue are simply communications between those parties during the settlement phase of their litigation.*"

(i)    "*While City and Jones might have had an alternate interest in effectuating a settlement agreement, such did not alter the relationship between the parties during the settlement.  [¶]  The Court sees no more alignment of interest between these direct adversaries than a simple desire to conclude the case, a desire which incidentally exists, hopefully in most litigation.*"

(j)    "*There's no privilege that's properly asserted in this case by Paradis or [PLG].*"

**E.    Pansky Issues a False, Misleading and Biased Ethics Report in an Attempt to Exonerate FEUER and the LACAO.**

295.   On or about October 22, 2019, Pansky issued a 150-page document reporting on the results of her so-called ethics review of the *City v. PwC* and *Jones v. City* cases, at a cost of more than $175,000 to CITY taxpayers, including Mr. Jones.  Plaintiff is informed and believes, and on that basis alleges, that Pansky was paid to prepare and issue her report in furtherance of the CITY's cover up by creating, in effect, a very expensive press release for FEUER in advance of any adverse findings by Kabateck or Robbins.

296.   In her report, Pansky concluded that the LACAO and its Special Counsel violated "*no ethical duties in seeking to obtain the most favorable*" terms to settle *Jones v. City*.  She found that, "*[t]o the extent that the city and the ratepayers had a mutual interest in pursuing the ultimate responsible party to recover for the benefit of the ratepayers, full reimbursement of the amount of the overcharges paid by ratepayers, there was no actual conflict of interest and therefore, there was no impropriety on the part of the city attorney in exploring either joint or separate*

*efforts to recover from the responsible party 100% of the losses suffered by the ratepayers.*"

297. Pansky's report was a farce for many reasons, including the following:

(a) *First*, the report was entirely unnecessary and a complete waste of taxpayer dollars given Judge Berle's appointment of Kabateck as new class counsel and Robbins as Special Master, with direction and authority to properly investigate the very same issues that Pansky purported to address.

(b) *Second*, Pansky did not conduct anything resembling an actual "investigation" or "ethics analysis." She did not interview or otherwise speak with – or even attempt to interview or otherwise speak with – a single key witness within the LACAO, including FEUER, CLARK, PETERS, Tom, Solomon, or Dorny, although she had access to them all. Nor did she ever seek to interview or otherwise speak with key third-party witnesses, such as Mr. Jones, Kiesel, Levine, or the LADWP employees who supervised and administered the Paradis, Aventador and Ardent Contracts (none of whom had asserted their privilege against self-incrimination and therefore were available to interview or speak with). In fact, her report stated: "*I have refrained from conducting independent discovery, including interviews with percipient witnesses, . . . and I have not endeavored to resolve factual inconsistencies evidenced by the sworn deposition testimony of various deponents.*"

(c) *Third*, Plaintiff is informed and believes, and on that basis alleges, that Pansky did not review – or even seek access to – key documents, records and communications that the LACAO was withholding, but rather limited her review to documents already produced by the CITY in discovery to PwC. In fact, Pansky stated in her report that she wanted "*to avoid basing my analysis on facts that have not been documented through formal discovery in [*City v. PwC*],*" which was not credible and itself defeated the purpose of hiring an expert to conduct an "independent" ethics investigation.

1    (d)    *Fourth*, Pansky disregarded court findings and rulings made after

2  full briefing and argument and based on competent and admissible evidence,

3  including Judge Berle's findings and rulings in overruling Paradis's assertion of the

4  work product doctrine with respect to the draft *Jones v. PwC* complaint, as further

5  described in paragraphs 247 through 248, above; granting PwC's motion to overrule

6  objections based on the mediation privilege, as further described in paragraphs 279

7  through 280, above; granting PwC's motion to compel the CITY to produce

8  documents it was withholding, as further described in paragraphs 281 through 286,

9  above; and denying PLG and Paradis's *ex parte* application for a protective order

10  prohibiting Mr. Jones from producing documents, as further described in

11  paragraphs 288 and 289, above.

12    (e)    *Fifth*, in a number of instances, Pansky's "findings" directly

13  contradicted those of Judge Berle.  By way of example:

14    (i)    She found "***no evidence at all***" that "*the settlement*

15  *negotiations were weak or superficial*" (emphasis added), which was directly

16  contrary to Judge Berle's findings that "*the evidence that has been presented in*

17  *connection with the purported mediation and purported settlement resulted from a*

18  *mediation which was ultimately presented to the Court for approval [that] was*

19  *based on collusion and misrepresentation," and "there was need to reexamine the*

20  *settlement based on possible collusion between Landskroner, Paradis and the City*

21  *and possibly others*."

22    (ii)    She found that "*[t]he [LACAO] and the City's outside*

23  *counsel **violated no ethical duties** in seeking to settle the class actions arising from*

24  *the CC&B problems as soon as practicable*" (emphasis added), which was directly

25  contrary to Judge Berle's finding that "*[t]he immediate rush to settle between the*

26  *City and [Landskroner], along with [Landskroner's] settlement letter sent the day*

27  *after filing of suit without any discovery undertaken[,] which settlement letter*

28  *contained detailed information regarding the City's complex billing system that*

**COMPLAINT**

428224.23

1   *Landskroner inexplicably knew [about], further suggests . . . a prima facie showing*

2   *of collusion.*"

3           (f)      *Sixth*, Pansky avoided investigating, analyzing, or even

4   considering incriminating evidence of false and misleading declarations and

5   deposition testimony, misrepresentations to Judge Berle and the suppression and

6   destruction of material evidence by CLARK and PETERS.  By way of example:

7           (i)      She did not analyze or otherwise address – and, in fact,

8   simply ignored – PETERS's April 26, 2018 declaration, in which he concealed that

9   Paradis had been counsel for Mr. Jones at the time the *Jones v. City* complaint was

10  filed; claimed that he had been the one who requested Paradis to prepare the draft

11  *Jones v. PwC* complaint, despite not being listed on the CITY's privilege log as

12  having received it; and misrepresented why the *Jones v. PwC* complaint was never

13  filed.

14          (ii)     She did not analyze or otherwise address – and, in fact,

15  simply ignored – PETERS's false and misleading testimony at his September 13,

16  2018 PMQ deposition, detailed above in paragraphs 207 through 208; his failure to

17  produce the Kiesel Emails and other documents sought in discovery by PwC; and

18  his refusal to answer relevant and proper questions without legal cause.

19          (iii)    She did not analyze or address – and, in fact, simply

20  ignored – metadata submitted by Kiesel to Judge Berle showing that the Kiesel

21  Emails were sent from Kiesel to PETERS and downloaded on at least two

22  occasions, including just days before CLARK's February 26, 2019 PMQ deposition,

23  for which PETERS had prepared and at which he had represented CLARK.

24          (iv)     She did not analyze or otherwise address – and, in fact,

25  simply ignored – CLARK's destruction of his notes of his discussions with

26  PETERS, Tom, Solomon, Dorny, Wright, Paradis, Tufaro, Kiesel and Annaguey in

27  preparation for his February 26, 2019 PMQ deposition.

28          (v)      She did not analyze or otherwise address – and, in fact,

simply ignored – CLARK's incredulous recantation or disavowal of his many damaging admissions in his February 26, 2019 PMQ deposition testimony.

(g)     *Seventh*, Pansky also did not investigate, analyze, or even consider damaging evidence of FEUER's complicity, including Paradis's April 26, 2019 text message that CLARK had cleared "*the entire strategy*" with FEUER; PETERS's December 24, 2014 email message to Paradis that FEUER "*will obviously need to approve*" the filing of the *Jones v. PwC* suit; CLARK's January 26, 2015 email to Kiesel that FEUER was "*completely on board*"; Blood's June 26, 2015 letter to FEUER warning that there were indicia of a "*reverse auction*"; and CLARK's testimony that he was "*sure*" he reported to FEUER about the draft *Jones v. PwC* complaint.

(h)     *Eighth*, Pansky relied on cherry-picked excerpts of testimony and documents to portray Special Counsel as "rogue actors," while disregarding Judge Berle's findings and the existence of substantial evidence to the contrary, such as the fact that the relationship between Paradis and Kiesel, on the one hand, and Mr. Jones, on the other, had been disclosed to many individuals at the LACAO and LADWP, including the text of the draft Special Counsel Agreement.

(i)     *Ninth*, Pansky sought to discredit Kiesel's testimony by disregarding Judge Berle's findings and substantial corroborating evidence, and instead accepting CLARK's and PETERS's conclusory declarations at face value, ignoring substantial evidence that contradicted their disavowals and impeached their credibility.  By way of example, she discounted Kiesel's testimony "*that he and Paradis had been instructed by 'the City' to 'facilitate' the filing and service of the [*Jones v. City*] class action lawsuit*," and "*that Peters and Clark were the two individuals who authorized him and Paradis to assist Jones*," in part based on the testimony of CLARK and PETERS, but ignoring (i) the fact that the CITY had provided Paradis with copies of the complaints in the Early Class Actions; (ii) Kiesel's April 3, 2015 email to PETERS evidencing that the CITY knew that the

**COMPLAINT**

428224.23

1    *Jones v. City* complaint was going to be filed; (iii) the fact that Paradis had

2    previously drafted the *Jones v. PwC* complaint on behalf of the CITY at PETERS's

3    instruction; and (iv) the fact that the *Jones v. City* complaint contained ten pages of

4    allegations that were taken word-for-word from the draft *Jones v. PwC* complaint.

5    (j)    *Tenth*, Pansky made no mention that Paradis's counsel had

6    offered to provide her with information supporting Paradis's claim that he acted

7    with the knowledge and at the direction of CLARK and PETERS, and that she had

8    ignored the offer.

9    298.   In addition, Pansky's legal analysis was fundamentally flawed and just

10   wrong in numerous respects.  By way of example, she did not analyze or otherwise

11   address the LACAO's failure to monitor and supervise Paradis and Kiesel's

12   activities as Special Counsel as required by the California Supreme Court's decision

13   in the *Atlantic Richfield* case (discussed above at paragraphs 41 through 42), and the

14   many ethical and criminal violations committed by CLARK, PETERS and other

15   LACAO attorneys.

16   299.   FEUER and CLARK caused the CITY to hire Pansky and to pay her

17   $176,195 for her disingenuous and farcical report.

18   300.   The day after Pansky released her report, on October 23, 2019, FEUER

19   issued a statement in which he falsely claimed that *"[Pansky's] report is thorough,*

20   *with her conclusions based on extensive analysis of sworn testimony, court*

21   *transcripts, court filings, other documents, and statutory and common law.  Her*

22   *conclusions speak for themselves."*

23   **F.    Levine and CLARK Resign.**

24   301.   On or about July 30, 2020, Levine stepped down as President of the

25   Board.

26   302.   On or about August 31, 2020, CLARK resigned from the LACAO.

27   / / /

28   / / /

**G.     Judge Berle Finds that the CITY and Its Counsel Committed a "Serious Abuse of Discovery" and Awards PwC $2.5 Million in Monetary Sanctions.**

303.   On or about June 29, 2020, PwC filed a post-dismissal Motion for Sanctions against the CITY for discovery abuses in *City v. PwC* occurring between January 20, 2017 and March 6, 2019, including the CITY's denial of PwC's legitimate discovery requests concerning the draft *Jones v. PwC* complaint and the circumstances leading to the filing and settlement of *Jones v. City*.

304.   On or about October 6, 2020, at the hearing on PwC's Motion, Judge Berle found that "*there has been a serious abuse of discovery by the City and its counsel*," and that "*this serious abuse merits considerable sanctions*."  In issuing his ruling, Judge Berle cited the following facts, among others, as warranting the imposition of such an extraordinary sanction:

(a)     "*On January 20, 2017, the City submitted its first privilege log reflecting that it withheld more than 19,000 documents responsive to PwC's first set of requests for production.*"

(b)     "*The City claimed the privilege to those 19,000 documents including seeking privilege to the . . . Jones versus PwC complaint and its related cover email.*"

(c)     "*On March 6, 2017, the Court granted PwC's motion to compel ordering production of all 17,000 plus documents withheld as work product and allowing the privilege log for the other claimed attorney-client privileged documents.*"

(d)     "*On April 7, 2017, the City relogged documents instead of producing the draft of the Jones versus PwC complaint.*"

(e)     "*[On] June 5, 2017, the City responded to [requests for production] no. 70 and 71 claiming there was only one responsive document that existed.  Nevertheless, upon a production in 2019 multiple documents were*

**COMPLAINT**

*produced as responsive, including emails from the special counsel for the City, Paul Paradis, to Deputy City Attorney Solomon which attached the Jones versus PwC complaint.*"

(f)   "*On September 29, 2017, the City served a new privilege log and continued to assert privilege claims regarding the draft of the Jones versus PwC complaint and the Jones versus County of Los Angeles similar demand.*"

(g)   "*On December 4, 2017, a court hearing was held on PwC's second motion to compel.  The City through its special counsel, Paul Paradis, failed at that time to apprise the Court of the Paradis/Jones relationship, the attorney-client relationship between Mr. Paradis as counsel and Mr. Jones as client.*"

(h)   "*On September 13, 2018, the City produced Thomas Peters who is the Chief Assistant City Attorney who appeared at the deposition as the PMQ, person most qualified, but refused to produce any documents.*"

(i)   "*Mr. Peters admitted at that time he did not prepare for his deposition.  He declined to answer questions by instruction of counsel.  The City unilaterally ended the deposition, thus avoiding potential disclosure of the pre-April 1, 2015, relationship between attorney Paradis and attorney Landskroner.*"

(j)   "*On December 12, 2018, at the motion to compel deposition hearing, the City through one of its attorneys associated with Mr. Paradis, Gina Tufaro, made statements to the Court to the effect that Mr. Paradis never represented Jones.*"

(k)   "*A recess was called in the proceedings after which Mr. Paul Kiesel, another outside counsel for the City, disclosed to the Court the attorney-client relationship between special counsel Paradis and Jones.*"

(l)   "*On January 17, 2018, in objections to PwC's proposed order regarding the December hearing, the City asserted what it claimed to be a quote 'common interest privilege' closed quote with respect to the Jones PMQ notice request for production nos. 3 and 4.*"

428224.23

1       (m)    *"As I recall, that was a hearing which I inquired the basis for*

2   *this common interest privilege and counsel for the City could not provide any*

3   *authority, couldn't articulate what exactly that interest was, except that it was*

4   *apparently a common interest in orchestrating settlement . . . . [¶] . . . [T]here is no*

5   *authority for that type of asserted common interest privilege."*

6       (n)    *"On January 24, 2019, the Court entered an order granting*

7   *PwC's motion to compel deposition denying the City's motion for a protective*

8   *order, overruling the City's objection to the PMQ's request for productions, and*

9   *pre-identified deposition questions, and authorizing PwC to depose*

10   *Mr. Landskroner and Mr. Jones."*

11       (o)    *"On February 12, 2019, in response to the Court's January 24*

12   *Order the City produced the caption and title page of the draft Jones versus PwC*

13   *complaint and one other document.  I do recall at that hearing or an earlier hearing*

14   *Mr. Paradis described the Jones versus PwC complaint as a though experiment.  I*

15   *often wonder what Mr. Paradis was thinking about."*

16       (p)    *"On March 1, 2019, the City and PwC filed briefs addressing*

17   *privilege questions raised by the Court.  The City continued to assert the common*

18   *interest privilege, but admitted in writing it was made aware of the Paradis/Jones*

19   *attorney-client relationship during its first meeting with Paradis and Kiesel in*

20   *December, 2014."*

21       (q)    *"[On] February 26, 2019, in his role as the City's PMQ witness*

22   *Chief Deputy City Attorney James Clark appeared and acknowledged his knowledge*

23   *prior to the filing of the Jones versus City of Los Angeles complaint that Paradis*

24   *had recruited Landskroner to sue the City."*

25       (r)    *"[On] March 14, 2019, the City served Mr. Clark's errata of*

26   *deposition testimony in which Mr. Clark recanted or disclaimed numerous material*

27   *aspects of his February deposition testimony . . . ."*

28       (s)    *"[On] April 9 and 29, during the continued PMQ deposition,*

**COMPLAINT**

*Mr. Clark recanted additional prior testimony which in turn necessitated PwC taking an additional 18 fact witness depositions."*

(t)   *"[On] May 28 to 29, 2019, at the hearing during the courthouse deposition of Mr. Kiesel the Court permitted Mr. Kiesel's voluntary production of multiple documents over which the City and Mr. Paradis had asserted objections finding that PwC had made a showing, a prima facie showing, of fraud."*

(u)   *"[On] July 25, 2019, the Court granted PwC's July 2[, 2019] motion to compel."*

(v)   *"[On] August 12, 2019, the Court granted PwC's July 19[, 2019] motion to compel finding again that PwC had made a prima facie showing of fraud by the City."*

(w)   *"On September 26, 2019, the City voluntarily dismissed the Complaint against PwC with prejudice, avoiding production of documents covered by the Court's July 25 and August 12 Orders."*

305.   Based on this history of discovery abuses, Judge Berle awarded $2.5 million in sanctions against the CITY and in favor of PwC.

306.   According to the CITY's outside counsel, the CITY incurred $147,036 in attorney's fees in unsuccessfully opposing PwC's motion for sanctions.

# FIRST CAUSE OF ACTION

## (For Deprivation of Plaintiff's Constitutional Right and Privilege to Access the Courts, in Violation of Title 42, United States Code, Section 1983)

## (Against the CITY)

307.   Plaintiff repeats and realleges paragraphs 1 through 306 of this Complaint as if fully alleged herein.

**A.   The Constitutional Right and Privilege to Access the Courts.**

308.   The United States Constitution declares, among other things, that *"[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States,"* U.S. Const., Art. IV, § 2, cl. 1; that *"Congress shall*

104
**COMPLAINT**

*make no law abridging . . . the right of the people . . . to petition the Government for a redress of grievances," id., Amend. I; that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law," id., Amend. V; and that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws," id., Amend. XIV, § 1.*

309.   The Supreme Court has held that these constitutional provisions – the Privileges and Immunities Clause of Article IV, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Due Process and Equal Protection Clauses – create a constitutional right and privilege to access the courts.  *See Christopher v. Harbury*, 536 U.S. 403, 415 n. 12 (2002).  Indeed, the Court has recognized that the right to sue in courts "is one of the highest and most essential privileges of citizenship." *Chambers v. Baltimore & O.R. Co.*, 207 U.S. 142, 148 (1907).  "In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government." *Id.*

310.   Both the Supreme Court and the United States Court of Appeals for the Ninth Circuit have held that a plaintiff may sue the government where a government cover up has impaired the plaintiff's right and privilege to access the courts by rendering otherwise available state remedies ineffective.  *See Harbury*, 563 U.S. at 413-14; *Delew v. Wagner*, 143 F. 3d 1219, 1223 (9th Cir. 1998).  This is precisely what happened to Mr. Jones in this case.

**B.     Mr. Jones Possessed Valuable Claims Against Paradis.**

311.   As described further in the Statement of Facts above, beginning in or about December 2014, and continuing through at least in or about April 2015, Paradis, while simultaneously representing Mr. Jones and serving as Special Counsel for the CITY, made false promises and material misrepresentations to and concealed and withheld important information from Mr. Jones; breached his fiduciary duties to Mr. Jones; and acted negligently in his representation of

1    Mr. Jones.

2        312.   As also described further in the Statements of Facts, Paradis engaged in

3    this conduct together with the CITY, Kiesel, Landskroner, Libman, Wright and

4    others, and as part of a broader scheme that involved procuring an unduly

5    advantageous settlement for the CITY in *Jones v. City* by collusion and fraud;

6    fraudulently obtaining Court approval for the City to pay Landskroner, Libman and

7    their respective law firms $11.6 million in largely undeserved attorney's fees;

8    shifting blame for the disastrous CISCON System rollout to PwC; and positioning

9    Paradis to receive millions of dollars in illicit profits from LADWP's improper

10   award of no-bid contracts worth more than $36 million to PLG, Aventador and

11   Ardent.

12       313.   As a result of these wrongful acts, transactions and practices, Mr. Jones

13   possessed, in his individual capacity, various state law causes of action against

14   Paradis, including the following:

15           (a)    **Breach of fiduciary duty.**

16               (i)    As Mr. Jones's attorney, Paradis owed him the duties and

17   obligations of a fiduciary, including the duties described in paragraphs 22

18   through 35 and 38 through 39, above.

19               (ii)    Paradis breached those duties by, among other things,

20   making false and misleading misrepresentations to Mr. Jones; concealing material

21   information from Mr. Jones; acting against his interests; simultaneously representing

22   and acting on behalf of the CITY, whose interests were adverse to those of

23   Mr. Jones; communicating Mr. Jones's confidential information to the CITY

24   without his consent or knowledge; failing to deal honestly and communicate

25   truthfully with Mr. Jones; and entering into secret fee-sharing agreements.

26               (iii)    Mr. Jones was harmed as a direct and proximate result of

27   these breaches of duty.

28               (iv)    Under California law, Paradis's breaches of his fiduciary

**COMPLAINT**

428224.23

duties to Mr. Jones entitled Mr. Jones to disgorgement of all of Paradis's illicit profits, even without proof of actual damages. *See Center for Healthcare Education and Research, Inc. v. International Congress for Joint Reconstruction, Inc.*, --- Cal. Rptr. 3d. ---, 2020 WL 7021312, at \*9 (Cal. Ct. App. Nov. 30, 2020).

(b)     **Aiding and abetting Class Counsel's breaches of fiduciary duty.**

(i)     Landskroner, Libman and their respective law firms breached their fiduciary duties to Mr. Jones by making false and misleading misrepresentations to him; concealing material information from him; acting against his interests; failing to deal honestly and communicate truthfully with him; and entering into secret fee-sharing agreements.

(ii)     Paradis aided and abetted these breaches of fiduciary duty by knowingly and intentionally providing substantial assistance and encouragement to Class Counsel's wrongful conduct, including by recruiting Class Counsel to represent Mr. Jones and directing them to act adverse to Mr. Jones's interests and to his detriment.

(iii)     As a direct and proximate result of this conduct, Paradis was liable to Mr. Jones for aiding and abetting Class Counsel's breaches of their fiduciary duties to him. *See Sindell v. Abbott Labs.*, 26 Cal. 3d 588, 604 (1980); *Casey v. U.S. Bank National Association*, 127 Cal. App. 4th 1138, 1144 (2005).

(c)     **Misuse of identity for commercial purposes in violation of California Civil Code section 3344.**

(i)     California Code of Civil Procedure section 3344(a) ("section 3344(a)") provides, in pertinent part, that "[a]ny person who knowingly uses another's name, . . . in any manner . . . for purposes of . . . soliciting purchases of . . . services, without such person's prior consent, . . . shall be liable for any damages sustained by the person or persons injured as a result thereof."

(ii)     Section 3344(a) further provides that (a) "[i]n addition [to

**COMPLAINT**

428224.23

1  damages], in any action brought under this section, the person who violated the

2  section shall be liable to the injured party or parties in an amount equal to the greater

3  of seven hundred fifty dollars ($750) or the actual damages suffered by him or her

4  as a result of the unauthorized use, and any profits from the unauthorized use that

5  are attributable to the use and are not taken into account in computing the actual

6  damages"; (b) "[i]n establishing such profits, the injured party or parties are required

7  to present proof only of the gross revenue attributable to such use, and the person

8  who violated this section is required to prove his or her deductible expenses";

9  (c) "[p]unitive damages may also be awarded to the injured party or parties"; and

10  (d) "[t]he prevailing party in any action under this section shall also be entitled to

11  attorney's fees and costs."

12          (iii)    Paradis used Mr. Jones's name for a commercial purpose,

13  namely, to solicit business from and/or sell services to the CITY, and that use was

14  not in connection with any news, public affairs, or sports broadcast or account, or

15  any political campaign.  In particular, Paradis knowingly used Mr. Jones's name to

16  be hired as Special Counsel by the CITY and to negotiate and obtain approval of the

17  collusive and fraudulent settlement in *Jones v. City* on behalf of the CITY, which

18  resulted in LADWP awarding the Paradis, Aventador and Ardent Contracts.

19          (iv)    Paradis did not have Mr. Jones's prior consent to use his

20  name for these purposes, and, in any event, any such consent was void ab initio

21  because it was obtained under false pretenses, including by the concealment of

22  material facts and other breaches of Paradis's fiduciary and ethical duties, as

23  described further in the Statement of Facts.

24          (v)    Mr. Jones was harmed as a direct and proximate result of

25  Paradis's misuse of his name.

26        (d)   **Violation of the California Unfair Competition Law in**

27  **violation of California Business & Professions Code section 17200 *et seq*.**

28          (i)    The California Unfair Competition Law ("UCL"),

**COMPLAINT**

California Business & Professions Code section 17200, *et seq.*, prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice . . . ."

(ii)    Under California Business & Professions Code section 17204, actions for relief under the UCL may be brought and prosecuted "by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition."

(iii)    Under California law, "[a] cause of action for damages is . . . personal property." *Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949, 959 (2005); *see also Vick v. DaCorsi*, 110 Cal. App. 4th 206, 212 n. 35 (2003); *Parker v. Walker*, 5 Cal. App. 4th 1173, 1182-83 (1992); *U.S. v. Stonehill*, 83 F. 3d 1156, 1159-60 (9th Cir. 1996); *Bensinger v. Davidson*, 147 F. Supp. 240, 245 (S.D. Cal. 1956); Cal. Civ. Code § 953 ("A thing in action is a right to recover money or other personal property by a judicial proceeding.").

(iv)    Paradis violated, conspired to violate and aided and abetted the violation of the UCL by engaging in the following unlawful, unfair and/or fraudulent business acts and practices: violating the State Bar Act, the California Rules of Professional Conduct and section 3344(a); committing wire fraud involving the deprivation of honest services in violation of Title 18, United States Code, sections 1343 and 1346; breaching his fiduciary duties to Mr. Jones; aiding and abetting Class Counsel's breaches of their fiduciary duties to Mr. Jones; making false promises and misrepresentations to and concealing material information from Mr. Jones, as described further in the Statement of Facts.

(v)    Mr. Jones suffered an injury in fact, and lost property, as a direct and proximate result of these unlawful, unfair and fraudulent business acts and practices, which entitled him to restitutionary disgorgement from Paradis, including the value of any property Paradis appropriated from Mr. Jones and any profits Paradis derived from that property.

(e)  **Conversion.**  Mr. Jones possessed causes of action for damages and other relief against the CITY which constituted his property; Paradis substantially interfered with Mr. Jones's ability to utilize those causes of action by instead exploiting them for his own and the CITY's benefit; Paradis did so without Mr. Jones's authorization, consent, or knowledge; Mr. Jones was harmed as a direct and proximate result of Paradis's interference with and misuse of Mr. Jones's causes of action; and Paradis's wrongful conduct was a substantial factor in causing that harm.

(f)  **Unjust enrichment.**  Paradis unjustly enriched himself by, among other things, causing the CITY to hire him as Special Counsel and compensate and reward him for filing the *Jones v. City* case by awarding him and PLG the Paradis, Aventador and Ardent Contracts, with a total value of more than $36 million, at the expense and to the detriment of Mr. Jones, as more fully described in the Statement of Facts.

(g)  **Constructive fraud.**

(i)  Under California Civil Code section 1573, constructive fraud is "any breach of duty which, without an actually fraudulent intent," by which a person "gains an advantage . . . by misleading another to his prejudice, or to the prejudice of any one claiming under him," or "any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud."

(ii)  Paradis owed Mr. Jones certain legal and ethical duties and obligations as described in paragraphs 22 through 35 and 38 through 39, above; Paradis breached those duties and obligations by concealing important information from Mr. Jones as more fully described in the Statement of Facts; and Mr. Jones was harmed as a direct and proximate result of Paradis's breaches of these duties and obligations.

/ / /

/ / /

**COMPLAINT**

(h)    **Promissory fraud and intentional and negligent**
**misrepresentation.**

(i)    California Civil Code section 1710 provides, in pertinent, that the tort of "deceit" includes "[a] promise made, without any intention of performing it," "[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true," or "[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true."

(ii)    Paradis made various false promises to Mr. Jones with no intention of performing them, and various misrepresentations to him, knowing that they were false, or having no reasonable grounds for believing them to be true, including that (a) he would act solely on behalf of Mr. Jones; (b) he would take all actions reasonably necessary to bring and prosecute an action against LADWP on Mr. Jones's behalf and for his benefit; (c) Mr. Jones would be informed of all important developments in the matter; and (d) Paradis would continue to represent Mr. Jones, together with Landskroner, after introducing Mr. Jones to Landskroner in March 2015.

(iii)    Paradis intended to induce Mr. Jones to act in reliance on these false promises and misrepresentations; Mr. Jones justifiably relied on them by retaining Paradis, authorizing Paradis to file the *Jones v. City* case and not terminating and/or replacing Paradis and Landskroner as his counsel prior to the settlement of the case; and Mr. Jones was harmed as a direct and proximate result of his reliance on these false promises and misrepresentations.

(i)    **Concealment.**

(i)    California Civil Code section 1710 provides, in pertinent part, that the tort of "deceit" also includes "the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."

(ii)    Paradis had a duty to disclose material information to

111

**COMPLAINT**

Mr. Jones by virtue of his fiduciary and confidential relationship with him and the ethical duties he owed him.

(iii)    Paradis intentionally concealed and withheld important information from Mr. Jones in violation of this duty, including that (a) within days of Mr. Jones signing the retainer agreement Paradis had sent him, Paradis was retained as Special Counsel by the CITY; (b) while representing Mr. Jones against the CITY, he was simultaneously representing the CITY; (c) he intended to use Mr. Jones to file, first, the *Jones v. PwC*, and then the *Jones v. City* complaint, as part of a plan devised in concert with the CITY, even though the CITY was adverse to Mr. Jones; (d) he had drafted the *Jones v. City* complaint for the CITY; (e) he and the CITY planned to use that complaint as a "*White Knight Complaint*" to settle all LADWP billing issues raised in the Early Class Actions; (f) he avoided appearing as counsel of record for Mr. Jones in the *Jones v. City* case to hide his massive conflict of interest in representing Mr. Jones and the CITY simultaneously; (g) he was transitioning *Jones v. City* to Landskroner and did not intend to continue to represent Mr. Jones in that case; (h) in addition to Landskroner, Mr. Jones was represented by Libman, with whom Landskroner had a secret fee-sharing agreement; (i) PLG and Kiesel Law would "*receive attorneys' fees in the amount of 19.99% (split evenly between the two firms) of any net monetary and non-monetary recovery in the* City v. PwC *case, after deduction of Costs*"; and (j) he had a secret fee-sharing agreement with Landskroner.

(iv)    Paradis intended to deceive Mr. Jones by concealing and withholding this information from him; the information would have been material to Mr. Jones if he had known of it, as he would not have retained Paradis in the first place, he would have terminated or replaced him as his counsel, or he would not have permitted him to use and exploit his causes of action against the CITY; and Mr. Jones was harmed as a direct and proximate result of this concealment and withholding of information.

112

**COMPLAINT**

1    (j)    **Professional negligence.**

2    (i)    As Mr. Jones's lawyer, Paradis had the duty to use such

3    skill, expertise, diligence and care as other members of the legal profession

4    commonly possess and would have used in representing Mr. Jones in like

5    circumstances.

6    (ii)    Paradis breached this duty in numerous respects, as

7    described more fully in the Statement of Facts, and his breaches of duty were a

8    substantial factor in causing Mr. Jones harm.

9    **C.    Mr. Jones Possessed Valuable Claims Against the CITY.**

10    314.    Mr. Jones also possessed the following state law causes of action

11    against the CITY, among others, including claims arising from violation of the State

12    Bar Act, the California Rules of Professional Conduct, the California Discovery Act,

13    California Penal Code sections 118 and 126 (perjury), 134 (preparing false

14    evidence), 135 (destruction of evidence) and 182(5) (conspiracy to obstruct justice),

15    and California Government Code section 1190 (local official conflict of interest):

16    (a)    **Breach of fiduciary duty and constructive fraud.**  The CITY

17    was liable to Mr. Jones for Paradis's breaches of fiduciary duty and constructive

18    fraud under agency and ratification principles: at the same time Paradis was

19    representing Mr. Jones, he was also acting as an actual and/or ostensible agent of the

20    CITY, with the CITY's (and, in particular, CLARK and PETERS's) knowledge and

21    authorization, and, in any event, even if Paradis's conduct exceeded the scope of his

22    actual or ostensible agency, the CITY (and, in particular, CLARK and PETERS)

23    ratified and adopted that conduct.

24    (b)    **Aiding and abetting Paradis's breaches of fiduciary duty and**

25    **fraud.**  The CITY was also liable to Mr. Jones for aiding and abetting Paradis's

26    breaches of his fiduciary duties to, and Paradis's acts of fraud and deceit against,

27    Mr. Jones by knowingly and intentionally substantially assisting and encouraging

28    Paradis's wrongful conduct.

428224.23

(c)   **Conspiracy with Paradis.**  The CITY was also liable to Mr. Jones for agreeing and conspiring with Paradis to defraud Mr. Jones and violate section 3344(a) and convert his causes of action arising from his billing dispute with LADWP.

(d)   **Intentional interference with contractual relations between Mr. Jones and Paradis and PLG.**

(i)   The CITY was also liable to Mr. Jones for intentionally interfering with his agreement with Paradis and PLG.

(ii)   Mr. Jones had an agreement with Paradis and PLG to represent him as a named plaintiff and putative class representative; the CITY knew of that agreement; the CITY engaged in wrongful conduct, as more fully described in the Statement of Facts, that interfered with and prevented Paradis and PLG's performance under that agreement; the CITY intended to interfere with the agreement, or knew that its actions were certain, or substantially certain, to disrupt Paradis and PLG's performance under the contract; and Mr. Jones was harmed as a direct and proximate result of the CITY's wrongful interference.

**D.   The Government Cover Up.**

315.   As more fully described in the Statement of Facts, beginning in or about April 2015, and continuing until the present, the CITY, Paradis and others have conspired to conceal and cover up their wrongful and actionable conduct against Mr. Jones from him, Judge Berle, PwC and others by, among other things: (a) wrongfully withholding relevant documents subject to legitimate discovery requests; (b) making invalid and baseless assertions of the attorney-client privilege, the common-interest doctrine, the work product doctrine and the mediation privilege; (c) making false and misleading statements under penalty of perjury; (d) making misrepresentations to the Court; (e) suppressing and destroying evidence; (f) committing discovery abuses; (f) paying exorbitant and fraudulently inflated attorney's fees; and (g) continuing to pay Aventador and Ardent in violation

1  of court orders.  Moreover, once the wrongful, collusive and fraudulent conduct of

2  the CITY, Special Counsel and Class Counsel began to come to light in early 2019,

3  the CITY began distancing itself from and trying to shift blame to Special Counsel

4  by falsely portraying them as "rogue actors."

5      316.   At the same time, the CITY deliberately avoided taking any action that

6  might be viewed as critical of CLARK and/or PETERS's handling of the *City v.*

7  *PwC* and *Jones v. City* cases.  Among other things, the CITY refrained from

8  terminating or disciplining them or other culpable LACAO attorneys; the LACAO

9  never referred any of its attorneys to the CITY's Ethics Commission, the State Bar

10  and/or law enforcement for investigation and potential legal action; and LADWP

11  never referred Wright, Levine, any of its employees, Paradis, Aventador and/or

12  Ardent to the CITY's Ethics Commission or law enforcement for investigation and

13  potential legal action.

14      317.   In furtherance of the cover up and in an effort to protect FEUER from

15  further scrutiny and damaging publicity, the CITY also dismissed the *City v. PwC*

16  case with prejudice, publicly reciting false and disingenuous reasons for doing so,

17  and commissioned and paid Pansky to prepare a false, misleading and biased ethics

18  report, which FEUER sought to publicly use to falsely exonerate himself of

19  wrongdoing.

20  **E.    Mr. Jones Has Lost His Ability to Pursue His State Causes of Action**

21  **      Against Paradis as a Result of the Cover Up.**

22      318.   Under California Code of Civil Procedure section 340.6(a)

23  ("section 340.6(a)"), "[a]n action against an attorney for a wrongful act or omission,

24  other than for actual fraud, arising in the performance of professional services shall

25  be commenced within one year after the plaintiff discovers, or through the use of

26  reasonable diligence should have discovered, the facts constituting the wrongful act

27  or omission, or four years from the date of the wrongful act or omission, whichever

28  occurs first."

**COMPLAINT**

428224.23

319.   The statute of limitations under section 340.6(a) for Mr. Jones to have filed suit against Paradis for the causes of action described above began to run in December 2014, when, having just become counsel for Mr. Jones, Paradis simultaneously and without Mr. Jones's authorization, consent, or knowledge, became Special Counsel for the CITY in matters in which the CITY was adverse to Mr. Jones. *See Prakashpalan v. Engstrom, Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1122 (2014).

320.   As a result of the CITY's cover up, the limitations period under section 340.6(a) for Mr. Jones to file suit against Paradis asserting the causes of action described above expired before Mr. Jones had sufficient knowledge of Paradis's wrongful and actionable conduct to be able to timely file an action against him, thus rendering Mr. Jones's legal remedies against Paradis ineffective.

**F.    Mr. Jones Has Lost His Ability to Pursue His Claims Against the CITY as a Result of the Cover Up.**

321.   Under the California Government Claims Act, California Government Code sections 900, *et seq*., "no suit for money or damages may be brought against a public entity . . . until a written claim therefor has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board." Cal. Gov. Code § 945.4.

322.   Under California Government Code section 911.2(a) ("section 911.2(a)"), a claim for money or other damages against a public entity (in this case the CITY) must be presented not later than six months after the accrual of a cause of action for claims relating to personal injury or injury to personal property, and one year after accrual of a cause of action for claims relating to any other cause of action, against the public entity.

323.   As a result of the CITY's coverup, Mr. Jones lacked sufficient knowledge of his claims against the CITY within the time permitted to investigate and timely present a claim under section 911.2(a).  In fact, as noted earlier,

116

**COMPLAINT**

1   Mr. Jones's Government Claim was denied by the CITY, in part, as untimely.

2   **G.   Mr. Jones Would Have Been Entitled to Substantial Relief Against**

3   **Paradis and the CITY.**

4   324.   If Mr. Jones had not been prevented by the CITY's cover up from

5   timely bringing his claims against Paradis and the CITY, he would have been

6   entitled to the following relief:

7   (a)   Disgorgement of Paradis's illicit profits obtained as a result of

8   being awarded the Paradis, Aventador and Ardent Contracts;

9   (b)   Compensatory and special damages;

10   (c)   An award of exemplary and punitive damages for his claims

11   against Paradis for breach of fiduciary duty, constructive fraud, promissory fraud,

12   intentional misrepresentation, concealment, conversion and violation of

13   section 3344(a);

14   (d)   Imposition of a constructive trust; and

15   (e)   Injunctive relief prohibiting Special Counsel and Class Counsel

16   from serving as counsel in *Jones v. City* and the LACAO from interfering with

17   Mr. Jones securing independent legal representation.

18   **H.   The CITY Deprived Mr. Jones of his Constitutional Right and**

19   **Privilege to Access the Courts.**

20   325.   The CITY's actions in wrongfully preventing Mr. Jones from bringing

21   his claims against Paradis and the CITY were under color of state law, and deprived

22   Mr. Jones of his right and privilege under the United States Constitution and the

23   laws of the United States to access the courts, in violation of Title 42, United States

24   Code, section 1983.

25   326.   As a direct and proximate result of this civil rights violation, Mr. Jones

26   has been damaged in an amount to be determined at trial.

27   / / /

28   / / /

**COMPLAINT**

428224.23

**SECOND CAUSE OF ACTION**

**(For Violation of California Code of Civil Procedure section 526a)**

**(Against All DEFENDANTS)**

327.   Plaintiff repeats and realleges paragraphs 1 through 326 of this Complaint as if fully alleged herein.

328.   California law authorizes taxpayers to sue to restrain and prevent illegal or wasteful governmental expenditures.  California Code of Civil Procedure section 526a(a) ("section 526a(a)") provides: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a local agency, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a resident therein, or by a corporation, who is assessed for and is liable to pay, or within one year before the commencement of the action, has paid, a tax that funds the local agency . . . ."

329.   The California Supreme Court has held that a plaintiff in a taxpayer action brought under section 526a(a) can seek repayment from local officials of illegal and/or wasteful expenditures of taxpayer funds, where the local officials were responsible for those expenditures.  *See Stanson v. Mott*, 17 Cal. 3d 206, 222-27 (1976).

330.   Within one year of the commencement of this action, Mr. Jones has been assessed and has paid, or is liable to pay, taxes that fund the CITY, including income tax and sales tax.

331.   FEUER, CLARK and PETERS have caused the CITY to illegally expend and waste millions of dollars in taxpayer funds for no other purpose than to conceal and cover up their wrongful and actionable conduct relating to the *City v. PwC* and *Jones v. City* cases, in violation of their legal and ethical duties as CITY officials and employees to act in the best interests of the CITY and to avoid putting their own interests ahead of those of the CITY.  In particular:

118

**COMPLAINT**

(a)     They caused the CITY to illegally expend and waste $176,195 by paying Pansky to prepare a false, misleading, biased and entirely unnecessary ethics report to falsely exonerate themselves of wrongdoing and ethical violations in the *Jones v. City* and *City v. PwC* cases;

(b)     They engaged in, and caused other LACAO attorneys to engage in, serious and pervasive discovery abuses in *City v. PwC*, as more fully described in the Statement of Facts, which ultimately resulted in an award of $2.5 million in sanctions against the CITY, and which was entirely avoidable if they had (i) heeded Liner's warnings, followed its advice and permitted it to perform the legal services for which it had been retained; (ii) monitored and supervised Special Counsel in the manner required by the California Supreme Court's decision in the *Atlantic Richfield* case; and (iii) directed and ensured that the LACAO attorneys handling the *City v. PwC* and *Jones v. City* cases abided by the California Discovery Act, the State Bar Act, the California Rules of Professional Conduct and Judge Berle's orders; and

(c)     They caused the CITY to incur $147,036 in attorney's fees in unsuccessfully opposing PwC's motion for sanctions, not only knowing that the LACAO had engaged in egregious and sanctionable misconduct during the discovery process in the *City v. PwC* case, but that they themselves had engaged in and directed that very misconduct, including, in the case of CLARK and PETERS, making false and misleading statements under oath and suppressing and destroying evidence, and that there was no substantial justification for such misconduct.

332.   These constitute illegal and wasted expenditures of public funds belonging to the CITY within the meaning of section 526a(a), and have resulted in injury to the public fisc.

/ / /

/ / /

/ / /

**COMPLAINT**

428224.23

1

**PRAYER FOR RELIEF**

2   Wherefore, Plaintiff prays for judgment as follows:

3 **As to the First Cause of Action for Violation of Title 42, United States Code,**

4 **Section 1983 Against the CITY:**

5   1.  For compensatory and special damages; and

6   2.  For attorney's fees, including expert fees, pursuant to Title 42,

7 United States Code, section 1988(b) and (c).

8 **As to the Second Cause of Action for Violation of California Code of Civil**

9 **Procedure section 526a Against All DEFENDANTS:**

10   1.  For an injunction enjoining the CITY from making any further

11 payments to conceal and cover up the misconduct described in this Complaint;

12   2.  For damages on behalf of the CITY;

13   3.  For an order finding and declaring that (a) the CITY's $176,195 in

14 payments to Pansky, (b) the serious and pervasive discovery abuses in *City v. PwC*,

15 resulting in Judge Berle awarding $2.5 million in sanctions against the CITY, and

16 (c) the payment of $147,036 in attorney's fees by the CITY to unsuccessfully

17 oppose PwC's motion for sanctions, constituted illegal and wasteful expenditures of

18 public funds within the meaning of section 526a(a);

19   4.  For a further order declaring FEUER, CLARK and PETERS jointly

20 and severally liable to the CITY to reimburse it for these illegal and wasteful

21 expenditures of public funds; and

22   5.  For attorney's fees pursuant to California Code of Civil Procedure

23 section 1021.5.

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

**COMPLAINT**

**For All Causes of Action:**

1.   For prejudgment interest at the maximum rate permitted by law and compounded to the extent permitted by law;

2.   For costs of suit; and

3.   For such other and further relief as the Court may deem just and proper.

DATED:  December 21, 2020          **ISAACS | FRIEDBERG LLP**

_____
Jeffrey B. Isaacs, Esq.
Jerome H. Friedberg, Esq.
Adam Kargman, Esq.
*Attorneys for Plaintiff Antwon Jones*

**COMPLAINT**

428224.23

## **DEMAND FOR JURY TRIAL**

Plaintiff Antwon Jones hereby demands a jury trial on all issues properly triable to a jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED:  December 21, 2020                    **ISAACS | FRIEDBERG LLP**

Jeffrey B. Isaacs, Esq.
Jerome H. Friedberg, Esq.
Adam Kargman, Esq.
*Attorneys for Plaintiff Antwon Jones*

**COMPLAINT**

428224.23